1  TERRENCE P. McMAHON (SBN: 71910)
   tmcmahon@mwe.com
2  DAVID H. DOLKAS (SBN: 111080)
   ddolkas@mwe.com
3  VERA M. ELSON (SBN: 156327)
   velson@mwe.com
4
5  McDERMOTT WILL & EMERY LLP
   275 Middlefield Road, Suite 100
6  Menlo Park, CA  94024-4004
   Telephone:    +1 650 815 7400
7  Facsimile:    +1 650 815 7401

8  Attorneys for Defendants and Counterclaimants
   PRIMARION, INC., INFINEON TECHNOLOGIES
9  NORTH AMERICA CORP., and INFINEON
   TECHNOLOGIES AG

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

15  VOLTERRA SEMICONDUCTOR              CASE NO.  C 08-05129 JCS
    CORPORATION,
16                                      **PRIMARION, INC., INFINEON**
              Plaintiff,                **TECHNOLOGIES NORTH AMERICA**
17                                      **CORP., AND INFINEON TECHNOLOGIES**
         v.                             **AG'S OPPOSITION AND MEMORANDUM**
18                                      **OF LAW IN SUPPORT OF THEIR**
    PRIMARION, INC., a Delaware         **OPPOSITION TO PLAINTIFF'S MOTION**
19  Corporation, INFINEON               **FOR PARTIAL SUMMARY JUDGMENT**
    TECHNOLOGIES AG, a German           **OF INFRINGEMENT**
20  Corporation, and INFINEON
    TECHNOLOGIES NORTH AMERICA          **Date:            September 25, 2009**
21  CORPORATION, a Delaware Corporation **Time:            9:30 a.m.**
                                        **Dept.:           Courtroom A, 15th Floor**
22            Defendants.               **Before:          Honorable Joseph C. Spero**
                                        **Complaint Filed: November 12, 2008**
23                                      **Trial Date:      None**

24  AND RELATED COUNTERCLAIMS.

25
                  **CONTAINS HIGHLY-CONFIDENTIAL INFORMATION**
26              **AND PARTIALLY FILED UNDER SEAL PURSUANT TO THE**
                   **PROTECTIVE ORDER ENTERED ON MAY 5, 2009**
27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND STATEMENT OF THE ISSUES ................................. 1

    A. Issues To Be Decided ................................. 1

    B. State of the Art ................................. 1

    C. The Accused Products ................................. 1

II. LEGAL STANDARD FOR SUMMARY JUDGMENT ................................. 1

III. THE CLAIM TERM "POWER SWITCH" IS INDEFINITE ................................. 2

    A. Does the Term "Power Switch" Mean Both Switches? ................................. 4

    B. Does the Term "Power Switch" Mean a Single Switch? ................................. 5

IV. THERE ARE GENUINE ISSUES OF MATERIAL FACT AND NO REASONABLE JURY COULD FIND FOR VOLTERRA ON THE ISSUE OF INFRINGEMENT ................................. 7

REDACT

**REDACTED**

       1. Claim Construction ................................. 7

       2. Non-Infringement ................................. 9

REDAC

**REDACTED**

       1. Claim Construction ................................. 10

       2. Non-Infringement ................................. 12

REDAC

**REDACTED**

       1. Claim Construction ................................. 13

       2. Non-Infringement ................................. 16

REDACT

**REDACTED**

       1. Claim Construction ................................. 17

       2. Non-Infringement ................................. 19

REDA
.

**REDACTED**

       1. Claim Construction ................................. 21

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

DEFENDANTS' OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT

- i -

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

**TABLE OF CONTENTS**
(continued)

Page

a.    Volterra Is Presumptively Estopped From Asserting Any Range of Equivalents Beyond the Literal "a" "b" "a" "b" Alternating Pattern of Doped Regions ........................................... 23

2.    Non-Infringement ........................................................................... 25

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

DEFENDANTS' OPPOSITION AND MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL          - ii -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)..................................................................................... 15

*Blakenhorn v. City of Orange*,
485 F.3d 463 (9th Cir. 2007)......................................................................................... 2

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)....................................................................................... 3

*Chimie v. PPG Indus., Inc.*,
402 F.3d 1371 (2005)............................................................................................... 8, 14

*Competitive Techs. v. Fujitsu Ltd.*,
286 F. Supp. 2d 1161 (N.D. Cal. 2003) ........................................................................ 2

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005)..................................................................................... 2

*Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*,
347 F.3d 1314 (Fed. Cir. 2003)................................................................................... 23

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004)................................................................................... 19

*Exxon Research & Eng'r Co. v. U.S.*,
265 F.3d 1371 (Fed. Cir. 2001)..................................................................................... 2

*Felix v. Am. Honda Motor Co.*,
562 F.3d 1167 (Fed. Cir. 2009)............................................................................. 23, 24

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki*,
535 U.S. 722 (2002).............................................................................................. 23, 24

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*,
356 F.3d 1348 (Fed. Cir. 2004)................................................................................... 23

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008)..................................................................................... 2

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
370 F.3d 1131 (Fed. Cir. 2004) (en banc) .................................................................. 23

*Houghton v. South*,
965 F.2d 1532 (9th Cir. 1992).................................................................................. 1, 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................................................... 2

*Phillips v. AWH Corp.*,

DEFENDANTS' OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL                    - i -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

**TABLE OF AUTHORITIES**
(continued)

Page

415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................. 8, 11, 12, 14

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004) ................................................................ 3

*Research Plastics, Inc. v. Fed. Packaging Corp.*,
   421 F.3d 1290 (Fed. Cir. 2005) ................................................................ 3

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
   563 F.3d 1358 (Fed. Cir. 2009) ................................................................ 2

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001) ................................................................ 3

*Rodriguez v. City of N.Y.*,
   72 F.3d 1051 (2d Cir. 1995) ................................................................... 2

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) .............................................................. 19

**FEDERAL STATUTES**

35 U.S.C. §112, ¶ 2 ......................................................................... 1, 2, 7

Fed. R. Civ. P. 56(c) ........................................................................ 1

**TREATISES**

Wm. Moore *et al.*, Moore's Federal Practice
   §§ 56.03[4], 56.11[1][b], (2009) ............................................................. 1

McDermott Will & Emery LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL          - ii -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

I.   **INTRODUCTION AND STATEMENT OF THE ISSUES**

    A.   **Issues To Be Decided**

The issues include: (i) whether the three claims that are the subject of Volterra's motion[1] are indefinite under 35 U.S.C. §112, ¶ 2; (ii) the construction of certain key claim terms and phrases; and (iii) whether there are genuine issues of material fact that mandate denial of Volterra's motion for summary judgment.

    B.   **State of the Art**

*See* the expert report of defendants' expert, Dr. R. Jacob Baker, Ex. 1 ("Baker Rpt."), ¶¶ 24-36.[2]  By way of background, Dr. Baker describes the state of the art as of the alleged date of invention from the perspective of the hypothetical person of ordinary skill in the art.

    C.   **The Accused Products**

*See* Baker Rpt. ¶¶ 149-53.  Dr. Baker provides a description of the relevant aspects of the accused products:   <span style="color:red">REDACTED</span>   products.  Defendants cite generally to Dr. Baker's Report in support of this Opposition.[3]

II.   **LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where the plaintiff moves on a claim on which it bears the burden at trial, "it must show not only a lack of material factual dispute but also that under the undisputed facts no reasonable judge or jury could find against [it]."  Wm. Moore *et al*., Moore's Federal Practice § 56.11[1][b] (2009); *id.* § 56.03[4] ("[S]ummary judgment for claimants is relatively rare."); *see also Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) ("Where, as here, the *moving party* bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went

---

[1] Volterra asserts claim 34 of the '264 patent, and claims 18 and 19 of the '522 patent (collectively, the "Asserted Claims"; and as to the patents, collectively, the "Burstein patents").
[2] "Ex." refers to exhibits attached to the Declaration of Vanessa Lefort in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment of Infringement, filed herewith.
[3] Defendants reserve the right to make additional arguments related to claim construction, indefiniteness, and non-infringement as the case progresses.

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL                    - 1 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  uncontroverted at trial."); *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In

2  determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities

3  and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v.*

4  *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If a rational trier of fact might resolve the issue

5  in favor of the nonmoving party, summary judgment must be denied." *Blakenhorn v. City of*

6  *Orange*, 485 F.3d 463, 470 (9th Cir. 2007). Notably, Volterra cites to only one case in which

7  summary judgment of infringement was granted—but in that case, unlike here, the accused

8  infringer apparently "concede[d] that its product included all of the limitations of claim 22."

9  *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369-70 (Fed. Cir. 2009).

10  ### III.    THE CLAIM TERM "POWER SWITCH" IS INDEFINITE

11       Indefiniteness is a question of law properly decided during claim construction. *Exxon*

12  *Research & Eng'r Co. v. U.S.*, 265 F.3d 1371, 1376 (Fed. Cir. 2001). None of the Asserted

13  Claims can be properly or fully construed because a key limitation of all three Asserted Claims is

14  indefinite and, therefore, not subject to construction. In particular, the term "power switch" is

15  indefinite. Baker Rpt. ¶¶ 44-58 (opining that one of ordinary skill would find the term "power

16  switch" is indefinite and setting out all the factual support in the intrinsic evidence in support of

17  that opinion). To be valid, a claim must be definite. 35 U.S.C. § 112, ¶ 2; *Halliburton Energy*

18  *Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("Because claims delineate the

19  patentee's right to exclude, . . . the scope of the claims [must] be sufficiently definite to inform

20  the public of the bounds of the protected invention, i.e., what subject matter is covered by the

21  exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the

22  public notice function of patent claims."). A claim is indefinite where "a skilled artisan could not

23  discern the boundaries of the claim based on the claim language, the specification, and the

24  prosecution history, as well as her knowledge of the relevant art area." *Id.* at 1249-50. Claims

25  that are "insolubly ambiguous," for which "reasonable efforts at claim construction prove futile,"

26  are indefinite. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005);

27  *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1161, 1167 (N.D. Cal. 2003) (J. Spero).

28  Indefiniteness must be shown by clear and convincing evidence. *Datamize*, 417 F.3d at 1348.

DEFENDANTS OPPOSITION AND MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL        - 2 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

The term "power switch" is a limitation of **all** three Asserted Claims. Moreover, the indefiniteness of the term "power switch" applies with equal force to all the Asserted Claims. "[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims in the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *see also Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005) ("claim terms are presumed to be used consistently throughout the patent").

The '522 patent is a continuation of the '264 patent. Asserted claim 19 of the '522 patent depends on asserted claim 18, which depends on claim 17, which in turn depends on independent claim 9. The term "power switch" appears three times in the body of claim 9. Claim 18 also independently recites "power switch." In the '264 patent, asserted claim 34 depends on independent claim 26. The term "power switch" appears in the preamble of claim 26. A preamble term is construed as a limitation "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). "[W]hen reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation." *Id.*; *see also Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004). A preamble term is limiting when the "specification is replete with references to the invention as [including the preamble term]." *Id.*

The '264 patent is replete with references to the term "power switch." The term appears twice in the Abstract, and nineteen times in the Summary of the invention alone. The term appears either in the preamble or body of all forty-three claims of the '264 patent. The "power switch" is also illustrated in the figures. For example, in FIG. 1 it is shown as the two switches 30 and 32 within the dashed box labeled 16. *See* Ex. 3 at 4:62-5:10 ('264 patent) ("switching circuit 16 which serves as a power switch").[4] FIG. 3A "is a schematic plan view of a **power switch** fabricated on a flip-chip according to the invention." 4:26-27 (emphasis added). Thus, the term "power switch" is fundamental to any understanding of the purported invention and

---

[4] All further references to the column and line numbers of the specification of the '264 patent, Ex. 3, shall be in the following format: xx:yy-zz. All references to figures as "FIG. XX" shall mean the figures of the '264 patent, Ex. 3, unless stated otherwise.

DEFENDANTS OPPOSITION AND MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT

\- 3 -

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  should be determined to be a limitation of claim 26.   REDACTED            .  Ex.

2  37 at 93:7-15; 94:10-14; 95:6-13; 95:17-96:18; 97:4-25, and *generally* 89:9-97:25 (REDACTED

3                                                                                                    ).

4  The indefiniteness arises because the term "power switch" has two irreconcilable potential

5  meanings.  Sometimes within the written description of the asserted patents, the term "power

6  switch" refers to a circuit with **two switches** (*i.e.*, the combination of a high-side switch, shown

7  as transistor 30 in FIG. 1, and a low-side switch, shown as transistor 32 in FIG. 1); *see also* Ex.

8  40 at B002, B003a  (graphics).[5]  In other places, the written description (*i.e.*, specification)

9  describes the "power switch" as constituting only **one switch** (*i.e.*, either a high-side switch or a

10 low-side switch, but not both).  *See e.g.*, 2:37-40.  These two inconsistent meanings within the

11 same context of the specification and claims cannot coexist.

**A.**    **Does the Term "Power Switch" Mean Both Switches?**

13          The bulk of the '264 patent's disclosures support the construction of "power switch" as

14 the combination of both a high-side switch and a low-side switch.  For example, claim 35 recites

15 in pertinent part (emphasis added):

16          A **power switch** for a voltage regulator having an input terminal and an output
           terminal, comprising:

17          **a PMOS switch** fabricated on a chip with a first alternating pattern of source pads
18          and drain pads;

19          **an NMOS switch** fabricated on the chip with a second alternating pattern of source
           pads and drain pads; . . . .

20 The PMOS switch is the high-side switch of the preferred embodiment, and the NMOS switch is

21 the low-side switch of the preferred embodiment.  5:6-9; Ex. 40 at B003.  Claim 35 thus supports

22 only one interpretation; namely, that the "power switch" is the combination of both a high-side

23 switch and a low-side switch.

24          At 3:16-21, the specification states (emphasis added):

25          The **power switch** has **a PMOS switch** fabricated on a chip with a first alternating
           pattern of source pads and drain pads, **an NMOS switch**  fabricated on the chip with
26          a second alternating pattern of source pads and drain pads, . . . .

27 ───────────────────
[5] Defendants' graphics, Ex. 40, are identified with unique identifiers in the lower right-hand
28 corner of each slide, *e.g.*, B002.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1   *See also* 2:16-20, 4:62-65 and 5:65-67.

2   **B.   Does the Term "Power Switch" Mean a Single Switch?**

3   The specification also supports an understanding of "power switch" as meaning either the

4   low-side switch or the high-side switch, but not both.  *See, e.g.,* 2:37-40 ("The first power switch

5   may include a distributed array of PMOS transistors [high-side switch] and the second power

6   switch may include a distributed array of NMOS transistors [low-side switch].").  There is no

7   support in the specification for the use of four switches to regulate the output voltage, therefore,

8   the above description in the specification could only mean that each power switch only consists of

9   a single switch.

10   In claims 1, 12, and 14 of the '264 patent, for example, the two inconsistent and

11   competing definitions of "power switch" clash head on.  Claim 1 recites a voltage regulator

12   comprising a "first power switch" that has both a high-side and a low-side switch.  9:27-30

13   ("[T]he first power switch includes a plurality of p+ regions fabricated in the n-type region in a

14   first array [high-side switch], and a plurality of n+ regions fabricated in the p-type region in a

15   second array [low-side switch] . . . .").  One of ordinary skill would understand this language to

16   mean that the power switch consists of both switches.  Baker Rpt. ¶ 53.  Claim 12, however, adds

17   a "second power switch" to the voltage regulator of claim 11, which depends on claim 1.

18   Because there is no support in the specification for four switches, dependent claim 12 must be

19   using the term "power switch" to mean a single switch.  *Id.*  Claim 14, which depends on claim

20   12, likewise uses the term "power switch" in a manner inconsistent with claim 1 to mean a single

21   switch.  There is no construction of "power switch" that would render claims 1, 12, and 14

22   internally consistent.  *Id.* at ¶ 55.

23   Claim 26 is simply ambiguous and could conceivably have either meaning.  Whether the

24   "power switch" covers a single switch, or both switches, is critical in assessing the issues of

25   infringement and invalidity—*Is it sufficient to find one integrated switch to invalidate the claims,*

26   *or is it necessary to find both switches integrated onto the same chip*?  Dr. Baker opines that a

27   person of ordinary skill could not ascertain the scope of what is claimed by the term "power

28   switch."  Baker Rpt. ¶¶ 46, 52.  Volterra's expert, Dr. Szepesi, offered no opinion in his July 10th

1   report regarding the construction of "power switch."[6]  Nor did Dr. Szepesi address the internal

2   inconsistencies regarding the term "power switch," even though Volterra was on notice that

3   defendants contended the term is indefinite in their invalidity contentions served on July 6, 2009.

4        Notably, Volterra itself has taken inconsistent positions with the Court regarding the scope

5   of its purported inventions.  In no less than three filings with the Court, Volterra has represented

6   that Volterra's migration to a "fully integrated" power stage (*i.e.*, with both switches integrated

7   onto the chip) is at the heart of their patented invention, and offers advantages in size, efficiency

8   and cost – in contrast to the "discrete solution" offered by others (*i.e.*, only the single high side

9   switch on the integrated circuit and connected to a separate, discrete low-side switch):

> The alternative to Volterra's pioneering technology that provides for **integrating the power switches** and other circuitry **in a single IC**, offered by each of Volterra's competitors (including Defendants . . . ) are so-called **'discrete solutions,'** i.e., voltage regulators where each of the high power switches and their driver are provided as ***separate*** **IC chips**.

13  Dkt. No. 31 at 2-3 (emphasis added).  Volterra has repeatedly alleged that Primarion's move to a

14  fully integrated power stage is, therefore, evidence of copying of the claimed invention.  Yet

15  Volterra's expert, Dr. Szepesi, does not offer any opinion to support Volterra's story. REDACTED

16

17

18

19

20

21        REDACTED             are at odds with the bulk

22  of the specification and figures, which teach that the power switch of the integrated circuit chip

23  consists of both switches.     REDACTED   also directly at odds with Volterra's

24  repeated refrain to the Court that Volterra's key technological contribution was to move away

25  from a "discrete solution," to a solution that integrates both switches onto a single chip.  *See, e.g.*,

26

---

27  [6] All references to "Szepesi Rpt." refer to the Report of Dr. Thomas Szepesi, Volterra's expert,
    attached as Ex. E to the Combined Decl. of Jeffrey M. Fisher ISO Volterra Semiconductor

28  Corporation's Motions for Summary Judgment and Preliminary Injunction.

**DEFENDANTS OPPOSITION AND  MP&A ISO**
**THEIR OPPOSITION TO MOTION FOR PARTIAL**       - 6 -
**SUMMARY JUDGMENT OF INFRINGEMENT**

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –**
**OUTSIDE COUNSEL ONLY**

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

Dkt. Nos. 31 at 2-3, 72 at 2.  In his report, Dr. Szepesi offered no construction for "power

switch."  When asked at his deposition, he stated that                    REDACTED

                                                            Ex. 37 at 107:25-108:11; 109:2-

110:2,113:13-25, and *generally* 105:20-113:25.  His expansive reading, of course, fails to explain

how the term could have both meanings *in the same context*, such as in claims 1, 12, and 14 of the

'264 patent.  In sum, the term "power switch" should be held indefinite under 35 U.S.C. §112, ¶2.

**IV.    THERE ARE GENUINE ISSUES OF MATERIAL FACT AND NO REASONABLE
        JURY COULD FIND FOR VOLTERRA ON THE ISSUE OF INFRINGEMENT.**

The following chart gives an overview of the elements missing from the accused products,

        REDACTED            , for each of the Asserted Claims, including the claims on

which the Asserted Claims depend.



| | | '264 Patent | | '522 Patent | | | |
|---|---|---|---|---|---|---|---|
| MISSING ELEMENTS ↓ | CLAIMS → | 26 | 34 | 9 | 17 | 18 | 19 |
| REDACTED | | X | X | n/a | n/a | n/a | n/a |
| | | X | X | n/a | n/a | n/a | n/a |
| | | n/a | n/a | X | X | X | X |
| | | n/a | n/a | X | X | X | X |
| | | X | X | X | X | X | X |

**X** = missing element
n/a = not applicable, claim element not in that claim

REDACT                                    REDACTED

**1.    Claim Construction**

Claim 26 of the '264 patent recites in part: "an array of metalized pads fabricated on a

surface of the substrate."  Defendants construe "metalized pads" as follows:

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

> **"metalized pads"**: *an array of "metalized pads" wherein each pad in the array consists of: (i) an individual and distinct raised island of metal separated a fixed distance from the other metalized pads; (ii) a passivation layer that lies partially over the island of metal; and (iii) an under-bump metal (UBM) that partially overlays both the island of metal and the passivation layer.*

Dr. Baker provides an in-depth analysis of the intrinsic and extrinsic evidence supporting defendants' construction in his report. Baker Rpt. ¶¶ 110-17. The term "metalized pad" was not a common term of art to one of ordinary skill. Baker Rpt. ¶ 111. Thus, a person of ordinary skill would have looked to the specification to understand the term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc) ("[T]he specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.") (internal quotation marks omitted). Although Dr. Szepesi does provide <span style="color:red">REDACTED</span>," he provides no opinion or indication in his report that his opinions are from the standpoint of one of ordinary skill; nor did he provide an opinion in his report defining the appropriate level of skill in the art. Szepesi Rpt. ¶ 62.[7] *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1378 (2005) ("[I]nterpreting claim language in light of the specification is proper when a term is so amorphous that one of skill in the art can only reconcile the claim language with the inventor's disclosure by recourse to the specification." (internal quotation marks omitted)).

FIGs. 4A and 4B disclose what the claims mean by the term "metalized pad." At 4:33-35, the specification states that "FIG. 4A is a schematic side view of **a pad** from the flip-chip of FIG. 3A."



*See also* FIG. 4B. At 6:66-7:13, the specification states (emphasis added):

> Each row of drain or source pads 70, 72, 74, 76 may contain a number of **individual pads**, e.g., four pads (as shown in FIG. 3A) to six pad (as shown in FIG. 3B). The **center-to-center distance between each pad** in a row may be about 300 microns,

---

[7]                              <span style="color:red">REDACTED</span>

*Compare* Ex. 37 at 53:5-15, 60:13-61:1, 61:23-62:3, *with* Ex. 37 at 217:19-219:15. *See also generally* Ex. 37 at 51:22-62:6.

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL                    - 8 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

and the center-to-center distance between each row of pads may be about 250 microns. **As shown in FIG. 4A, each pad includes a final metal layer 80, such as aluminum, a nitride passivation layer 82, and an under-bump metalization (UBM) layer 84.** As shown in FIG. 4B, although the pads are  illustrated in FIG. 3 as square, each pad may be octagonal, or some other shape that is appropriate to maximize circuit performance for a particular application. The UBM layer 84 can have an edge-to-edge distance of about 100 microns, and **the final metal layer 80 can having an edge-to-edge distance of about 115 microns**.

In his report, Dr. Szepesi never opines that one of ordinary skill would have understood the term "metalized pad" outside the context of the patent.   <span style="color:red">REDACTED</span>

Ex. 37 at 187:14-22, 191:9-15, 185:12-19, and *generally* 179:1-191:25.

    **2.**     **Non-Infringement**

<span style="color:red">REDACTED</span>

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL    - 9 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

REDACTED

# REDACTED

REDACTED

REDACTED

REDAC

### 1.  Claim Construction

Claim 26 of the '264 patent recites in part: "an array of metalized pads fabricated on a surface of the substrate."  Defendants construe "on a surface of the substrate" as follows:

> **"substrate" [1]**: *the base layer of an integrated circuit chip that contains the doped regions, and above which are deposited additional layers, such as metal and insulators, to form the whole integrated circuit chip.*
> **"fabricated on a surface of the substrate"**: *formed directly upon the base layer of the integrated circuit chip.*

Dr. Baker provides a full analysis of the intrinsic and extrinsic evidence supporting defendants' constructions of "substrate" in his report.  Baker Rpt. ¶¶ 61-68, 118-21.  Dr. Szepesi offers no alternative construction of "substrate."  The Burstein patents use the term "substrate" in two different contexts.  Unlike for the term "power switch," for "substrate" the appropriate

DEFENDANTS OPPOSITION AND MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL              - 10 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   meaning can be ascertained from the context in which the term is used in the claims. The first

2   meaning of "substrate," labeled [1] below, relates to a particular layer within an integrated circuit

3   chip, and is recited in all three Asserted Claims. The second meaning of "substrate," labeled [2]

4   below, relates to a separate structure external to the integrated circuit chip and upon which the

5   chip may be mounted for packaging. It is the absence of this packaging substrate in claim 9 (and

6   thus in claims 18 and 19) of the '522 patent that is significant, as discussed below.

7   　　　　**"substrate" [1]**: In the context of an IC chip, the Detailed Description of the specification

8   repeatedly describes the "substrate" as only the base or bottom layer of the chip that contains the

9   doped regions – and not as the sum of all of the layers of the chip. *See* 3:3-8, 6:3-8 ("doped

10  regions may be p+ regions **formed in an n-type well or substrate**" (emphasis added)); *see also*

11  Ex. 40 at B028. The "Detailed Description" of the patent at 6:9-13 states (emphasis added):

12  　　　　The IC chip can include two or more metalization layers, e.g., three layers, **formed
　　　　over the semiconductor substrate** to carry current from the doped regions to the
13  　　　　electrode pads **on the surface of the chip**.

14  and at 6:22-25:

15  　　　　Unillustrated metalization layers **formed over the semiconductor substrate** can
　　　　carry current from the doped regions to the electrode **pads on the surface of the
16  　　　　chip**.

17  Also at 6:26-28:

18  　　　　As shown in FIG. 3A, **on the surface of the chip, overlying the buried array of
　　　　distributed transistors, is an array of drain pads and source pads**.
19

20  The Summary at 2:54-55 does repeat the claim language, "metalized pads fabricated on a surface

21  of the substrate," but a person of ordinary skill in the art would have read the entirety of the

22  patents, including the Detailed Description where "substrate" is repeatedly described as the base

23  layer of the IC chip. *See Phillips*, 415 F.3d at 1315 ("[A] person of ordinary skill in the art is

24  deemed to read the claim term . . . in the context of the entire patent . . . ."). A person of ordinary

25  skill would have understood the substrate of the integrated circuit chip to mean the base layer

26  containing the doped regions, and not the additional layers, such as metal and insulators deposited

27  on top of the substrate to form the entire chip. Technical references, such as Dr. Baker's 1998

28  textbook, "CMOS Circuit Design Layout and Simulations," describe an IC chip as having a

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

DEFENDANTS OPPOSITION AND MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL　　　　- 11 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

1    substrate or base layer, followed by multiple layers of insulators and metal.  Ex. 22 at

2    PRIMC00000178; Baker Rpt. ¶ 68.

3        **"fabricated on a surface of the substrate"**:  Consistent with the understanding that the

4    "substrate" is the base layer of the IC chip that contains the doped regions, the specification of the

5    '264 patent repeatedly distinguishes the "surface of the substrate" from a "surface of the chip."

6    This can be seen in the quotes set out above from the specification at 6:9-13, 6:22-2, 6:26-28

7    (repeatedly making reference to pads as "**on the surface of the chip**," as opposed to additional

8    metal layers "**formed over the semiconductor substrate**").  For example, in the preferred

9    embodiment, current flows from the doped regions of the substrate, up through the metal layers,

10   and on up to the "electrode pads" that lie "on the surface of the chip."  6:22-25.

11       Besides the specification, one of ordinary skill in the art also looks to "[o]ther claims . . . ,

12   both asserted and unasserted, . . . [as] valuable sources of enlightenment as to the meaning of a

13   claim term."  *Phillips*, 415 F.3d at 1314.  Here, asserted claim 34, which depends on claim 26,

14   recites "solder balls across **a surface of the chip**."  Thus, within the same family of claims, the

15   patentee knew how to differentiate between a structure on the surface of the chip, as opposed to

16   on the surface of the substrate.  In sum, one of ordinary skill in the art reviewing the patent as a

17   whole would have concluded that claim 26 means what is says, *i.e.*, "metalized pads **on a surface**

18   **of the substrate**."  Dr. Szepesi offers no competing construction.  To the extent that Volterra

19   implicitly construes "substrate" as the entire chip (otherwise it could not read claim 26 on the

20   accused products), Volterra's position contradicts both the intrinsic and extrinsic evidence.

21       **2.    Non-Infringement**

22                                   <span style="color:red">REDACTED</span>

23

24

25

26

27

28

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL                                 - 12 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –**
**OUTSIDE COUNSEL ONLY**

<span style="color:red">REDACTED</span>

<span style="color:red">REDACT</span>

<span style="color:red">REDACTED</span>

### 1.    Claim Construction

Claim 9 of the '522 patent recites in part: "**a first flip-chip type integrated circuit chip mounted on** the **printed circuit board**" (emphasis added).  Defendants construe the bolded terms, as well as **"substrate" [2]** as follows:

---

**"substrate" [2]**: *a planar structure disposed between the integrated circuit chip and the printed circuit board that includes a first signal layer on the top surface facing the integrated circuit chip, and a second signal layer on the bottom surface facing the printed circuit board.*

**"printed circuit board"**: *a board for mounting of typically numerous components on which most connections are made by printed circuitry, such as the motherboard of a computer.*

**"a first flip-chip type integrated circuit chip"**: *an integrated circuit chip (a.k.a. a die) oriented such that its external connection points are facing the structure upon which it is being mounted (a.k.a. a flip-chip configuration).*

**"mounted on"**: *directly placed and soldered onto.*

---

An understanding of the first three terms above is helpful for understanding why the "mounted on" limitation is not met by the accused products.  We first consider the second meaning of **"substrate" [2]**. Baker Rpt. ¶¶ 69-75. Dr. Szepesi offers no competing construction of "substrate."  In the context of packaging, "substrate" refers to the planar structure (44) in FIG. 2.  The integrated circuit chip (42) is flipped upside down (solder balls (56) down) and mounted onto the "substrate" (44).  Together, the flipped IC chip and the "substrate" form the "flip-chip package" (40).  5:46-49; Ex. 40 at B013.

FIG. 2 shows that the "flip-chip package" is mounted on a printed circuit board ("PCB") (46).  5:46-50; *see also* Abstract ( "A voltage regulator . . . has a printed circuit board, a substrate mounted on the printed circuit board, and a first-flip chip type integrated circuit mounted on the substrate.").  The specification also repeatedly explains that the "substrate" has signal layers on the top and bottom, and is fundamentally used to connect signals on the chip to corresponding

MᶜDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
Aᴛᴛᴏʀɴᴇʏs Aᴛ Lᴀᴡ
Mᴇɴʟᴏ Pᴀʀᴋ

1   terminals on the printed circuit board.  7:14-15 ("As previously discussed, the substrate 44

2   transfers signals from the chip 42 to the printed circuit board 46."); FIGs. 5, 7 (showing the top

3   and bottom of the surfaces of the substrate as signal layers).  One of ordinary skill would also

4   have understood that independent claims 1, 35, and 43 of the '264 patent use the term "substrate"

5   to refer to the planar structure (44) in FIG. 2.

6        **"printed circuit board"**: for this likely non-controversial term, Defendants refer the

7   Court to Dr. Baker's report at ¶¶ 124-25.  Dr. Szepesi offers no competing construction.

8        **"a first flip-chip type integrated circuit chip"**:  Defendants refer the Court to Dr.

9   Baker's report at ¶ 126 and Ex. 30, which provides supporting extrinsic evidence for defendants'

10  proposed construction.                    <span style="color:red">REDACTED</span>

11

12

13              which shows the chip mounted onto a packaging substrate (substrate 44), which in

14  turn is mounted onto the printed circuit board.  *Chimie*, 402 F.3d at1377 ("[A] construction that

15  would not read on the preferred embodiment . . . would rarely if ever be correct . . . .") (internal

16  quotation marks omitted).  Moreover, "mounted on" is a disputed term which itself requires

17  construction and so should not be included in another construction.

18       **"mounted on"**: for this term, "[o]ther claims of the patent in question, both asserted and

19  unasserted, . . . [are] valuable sources of enlightenment as to the meaning of the claim term."

20  *Phillips*, 415 F.3d at 1315.  Dr. Baker provides a full analysis of the proper construction of this

21  term in light of both intrinsic and extrinsic evidence, all from the standpoint of one of ordinary

22  skill.  Baker Rpt. ¶¶ 127-37.  Dr. Szepesi offers no competing construction in his report.

23       In light of claims 18, 19, 21, and 22 of the '264 patent, "mounted on" must mean *directly

24  placed and soldered onto*.[8]  Claim 18 of the '264 patent recites "[t]he voltage regulator of claim

25  17, wherein the inductor is **mounted on the substrate**," while claim 19 recites "[t]he voltage

26  regulator of claim 17, wherein the inductor is **mounted on the printed circuit board**" (emphasis

27  ────────────
[8] Although the term "mounted on" is a term of claim 9 of the '522 patent, the '522 is a

28  continuation of the '264.  The Burstein patents share a common specification, and it is appropriate
    to consider the claims of the '264 in construing the same term in the claims of the '522.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1   added).  Likewise, the specification expressly contemplates two mounting options for inductors.

2   OPTION 1: the inductor (34) is directly placed and soldered onto the substrate (44), as shown in

3   FIG. 2.  OPTION 2: the inductor (34) is directly placed and soldered onto the printed circuit

4   board (46), as shown in FIG. 9.  8:40-56.  Claim 18 of the '264 patent covers OPTION 1, while

5   claim 19 of the '264 patent covers OPTION 2.  Claims 21 and 22 of the '264 patent present the

6   same issue with respect to the capacitor (36).  8:64-67.  Volterra will try to argue that "mounted

7   on" an intervening structure, such as substrate, can mean *indirectly* mounted on the printed circuit

8   board.  But in light of the clear and unambiguous language of the claims, such as 18, 19, 21, and

9   22, Volterra's position would impermissibly render claims 19 and 22 superfluous.[9]  *See Bicon,*

10  *Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("Allowing a patentee to argue that

11  physical structures and characteristics specifically described in a claim are merely superfluous

12  would . . . leav[e] examiners and the public to guess about which language the drafter deems

13  necessary to his claimed invention and which language is merely superfluous, non-limiting

14  elaboration.  For that reason, claims are interpreted with an eye toward giving effect to all terms

15  in the claim.").  When questioned regarding claims 18, 19, 21, and 22 at his deposition, REDACTED

16

17                                                                  Ex. 37 at 198:10-199:25, 202:13-203:20, and

18  *generally* 196:1-204:15.  Defendants' construction, on the other hand, is consistent with all the

19  claims, as well as all other intrinsic and extrinsic evidence.

20          FIG. 2 and the specification provide further guidance.  FIG. 2 shows the preferred

21  embodiment of a "flip-chip package" (40), *i.e.*, a combination of the IC chip (42) mounted on

22  intervening substrate (44).  5:46-50.  The specification repeatedly distinguishes between the

23  integrated circuit chip "mounted on the substrate," and the substrate that is "mounted on the

24  printed circuit board."  *See, e.g.*, Abstract, 5:46-50.  In an alternate embodiment, the integrated

25  circuit chip is mounted directly on the printed circuit board.  8:15-19; FIGS. 8A-8G; *see also* Ex.

26  40 at B014, B015.  Thus, the Burstein patents expressly describe two distinct mounting options

---

27  [9] Alternatively, claims 18 and 21 of the '264 patent would be superfluous.  But neither scenario

28  where a claim is rendered superfluous is the correct one, particularly given that defendants'
    proposed construction would be consistent with all the claims, and the patent as well.

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT                - 15 -

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

1   for the integrated circuit chip.  <u>OPTION A</u>: the "flip-chip package," *i.e.*, the integrated circuit

2   chip is mounted on the substrate, which is in turn mounted on the printed circuit board.  5:46-50;

3   *see* Ex. 40 at B013.  <u>OPTION B</u>: the integrated circuit chip mounted directly onto the printed

4   circuit board with no intervening substrate.  8:15-16; *see* Ex. 40 at B014-B015.

5           The preferred embodiment of OPTION A is actually claimed in claim 1 of the '264 patent,

6   which recites: "a substrate **mounted on the printed circuit board**; a first-flip chip type

7   integrated circuit **mounted on the substrate**."  Claim 1 shows that the patentee knew to describe

8   the "package" embodiment.  The alternate embodiment of OPTION B, however, is claimed in

9   claim 9 of the '522 patent.  Claim 9 recites, "a first flip-chip type integrated circuit **chip mounted**

10  **on the printed circuit board**."  In light of the intrinsic evidence, including claims 18, 19, 21, and

11  22 of the '264 patent, a person of ordinary skill would have understood "mounted on" to mean

12  *directly placed and soldered onto*.  Accordingly, the phrase "a first flip-chip type integrated

13  circuit chip mounted on a printed circuit board" in claim 9 means that the flip-chip type integrated

14  circuit chip must be flipped over and *directly placed and soldered onto* the printed circuit board,

15  with no intervening structure, in order for this limitation to be met.

16          **2.      <u>Non-Infringement</u>**

17                          <span style="color:red">REDACTED</span>

18

19

20

21

22

23

24

25

26

27

28

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

# REDACTED

REDACT                          REDACTED

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

**1.    Claim Construction**

Claim 9 of the '522 patent recites in part: "a filter disposed to provide **a substantially DC voltage at the output terminal**; and a control circuit connected to the gate region to control the power switch to **maintain the DC voltage substantially constant**."  Defendants construe the bolded terms as follows.

> **"a substantially DC voltage at the output terminal"**: *a fixed and stable output voltage.*
>
> **"to maintain the DC voltage substantially constant"**: *to maintain a fixed and stable output voltage.*

Dr. Baker provides a full analysis of the intrinsic and extrinsic evidence supporting defendants' constructions of the above phrases in his report.  Baker Rpt. ¶¶ 141-48.  Dr. Szepesi offers no alternative construction of these phrases.  One of ordinary skill reading the Burstein patents would have understood the patents to be discussing the traditional switching voltage regulator that is designed to provide a fixed and stable DC (Direct Current) output voltage.  Such voltage regulators would have been referred to as "static" voltage regulators, as opposed to "dynamic" voltage regulators that can alter the voltage on-the-fly during operation.

At 1:9-10 (emphasis added), the specification states:

> Voltage regulators, such as DC to DC converters, are used to provide **stable** voltage sources for electronic systems.

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL          - 17 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

1   *See also* Abstract, 2:5-8 ("a substantially DC voltage"), 4:1-4, and 9:34-37.  In further discussing

2   the role of the output filter in providing a substantially DC voltage at the output, at 5:20-33

3   (emphasis added), the specification states:

4       The intermediate terminal 22 is coupled to the output terminal 24 by an output filter
        26. The output filter 26 converts the rectangular waveform of the intermediate voltage

5       at the intermediate terminal 22 into **a substantially DC output voltage** at the output
        terminal 24. . . .  The resulting output voltage Vout is **a substantially DC voltage**.

6

7   In discussing the role of the controller in maintaining a substantially DC voltage at the output, the

8   specification states at 5:38-46 (emphasis added):

9       The output voltage is regulated, or **maintained at a substantially constant level**, by
        a feedback loop in the controller assembly that includes a feedback circuit 28. The

10      feedback circuit 28 includes circuitry which measures the output voltage and/or the
        current passing through the output terminal.  The measured voltage and current are

11      used to control the pulse modulator 18 so that the output voltage at the output

12      terminal 24 **remains substantially constant**.

13                              REDACTED

14

15              Ex. 37 at 234:10-20.  Dr. Baker agrees.  Baker Rpt. ¶¶ 143, 147.  As an

16  example, if the nominal output voltage is 5 volts, then any ripples or variation between 5.25 volts

17  and 4.75 volts could reasonably be considered substantially constant.  *See also* Ex. 20 at

18  PRIMC00000142 (LM2650 datasheet, 1997).

19          The 1998 Dissertation by Dr. Anthony Stratakos, a founder and chief scientist at Volterra,

20  titled, "*High-Efficiency Low-Voltage DC-DC Conversion for Portable Applications*," addresses

21  the difference between the classic static voltage regulator described in the Burstein patents, and a

22  dynamic voltage regulator.  A pertinent passage in Dr. Stratakos' dissertation states:

23      To dynamically trade performance for decreased energy consumption at system run-
        time, a new type of DC-DC converter, called a *dynamic DC-DC converter* or *tracking*

24      *converter*, is required.  A dynamic DC-DC converter is quite different from a
        conventional **static** DC-DC converter.  Whereas a **static** DC-DC converter must

25      **maintain a substantially DC output**, a **dynamic** DC-DC converter must be capable
        of rapidly slewing its output.

26

27  Ex. 33 at PRIM00001837 (bold emphasis added).  The Stratakos dissertation refers to a DC-DC

28  converter, which one of ordinary skill would have understood to by synonymous with a switching

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT                - 18 -

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

1  voltage regulator.  *See, e.g.*, 1:13-15  ("Switching voltage regulators . . . are known to be an

2  efficient to [sic] type of DC to DC converter.").

3       **2.       Non-Infringement**

4                   REDACTED

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

<span style="color:red">REDACTED</span>

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

REDACTED

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL          - 20 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

REDAC

<div style="text-align:center; color:red;">REDACTED</div>

### 1. <u>Claim Construction</u>

The claimed "alternating pattern" of doped regions is a limitation of all three Asserted Claims. Claim 26 of the '264 patent recites in pertinent part (emphasis added):

> a substrate having **a first plurality of doped regions** and **a second plurality of doped regions**, the first and second pluralities of doped regions arranged in a first **alternating pattern**;

Similarly, claim 9 of the '522 patent recites in pertinent part (emphasis added):

> a chip substrate having **a first plurality of doped regions** and **a second plurality of doped regions**, the first plurality of doped regions and the second plurality of doped regions being arranged in an **alternating pattern**.

Defendants construe the bolded terms as follows:

---

**"doped region"**: *a region of the semiconductor substrate that contains either a p-type or n-type impurity that changes the electrical characteristic of the substrate.*

**"first plurality of doped regions"**: *a set of identical, repeated doped regions that collectively form a terminal of the device, e.g., the drain.*

*"**second plurality of doped regions**": a set of identical, repeated, doped regions that collectively form another terminal of a device, e.g., the source.*

*"**alternating pattern**" of doped regions: either (i) an "a" "b" "a" "b" pattern of parallel stripes, or (ii) a checkerboard pattern of rectangles.*

---

Dr. Baker provides a complete analysis of the intrinsic and extrinsic evidence supporting defendants' constructions of the above phrases in his report, including an analysis of the relevant passages of the '264 file history. Baker Rpt. ¶¶ 76-109. Dr. Szepesi offers no alternative construction of these phrases, and indeed <span style="color:red;">REDACTED</span>

<div style="text-align:center;">Ex. 37 at 260:25-261:22, 62:22-63:2, and <em>generally</em> 51:22-65:1.</div>

**"doped region"**: The specification states that the "first and second pluralities of doped regions may be p+ regions formed in an n-type well or substrate," or they "may be n+ regions formed in a p-type well or substrate." 3:3-8. The 1982 textbook titled "*Intuitive IC Electronics*" explains that in a semiconductor substrate, even "slight amounts of impurity doping" can cause "[v]ery dramatic changes . . . in electric conduction," and that "[t]wo types of dopant are possible" where one type of dopant is a donor that is "called N-type silicon" and the other type is

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT
- 21 -
CASE NO.: C 08-05129 JCS
<u>HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY</u>

an acceptor "called P-type silicon."  Ex. 23 at PRIMC00000190-91.  In light of the intrinsic and

extrinsic evidence, one of ordinary skill would have understood "doped regions" as construed by

Defendants.

**"first plurality of doped regions"** and **"second plurality of doped regions"**:  As shown

in FIG. 3B, the "first plurality of doped regions" refers to the doped regions that collectively form

the drain of the distributed transistor, and the "second plurality of doped regions" refers to the

doped regions that collectively form the sources of the distributed transistor, or vice versa.  The

specification states:

> At 3:3-4: "The first and second pluralities of doped regions may be p+ regions formed in
> an n-type well or substrate."

> At 3:6-8: "The first and second pluralities of doped regions may be n+ regions formed in a
> p-type well or substrate."

> At 6:3-8: "Specifically, the NMOS transistor 32 includes alternating stripes of n-doped
> source regions 60 and drain regions 62 in a p-type well or substrate. The PMOS transistor
> array 30 will be constructed similarly, with alternating stripes of p-doped source regions
> and drain regions in an n-type well or substrate."

**"alternating pattern" of doped regions**: a person of ordinary skill would have

understood the term "alternating pattern" of doped regions in the Asserted Claims to mean: *either*

*(i) an "a" "b" "a" "b" pattern of parallel stripes, or (i) a checkerboard pattern of rectangles*.

Those are the only two alternating patterns supported in the specification.[11]



---

[11] A second embodiment is shown in FIG. 3C as a checkerboard pattern.  In it, each row or
column likewise is an alternating "drain" "source" "drain" "source" pattern.  *See* Ex. 40 at B045.

<span style="color:red">REDACTED</span>

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT

- 22 -

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   As best illustrated on the rightmost figure of FIG. 3B of the patent, the "alternating pattern" is

2   made up of alternating stripes of drain regions (shown in green above) and source regions (shown

3   in pink above) in an alternating "drain" "source" "drain" "source" pattern.  The specification at

4   5:65-6:3 teaches that (emphasis added):

> As shown in FIG. 3A and 3B, each switch in the switching circuit 16 on IC chip 42 is
> fabricated as a distributed array of parallel transistors. **Each switch includes multiple**
> **doped regions arranged to form <u>parallel stripes,</u> and <u>alternating stripes are</u>**
> **<u>connected to form the source and drain regions of the distributed transistor</u>**.

### a.   <u>Volterra Is Presumptively Estopped From Asserting Any</u><br><u>Range of Equivalents Beyond the Literal "a" "b" "a" "b"</u><br><u>Alternating Pattern of Doped Regions.</u>

10   "[P]rosecution history estoppel may bar the patentee from asserting equivalents if the

11   scope of the claims has been narrowed by amendment during prosecution." *Honeywell Int'l Inc.*

12   *v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004) (en banc).  Under

13   amendment-based prosecution history estoppel, a narrowing amendment made to avoid prior art

14   creates a presumption that the patentee surrendered the territory between the original claim and

15   the amended claim.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki*, 535 U.S. 722, 736, 740-

16   41 (2002).  Argument-based prosecution history estoppel arises when arguments made by the

17   patentee to the PTO "evince a clear and unmistakable surrender of subject matter." *Deering*

18   *Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1326 (Fed. Cir. 2003).

19   As recently reiterated by the Federal Circuit, "[t]he presumption of surrender applies to ***all*** claims

20   containing the added limitation, regardless of whether the claim was, or was not, amended during

21   prosecution." *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1183 (Fed. Cir. 2009) (internal

22   quotation and alteration marks omitted) (emphasis added).  "Prosecution history estoppel as a

23   limit on the doctrine of equivalents presents a question of law." *Glaxo Wellcome, Inc. v. Impax*

24   *Labs., Inc.*, 356 F.3d 1348, 1351 (Fed. Cir. 2004).

25   The originally filed application that eventually issued as the '264 patent had 45 claims.

26   Ex. 4 at PRIM00004172-77.  Originally-filed claim 1 recited a switching voltage regulator as

27   shown in FIG. 1 of the patent, and included a flip-chip integrated circuit chip with a power switch

28   mounted on a substrate, which was in turn mounted on a printed circuit board.  *Id.* at -4172.  In a

McDERMOTT WILL & EMERY LLP<br>ATTORNEYS AT LAW<br>MENLO PARK

July 28, 2000 First Office Action, the Examiner rejected all 45 claims as obvious in view of

certain prior art references.  *Id.* at -4206-10; Ex. 10 (*Hallberg et al.*); Ex. 9 (*Stager et al.*); Ex. 7

(*Honn et al.*); and Ex. 8 (*McMahon*).  To overcome the prior art rejection, the patentee amended

claim 1 to add the following limitation (underlined in original):

> a first flip integrated circuit chip mounted on the substrate, the first integrated
> circuit chip including a first power switch fabricated therein to alternately couple
> and decouple the input terminal to the output terminal, <u>wherein the flip-chip type
> integrated circuit chip includes a p-type region and n-type region, and the first
> power switch includes a plurality of p+ regions fabricated in the n-type region in a
> first array, and a plurality of n+ regions fabricated in the p-type region in a second
> array, and wherein alternating p+ regions are connected to the input terminal and
> to an intermediate terminal, and alternating n+ regions chip are connected to the
> intermediate terminal and to ground;</u>

Ex. 4 at PRIM00004212.  In addition, the patentee argued to the Examiner that, **as to all claims**:

> Hallberg, Stager and Honn do not teach or suggest the various limitations relating
> to **the layout of the doped regions** and pads and their connections to the
> terminals. For example, Hallberg, Stager and Honn do not teach doped regions in
> an array with **alternating regions** of the array connected to different terminals, an
> array of pads with two pluralities of pads arranged in an **alternating pattern** and
> electrically connected to two doped regions, or two electrodes having interdigited
> fingers.

*Id.* at -4214 (emphasis added).   Here, the patentee argued that the pending claims were

distinguishable over the prior art because of the "layout of the doped regions," specifically

describing the layout of doped regions as having "**alternating regions**."  Not having before him

any art showing the layout of a distributed transistor, the Examiner allowed the claims, but in his

"Reasons for Allowance" reinforced that the layout of the doped regions and alternating pattern

was a reason for the allowance.  *Id.* at -4217.  In his "Reasons for Allowance," the Examiner

expressly relied upon and called out (as did the applicants) a structure specific to the PMOS and

NMOS transistors, which are the only types of transistors disclosed in the Burstein patents.  *Id.*;

Ex. 40 at B038a, B039b.  Based on this prosecution history, Volterra is presumptively estopped

from now asserting that anything other than an "a" "b" "a" "b" pattern of drains and sources that

is characteristic of a PMOS or NMOS transistor constitutes the "alternating pattern" of doped

regions of the claims.  *See Festo*, 535 U.S. at 736, 740; *see also Felix*, 562 F.3d at 1183-84.

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL                         - 24 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1

2.     **Non-Infringement**

2

REDACTED

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

# REDACTED

21

22

23

24

25

26

27

28

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INFRINGEMENT

- 25 -

CASE NO.: C 08-05129 JCS
**HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY**

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1

2   Dated: August 12, 2009                    McDERMOTT WILL & EMERY LLP

3

4                                             By: _/s/_ David H. Dolkas_____

5                                                 TERRENCE P. MCMAHON
                                                  DAVID H. DOLKAS
6                                                 VERA M. ELSON
                                                  Attorneys for Defendants and
7                                                 Counterclaimants
                                                  PRIMARION, INC., INFINEON
8                                                 TECHNOLOGIES NORTH AMERICA
                                                  CORP., and INFINEON
9   MPK 156364-3.072750.0023                      TECHNOLOGIES AG

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS OPPOSITION AND  MP&A ISO
THEIR OPPOSITION TO MOTION FOR PARTIAL          - 26 -
SUMMARY JUDGMENT OF INFRINGEMENT

CASE NO.: C 08-05129 JCS
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL ONLY

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK