1   James W. Morando (State Bar No. 087896)
        jmorando@fbm.com
2   Jeffrey M. Fisher (State Bar No. 155284)
        jfisher@fbm.com
3   Racheal Turner (State Bar No. 226441)
        rturner@fbm.com
4   Farella Braun & Martel LLP
    235 Montgomery Street, 17th Floor
5   San Francisco, CA  94104
    Telephone:  (415) 954-4400
6   Facsimile:  (415) 954-4480

7   Attorneys for Plaintiff
    VOLTERRA SEMICONDUCTOR CORPORATION

8

9                    UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

12

13  VOLTERRA SEMICONDUCTOR                    Case No. CV-08-5129 JCS
    CORPORATION, a Delaware corporation,
14                                            **REDACTED PLAINTIFF VOLTERRA
                    Plaintiff,                SEMICONDUCTOR CORPORATION'S
15                                            OPENING CLAIM CONSTRUCTION
            vs.                               BRIEF**
16                                            **(Patent L.R. 4-5(a))**
    PRIMARION, INC., a Delaware
17  corporation, INFINEON                     **PARTIALLY FILED UNDER SEAL**
    TECHNOLOGIES AG, a German
18  corporation, and INFINEON                 Date:      December 18, 2009
    TECHNOLOGIES NORTH AMERICA                Time:      11:00 a.m.
19  CORPORATION, a Delaware corporation,
                                              Dept:      Courtroom A, 15th Floor
20                  Defendants.               Before:    Honorable Joseph C. Spero

21
    AND RELATED COUNTERCLAIMS.
22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION ............................................................................................. 1

II.     ISSUE PRESENTED ....................................................................................... 1

III.    LEGAL STANDARD FOR CLAIM CONSTRUCTION ................................ 2

IV.     THE '264 AND '522 PATENTS ...................................................................... 3

    A.      Background of Technology ................................................................... 3

    B.      Claim Construction ............................................................................... 3

        1.      "integrated circuit" ................................................................... 3

        2.      "metalized pads" ....................................................................... 5

        3.      "flip-chip type integrated circuit chip" ..................................... 7

        4.      "a first plurality of doped regions" and a "second plurality of doped
                regions" arranged in an "alternating pattern" ............................ 8

            a.      "doped regions" and "first plurality of doped regions" and
                    "second plurality of doped regions" .................................. 9

            b.      alternating pattern ............................................................. 12

        5.      "substrate" ............................................................................... 13

        6.      "mounted on" ........................................................................... 14

        7.      "maintain the DC voltage substantially constant" ................... 16

V.      THE '823 PATENT .......................................................................................... 17

    A.      Background of Technology .................................................................. 17

    B.      Claim Construction .............................................................................. 22

        1.      "substantially continuous plane"/ "isolated structure" ............. 22

        2.      "lateral protrusion" .................................................................. 25

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- i -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3    *Acumed LLC v. Stryker Corp.*,
4        483 F.3d 800 (Fed. Cir. 2007)................................................................................ 11

5    *Chimie v. PPG Industries, Inc.*,
         402 F.3d 1371 (Fed. Cir. 2005)........................................................................... 15, 23

6    *Dayco Products v. Total Containment, Inc.*,
7        258 F.3d 1317 (Fed. Cir. 2001)............................................................................. 24

8    *Fiskars, Inc. v. Hunt Manufacturing Co.*,
         221 F.3d 1318 (Fed. Cir. 2000)............................................................................. 12

9    *Hockerson-Halberstadt, Inc. v. Avia Group International, Inc.*,
10       222 F.3d 951 (Fed. Cir. 2000)................................................................................. 7

11   *Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*,
         381 F.3d 1111 (Fed. Cir. 2004)............................................................................... 2

12   *Kara Tech., Inc. v. Stamps.com Inc.*,
13       -- F.3d --, 2009 WL 3030360 (Fed. Cir., Sep. 24, 2009) ................................... 2, 15

14   *Liquid Dynamics Corp. v. Vaughan Co.*,
         355 F.3d 1361 (Fed. Cir. 2004)............................................................................. 16

15   *MBO Labs., Inc. v. Becton, Dickinson & Co.*,
16       474 F.3d 1323 (Fed. Cir. 2007).............................................................................. 6

17   *Markman v. Westview Instruments, Inc.*,
         52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)...................................... 2

18   *Nikon Corp. v. ASM Lithography B.V.*,
19       308 F. Supp. 2d 1039 (N.D. Cal. 2004) ................................................................ 14

20   *Phillips v. AWH Corp.*,
         415 F.3d 1303 (Fed. Cir. 2005)...................................................................... 2, 13, 14

21   *SRI International v. Matsushita Electric Corp. of America*,
22       775 F.2d 1107 (Fed. Cir. 1985)............................................................................. 11

23   *Varco, L.P. v. Pason System USA Corp.*,
         436 F.3d 1368 (Fed. Cir. 2006)............................................................................. 12

24   *Ventana Medical System, Inc. v. Biogenex Labs., Inc.*,
25       473 F.3d 1173 (Fed. Cir. 2006)......................................................................... 11, 12

26   *Vitronics Corp. v. Conceptronic, Inc.*,
         90 F.3d 1576 (Fed. Cir. 1996)............................................................................... 17

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF          - ii -          CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                                    23666\2046782.5

**OTHER AUTHORITIES**

5A Chisum on Patents at 18.03[2][e][iii] (2005) ................................................................. 17

N.D. Cal. Patent L.R.4-3 ....................................................................................................... 2

N.D. Cal. Patent L.R.4-5 ....................................................................................................... 1

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- iii -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1    **I.      INTRODUCTION**

2              Volterra Semiconductor Corporation ("Volterra") has designed and developed innovative

3    and improved solutions for voltage regulators used in power management applications.

4    Specifically, Volterra has developed flip chip integrated power products which combine high

5    power switches and other circuitry on a single integrated circuit using flip chip packaging.  That

6    technology is covered by the claims of various patents, including U.S. Patent Nos. 6,278,264 (the

7    "'264 Patent"), 6,462,522 (the "'522 Patent"), and 6,713,823 (the "'823 Patent") (together the

8    ("Flip Chip Power Stage Patents").

9              Defendants Primarion, Inc., Infineon Technologies AG, and Infineon Technologies North

10   America Corporation (collectively "Defendants") recently introduced and offered for sale nearly

11   identical flip chip integrated power products to those sold by Volterra.  In July 2009, Volterra

12   filed a motion for partial summary judgment of infringement and simultaneously moved for a

13   preliminary injunction to enjoin Defendants from offering for sale their flip chip integrated power

14   products based on certain claims of the '264 and '522 Patents.  *See generally* Volterra's Motion

15   for Entry of Preliminary Injunction, filed July 10, 2009, Dkt. No. 102 ("PI Motion") & Volterra's

16   Motion for Partial Summary Judgment of Infringement, filed July 10, 2009, Dkt. No. 105

17   ("MSJ").  As part of those motions, the parties briefed and argued the construction of certain

18   claim terms before this Court.

19             Pursuant to Patent L.R. 4-5 and the Amended Case Management Order, the parties now

20   brief their proposed constructions of several of the same claim terms that were at issue in

21   Volterra's PI and MSJ Motions, as well as three additional claim terms from the '823 Patent

22   which were not at issue in Volterra's motions.  As set forth below, Volterra's proposed

23   constructions are proper and should be adopted.  Defendants, on the other hand, are again

24   proposing claim constructions that attempt to import limitations into the claims that are

25   unsupported by the patents themselves, their prosecution histories, or the extrinsic evidence.

26   **II.     ISSUE PRESENTED**

27             At issue in this brief is the construction of ten claim terms in the Flip Chip Power Stage

28   Patents.  Exhibit A to the parties' Joint Claim Construction Statement, as amended by

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

23666\2046782.5

1  Defendants, sets forth the five claim terms each party has selected for construction together with

2  each party's proposed construction.[1]  *See* Dkt. Nos. 328 & 451-3, attached hereto as Exhibits 1

3  and 2 to the Declaration of Jeffrey M. Fisher in Support of Volterra's Opening Claim

4  Construction Brief ("Fisher Decl.").

5  **III.   LEGAL STANDARD FOR CLAIM CONSTRUCTION**

6         The proper construction of claims is a legal determination.  *Markman v. Westview*

7  *Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  To

8  ascertain the meaning of terms used in the patent claims, courts first consider a patent's intrinsic

9  evidence, which includes the claims themselves, the specification, and the prosecution history.

10  *Markman*, 52 F.3d at 979; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir.

11  2005).  Courts may also rely on extrinsic evidence such as dictionary definitions, expert opinion,

12  and the prior art.  *Markman*, 52 F.3d at 980-81.  In construing claims, it is "unjust to the public, as

13  well as an evasion of the law, to construe it in a manner different from the plain import of its

14  terms." *Phillips*, 415 F.3d at 1312 (citation omitted).  This is because "[i]t is a 'bedrock

15  principle' of patent law that 'the claims of a patent define the invention to which the patentee is

16  entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (*quoting Innova/Pure Water, Inc. v.*

17  *Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

18         The words of a claim are generally given their ordinary and customary meaning as

19  understood by a person of ordinary skill in the art at the time of the invention.  Although the

20  specification may describe specific embodiments, the Federal Circuit warns against confining the

21  claims to those embodiments.  *Kara Tech., Inc. v. Stamps.com Inc.*, -- F.3d --, 2009 WL 3030360

22  (Fed. Cir., Sep. 24, 2009).

23

24  [1] In addition to the five terms each party is allowed to proffer for construction under N.D. Cal.
    Patent L.R.4-3, Defendants also submitted a list of over fifty terms attached as Exhibit B to the

25  Joint Claim Construction Statement for which they claim they are allowed to request
    construction.  Volterra believes this is contrary to the Patent Local Rules and the Amended Case

26  Management Order in this case which states that "[a]bsent good cause shown, no more than ten
    (10) terms will be constructed at the Claim Construction hearing.  If the parties cannot agree on

27  the ten terms, each side will be allowed five (5) terms." Am. Case Mgmt. Order, ¶ I.E, Dkt. No.

28  91.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF          - 2 -          CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                                              23666\2046782.5

IV.    **THE '264 AND '522 PATENTS**

A.    **Background of Technology**

The '264 and '522 Patents (Fisher Decl., Exs. 3 & 4) disclose an integrated circuit for a switching voltage regulator including a power switch in flip chip packaging.  The use of flip chip packaging for a voltage regulator application as taught in the '264 and '522 Patents results in increased device reliability, efficiency and temperature control, and decreased parasitic inductance and parasitic resistance, reducing excess heat and stress on the integrated circuit.  '264 Patent, Fisher Decl., Ex. 3, 4:5-13.  This results in a small package size device that has high efficiency at a high switching frequency.

Because the Court is familiar with the technology and the accused products at issue in this case as a result of its consideration of Volterra's PI and MSJ Motions, Volterra presents only this brief overview of the relevant technology and the '264 and '522 Patents.  For a more detailed background of the technology, Volterra incorporates by reference its MSJ and the accompanying Expert Report of Dr. Thomas Szepesi on Infringement.  *See* Fisher Decl., Exs. 5 & 6; *see also* Declaration of Dr. Thomas Szepesi in Support of Volterra's Opening Claim Construction Brief ("Szepesi Decl."), Exs. 1 & 5.

B.    **Claim Construction**

1.    "integrated circuit"

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| integrated circuit | An interconnected arrangement of passive and active elements forming at least part of a voltage regulator circuit including a power switch, which is implemented on a single semiconductor substrate. | A miniaturized electronic circuit (a.k.a. an IC, microcircuit, silicon chip, chip, or die) consisting of interconnected circuit elements that have been manufactured in, on, and above the surface of a substrate of semiconducting material. |

The '264 Patent, Claim 26 and '522 Patent, Claims 9 and 22 claim "an integrated circuit." As set forth in Volterra's Motion for Summary Judgment, Volterra construes an "integrated circuit" as used in the Asserted Patents as "an interconnected arrangement of passive and active elements forming at least part of a voltage regulator circuit including a power switch, which is

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 3 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1   implemented on a single semiconductor substrate." Szepesi Decl., Ex. 1, ¶ 61.[2]

2       Volterra's construction is supported by the specification.  The specification states that an

3   integrated circuit may include a "portion of the control circuit, such as an interpreter to interpret

4   commands from the portion of the control circuit fabricated on the second chip, or a sensor that

5   directs measurements to the portion of the control circuit fabricated on the second chip, may be

6   fabricated on the first chip." '264 Patent, Fisher Decl., Ex. 3, 2:24-29.  Similarly, the

7   specification provides that additional "circuitry on the IC chip may measure a characteristic of the

8   switching circuit, e.g., the current flowing through the PMOS transistor array 30 and NMOS

9   transistor array 32 and pass the measurement back to the rest of the control circuitry via control

10   pads 78." *See* '264 Patent, Fisher Decl., Ex. 3, 6:50-55.  These referenced portions of the control

11   circuit or sensors typically have passive elements such as resistors and capacitors.  *See* Szepesi

12   Dep., Fisher Decl., Ex. 9 at 318:12-319:20.  Other portions of the specification confirm that the

13   integrated circuit includes a power switch and may include other passive elements.  *See* '264

14   Patent, Fisher Decl., Ex. 3, 1:4-7 (noting that the integrated circuit is implementing a switching

15   voltage regulator fully or partially); *see also id.*, 1:65-2:5, 2:33-36, 2:50-55; and 3:62-4:1.

16       Defendants previously agreed that an integrated circuit includes active and passive

17   elements.  In their Amended Proposed Claim Constructions, Defendants defined an integrated

18   circuit as "[a] miniaturized electronic circuit (a.k.a. an IC, microcircuit, silicon chip, chip, or die)

19   consisting mainly of semiconductor devices and passive components (e.g., resistors and

20   capacitors) that have been manufactured in, on, and above the surface of a *substrate* of

21   semiconducting material."  Fisher Decl., Ex. 10 (emphasis in original), served Aug. 18, 2009.

22

23

24

25

---

26   [2] Volterra has previously briefed and provided evidence on its positions regarding construction of the term "integrated circuit" and many of the other terms discussed herein.  Specifically, Volterra

27   incorporates by reference its PI Motion and Reply (Fisher Decl., Exs. 5 & 6), MSJ & Reply in Support (Fisher Decl., Exs. 7 & 8); Expert Reports of Dr. Thomas Szepesi (Szepesi Decl., Exs. 1,

28   5, & 6), and the Joint Claim Construction Statement (Fisher Decl., Ex. 1).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF        - 4 -
Case No. CV-08-5129 JCS

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1

2

3

4

5

6                                                                    The McGraw-

7  Hill Dictionary of Electrical and Electronic Engineering further supports this construction,

8  defining integrated circuit as an "interconnected array of active and passive elements integrated

9  with a single semiconductor substrate or deposited on the substrate by a continuous series of

10 compatible processes, and capable of performing at least one complete electronic circuit

11 function." Fisher Decl., Ex. 13 at VLTSA00040890.

12        Just prior to the filing of the parties' Joint Claim Construction Statement, however,

13 Defendants amended their proposed claim construction of the term "integrated circuit" and

14 removed the reference to "passive" components. Defendants' current construction erroneously

15 ignores that in the context of the '264 and '522 Patents, the integrated circuit forms at least part of

16 a voltage regulator circuit, including a power switch. In support for their proposed construction,

17 Defendants rely on Figures 1 and 2 of the '264 and '522 Patents. These figures *support*

18 Volterra's construction as they depict the integrated circuit and reference Figure 3, which in turn

19 depicts power switches and control circuitry connected to the control pads 78. *See* '264 Patent,

20 Fisher Decl., Ex. 3, 6:43-55 & Figs. 3A-3C. This underscores that an integrated circuit has active

21 and passive elements. Accordingly, Volterra's construction of "integrated circuit" should apply.

22        2.    "metalized pads"

23

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| metalized pads | Pads that include an under-bump metallization layer (UBM) that forms an interface between the top metal layer of the integrated circuit and the solder balls (bumps) that are often used in flip-chip type integrated circuits. Pads in an integrated circuit are openings in the top passivation layer that allow connection to the top | An array of "metalized pads" wherein each pad in the array consists of: (i) an individual and distinct raised island of metal separated a fixed distance from the other metalized pads; (ii) a passivation layer that lies partially over the island of metal; and (iii) an under-bump metal (UBM) that partially overlaps both the island of |

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS                - 5 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
|  | metal layer, to enable formation of connections between the integrated circuit and external circuit elements. | metal and the passivation layer. |

Claim 26 of the '264 Patent and Claim 22 of the '522 Patent claim the use of "metalized pads." Volterra construes "metalized pad" to mean "pads that include an under-bump metallization layer (UBM) that forms an interface between the top metal layer of the integrated circuit and the solder balls (bumps) that are often used in flip-chip type integrated circuits." Szepesi Decl., Ex. 1, ¶ 62. A pad is "an opening in the top passivation layer that allows connection to the top metal layer, to enable formation of connections between the integrated circuit and external circuit elements." Szepesi Decl., Ex. 1, ¶ 62 n.2. Volterra's proposed construction is supported by the specification of the '264 Patent which states, "each pad includes a final metal layer 80, such as aluminum, a nitride passivation layer 82, and an under-bump metalization (UBM) layer 84." '264 Patent, Fisher Decl., Ex. 3, 7:4-7.

Defendants' construction differs from Volterra's by attempting to limit the final metal layer of the metalized pads to "an individual and distinct raised island of metal separated a fixed distance from the other metalized pads." There is nothing in the specification that suggests that the limitations "distinct" or "separated a fixed distance from other metalized pads" should be imported into the claims as Defendants urge. The specification describes the metal layers that carry current from the doped regions to the electrode pads on the surface of the chip. *See, e.g., id.*, 6:9-13. Similarly, the specification does not limit the width of the final metal layer that is part of the metalized pad. Rather, the final metal layer, depicted as element 80 in Figure 4A, can be formed over large sections of the semiconductor substrate. *See id.*, 6:9-13; 6:22-25.

Nor do any of the drawings cited by Defendants support their position that a metalized pad is limited to "individual and distinct raised islands of metal separated a fixed distance from other metalized pads." There is no basis in the claims or specification to limit the claims to an embodiment depicted only in a drawing and discussed nowhere in the specification of the patent. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 133-34 (Fed. Cir. 2007) (refusing to limit claim term to embodiment depicted in patent figures because "patent coverage is not

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS                    - 6 -                    CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1   necessarily limited to inventions that look like the ones in the figures"); *Hockerson-Halberstadt,*

2   *Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951, 956 (Fed. Cir. 2000) (patent drawings may not be relied

3   on for precise proportions of elements or particular sizes for purposes of claim construction).

4   Figures 2 and 4A, referenced by Defendants in the Joint Claim Construction statement, merely

5   depict "schematic side view[s]" of embodiments of the flip chip package and metalized pad

6   respectively ('264 Patent, Fisher Decl., Ex. 3, 4:24-25, 4:33-35) and do not limit how far the final

7   metal layer under the pad opening might extend beyond the pad opening.  Figures 3A and 3B depict

8   a plan (top down) view of the metalized pads, but there is no basis for the "fixed distance"

9   limitation, and the drawings do not preclude the same "final metal layer" extending to and/or being

10  connected to multiple metalized pads.  Figure 4B similarly depicts an embodiment, but in no way

11  suggests that all embodiments should be so limited.  Indeed, Figure 4B provides no details showing

12  how the pad is connected to the underlying doped regions or to the other pads of the device.

13       Because there is no basis for requiring "metalized pads" to include "individual and distinct

14  raised islands of metal," Volterra's construction should be adopted.

15              3.    "flip-chip type integrated circuit chip"

16
| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| flip-chip type integrated circuit chip | An integrated circuit chip that is mounted onto a printed circuit board (PCB) face down, i.e. flipped over, using solder ball or solder bump connections which are only attached to one surface of the die, where the solder balls are under the integrated circuit chip. | An integrated circuit chip (a.k.a. a die) oriented such that its external connection points are facing the structure upon which it is being mounted (a.k.a. a flip-chip configuration). |

21       Claims 9 and 18 of the '522 Patent claim a "flip-chip type integrated circuit chip."

22  Volterra construes a "flip-chip type integrated circuit chip" as "an integrated circuit chip that is

23  mounted onto a printed circuit board (PCB) face down, i.e. flipped over, using solder ball or

24  solder bump connections which are only attached to one surface of the die, where the solder balls

25  are under the integrated circuit chip."  This construction is supported by the specification and

26  drawings which describe and show an integrated circuit chip face down with solder ball or solder

27  bump connecting on one surface of the die to the printed circuit board (either directly or

28  indirectly, e.g., via an interposer such as a substrate).  *See* '522 Patent, Fisher Decl., Ex. 4, 2:16-

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF                    - 7 -
Case No. CV-08-5129 JCS

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

19; 3:67-4:1; Figs. 2, 3A, 6, 7, & 8A-8G.  This definition corresponds to definitions given in technical dictionaries as well as the understanding of those of skill in the art.  *See* Fisher Decl., Ex. 13 at VLTSA00040889 (defining flip-chip as: "A tiny semiconductor die having terminations all on one side in the form of solder pads or bump contacts; after the surface of the chip has been passivated or otherwise treated, it is flipped over for attaching to a matching substrate");

; *see also* Szepesi Decl., Ex. 1, ¶ 63.  Finally, Defendants have proffered extrinsic evidence that supports Volterra's construction.  *See, e.g.,* Fisher Decl., Ex. 2 (quoting Device Electronics for Integrated Circuits, attached as Fisher Decl., Ex. 15 at PRIM01946703 and noting "in some cases the IC chips are bonded face down . . . . All leads are then simultaneously bonded by melting pre-formed solder bumps on the IC pads in what is called flip-chip bonding.").

Defendants do not dispute that all connection points of the flip chip integrated circuit are facing the structure upon which the chip is being mounted.  They therefore agree with Volterra that all of the solder ball or bump connections are only attached to one surface of the die and that the solder balls or bumps are under the integrated circuit chip.

4.    "a first plurality of doped regions" and a "second plurality of doped regions" arranged in an "alternating pattern"

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| a "first plurality of doped regions" and a "second plurality of doped regions" arranged in an "alternating pattern" | Volterra believes these terms should be given their plain and ordinary meanings. | "doped region"<br>Either p+ regions fabricated in an n-type region where the p+ regions form the source regions (or drain regions) of the transistor, or n+ regions fabricated in a p-type region where the n+ regions form the source regions (or drain regions) of the transistor.<br><br>"first plurality of doped regions"<br>A set of two or more sources (or alternatively drains). |

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 8 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| | | "second plurality of doped regions" A set of two or more drains (or alternatively sources). "alternating pattern" Either (i) an "a" " b" "a" "b" pattern of parallel stripes; or (ii) a checkerboard pattern of rectangles. Note, this construction is in the context of "a first plurality of doped regions" and "a second plurality of doped regions" arranged in an "alternating pattern." E.g., claim 26 states in relevant part "a substrate having a first plurality of doped regions and a second plurality of doped regions, the first and second pluralities of doped regions arranged in a first alternating pattern." This construction is not in the context of the alternating pattern of pads. |

Each asserted independent claim – Claim 26 of the '264 Patent and Claims 9 and 22 of the '522 Patent – claims a substrate having "a first plurality of doped regions and a second plurality of doped regions, the first plurality of doped regions and the second plurality of doped regions being arranged in a [first] alternating pattern." Defendants request constructions of "doped region," "first plurality of doped region," "second plurality of doped region," and "alternating pattern" that limit those terms in a way unsupported by the patents, their specification, or prosecution history. Volterra believes these terms do not need construction and should be given their plain and ordinary meaning. *See* Szepesi Decl., Ex. 5, ¶¶ 52-55.[3]

        a.     "doped regions" and "first plurality of doped regions" and "second plurality of doped regions"

While Volterra contends that the term "doped regions" should be given its plain and ordinary meaning, over the course of the last two months, Defendants have presented no less than

---

[3] Volterra objects to Defendants' request that the Court construe four claim terms – three of which were added the day of filing of the Joint Claim Construction Statement – under the guise of construing the claim term "first and second plurality of doped regions."

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS
- 9 -
CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

three different proposed constructions for the term.[4]   The various positions taken by Defendants are confusing, inconsistent, and unsupportable.

Defendants' latest position is that doped regions should be construed as

> either p+ regions fabricated in an n-type region where the p+
> regions form the source regions (or drain regions) of the transistor,
> or n+ regions fabricated in a p-type region where the n+ regions
> form the source regions (or drain regions) of the transistor.

There is no basis in the patent claims, specification, or prosecution history to limit doped regions or the first and second plurality of doped regions to only "p+ regions fabricated in an n-type region where the p+ regions form the source regions (or drain regions)" or "n+ regions fabricated in a p-type region where the n+ regions form the source regions (or drain regions)" of the transistor.  The claim language itself evidences that the only requirement is that the first and second plurality of regions be "doped."  The plain and ordinary meaning of the claim term does not require that the doped regions be limited as Defendants suggest.  Rather the asserted independent claims provide that the doped regions are electrically connected, or coupled, to certain terminals of the voltage regulator.  *See, e.g.,* '264 Patent, Fisher Decl., Ex. 3, 2:59-64; Szepesi Decl., Ex. 5, ¶¶ 54, 59.  Similarly, nothing in the specification limits one set of doped regions to a drain region and another to a source region of a MOSFET.  *See generally* '264 Patent, Fisher Decl., Ex. 3; Szepesi Decl., Ex. 5, ¶ 55.  To the contrary, Claim 26 of the '522 Patent, which depends from Claim 22, further specifies that the "first plurality of doped regions" and the "second plurality of doped regions" are the source regions and drain regions respectively.  '522 Patent, Fisher Decl., Ex. 4, 11:10-13.  Defendants' proposed limitation would render dependent claim 26 of the '522 Patent superfluous.  Moreover, Claim 1 includes the limitations Defendants improperly seek to read into Claim 26.  That Claim 26 uses the broader language "doped regions" instead of the more specific

---

[4] Defendants originally construed "doped regions" as "a region of a semiconductor substrate that contains either a p-type or n-type impurity that changes the electrical characteristic of the substrate."  Defs.' MSJ Opp. (Dkt. No. 197) at 21.  When the parties submitted their joint claim construction statement on August 31, 2009, Defendants construed "doped regions" as "the entirety of a continuous region of the semiconductor substrate that contains only n-type or only p-type impurity, regardless of the concentration of the impurity, and that forms a drain (or alternatively a source) of a device."  Dkt. No. 328-1, Fisher Decl., Ex. 1-A at 21.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF                    - 10 -
Case No. CV-08-5129 JCS

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1   language used in Claim 1 demonstrates that Defendants' proposed construction is wrong. *See SRI*

2   *Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("[W]hen a patent

3   claim does not contain a certain limitation and another claim does, that limitation cannot be read

4   into the former claim.").

5         Defendants' purported "evidence" in support of their proposed limitation consists of

6   various citations to portions of the specification that explain that one embodiment of the patented

7   invention "*may* include a plurality of p+ regions fabricated in the n-type region, and a plurality of

8   n+ regions fabricated in the p-type region." *See* '264 Patent, Fisher Decl., Ex. 3, 2:14-18

9   (emphasis added); *see also id.*, 3:3-4, 3:6-8, 5:65-6:13. While each of those passages describe

10  possible embodiments, there is no basis to limit the claims to those embodiments. *See Acumed*

11  *LLC v. Stryker Corp.*, 483 F.3d 800, 807-809 (Fed. Cir. 2007). In *Acumed*, the Federal Circuit

12  rejected an accused infringer's attempt to narrow the construction of the term "transverse holes"

13  to require the holes be limited to perpendicular holes based on a feature of the preferred

14  embodiment of the claims. *Id*. at 807. In rejecting patent challenger's construction, the Federal

15  Circuit noted that the term "transverse" as used in the patent claims was broader than the term

16  "perpendicular" used in the specification to describe the preferred embodiment. *Id*. Similarly,

17  here, the specification's description of "p+ regions fabricated in the n-type region" and "n+

18  regions fabricated in the p-type region" is merely a specific embodiment described by the

19  inventors that is narrower than the term "doped regions" used elsewhere in the specification and

20  the asserted claims. '264 Patent, Fisher Decl., Ex. 3, 9:1-2; 9:13-15; *see also Acumed*, 483 F.3d at

21  807 (noting that the patentees could have used the term "perpendicular" in the claims as they did

22  when discussing their preferred embodiment, but they purposely chose a different term implying a

23  broader scope). Accordingly, there is no basis for limiting the plain and ordinary meaning of the

24  term "doped regions."

25        Similarly, Defendants' citations to portions of the prosecution history in support of their

26  current claim construction position on "doped regions" are inapplicable. Prosecution history

27  disavowal does not apply to limit the ordinary meaning of the claim terms where, as here, the

28  amendment at issue was made to an unasserted claim using very different claim language. *Ventana*

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 11 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1    *Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1184 (Fed. Cir. 2006) (rejecting defendants'

2    attempt to apply prosecution history disavowal to statements made with respect to claim language

3    that was not in the asserted claims); *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1323 (Fed. Cir.

4    2000) (stating "[c]laims whose allowance was not due to a particular argument are not subject to

5    estoppel deriving from that argument"). Here, as in *Fiskars*, unasserted Claim 1 was amended to be

6    expressly limited to a plurality of "p+ regions fabricated in the n-type region in a first array" and a

7    plurality of "n+ regions fabricated in the p-type region in a second array." '264 Patent, Fisher

8    Decl., Ex. 3, 9:25-30. Claim 26 (originally, Claim 27) was not amended and claims more broadly

9    "a first plurality of doped regions" and "a second plurality of doped regions." '264 Prosecution

10   History, Fisher Decl., Ex. 16 at VLTR102. In addition, in response to the office action, the

11   prosecutor addressed each independent claim separately. *See id.* at VLTR134.

12

13

14

15   As a result, the

16   Asserted Claims cannot be limited to the particular arrangement of doped regions described in

17   Claim 1.

18       Defendants' construction imports limitations into the term "doped regions" unsupported

19   by the patents or their prosecution history. There is no support for Defendants' construction. The

20   plain and ordinary meaning of "doped regions" should apply.

21              b.    alternating pattern

22       As discussed in Volterra's MSJ Reply, there is no basis for limiting the alternating pattern

23   to either only two patterns: (i) an "a" "b" "a" "b" pattern of parallel stripes; or (ii) a

24   checkerboard pattern of rectangles.

25   It would

26   therefore be improper to construe the term "alternating pattern" by limiting it solely to drawings and

27   descriptions that represent preferred embodiments in the specification. *See Varco, L.P. v. Pason*

28   *Sys. USA Corp.*, 436 F.3d 1368, 1375 (Fed. Cir. 2006). The description of the invention in the

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS
- 12 -
CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

specification states clearly that the "alternating pattern" *may* be in alternating stripes (*see* '264 Patent, Fisher Decl., Ex. 3, 2:66-3:2; 3:29-30), but other embodiments are also possible. *Id.,* 9:1-2; 9:13-15. Accordingly, Defendants' construction of "alternating pattern" should similarly be rejected and the plain and ordinary meaning of "alternating pattern" should apply.

5.   "substrate"

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| substrate | Volterra believes this term should be given its plain and ordinary meaning. | Definition 1:<br>The base layer of an integrated circuit chip that contains the doped regions, and above which are deposited additional layers, such as metal and insulators, to form the whole integrated circuit chip.<br><br>Definition 2:<br>A planar structure disposed between the integrated circuit chip and the printed circuit board that includes a first signal layer on the top surface facing the integrated circuit chip, and a second signal layer on the bottom surface facing the printed circuit board. |

Defendants' construction of the claim term "substrate" in two different ways is unhelpful and confusing. Defendants' second construction of "substrate" is not anywhere in the asserted claims and, in the context of this litigation, applies only to the use of that term in certain portions of the patent specification to describe an interposer between the chip and the printed circuit board in certain embodiments. This is improper. By definition, claim construction applies to the proper construction of *claims*, not the construction of other terms that may appear elsewhere in the patent. The claims, not the specification, define the bounds of the invention. *See Phillips*, 415 F.3d at 1312. Defendants' second definition of substrate is unnecessary and should be rejected.

Defendants' first proffered construction of substrate applies to the use of substrate in Claim 26 of the '264 Patent and Claims 9 and 22 of the '522 Patent. Defendants propose construing substrate as "the base layer of an integrated circuit chip . . . above which are deposited additional layers. . . ." This construction imports extraneous limitations. By including reference

1   to additional layers, metal, and insulators, Defendants describe various other structures not

2   relevant to the construction of the term "substrate." A construction that requires the substrate to

3   include various additional layers is confusing and unhelpful to the jury when placed in the context

4   of the patent as a whole. Defendants' citation to *Nikon Corp. v. ASM Lithography B.V.*, 308 F.

5   Supp. 2d 1039, 1062 (N.D. Cal. 2004) is inapplicable. That case addressed the meaning of the

6   term "substrate" in another patent relating to photolithography machines. Accordingly, it is

7   extrinsic evidence with little, if any, weight as to construction of the asserted claims here.

8   *Phillips*, 415 F.3d at 1317. Moreover, *Nikon* **supports** the proposition that "substrate" has an

9   "established meaning in scientific parlance." Therefore, "substrate" does not need construction

10  because it would be readily understood by one of ordinary skill in the art.

11          6.      "mounted on"

12
| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| Mounted on | Volterra believes this term should be given its plain and ordinary meaning. | Directly placed and soldered onto. |

14          Claim 9 of the '522 Patent provides that the flip chip type integrated circuit must be

15  "mounted on" the printed circuit board. Volterra believes the term "mounted on" does not need

16  construction and should be given its plain and ordinary meaning. *See* Szepesi Decl., Ex. 5, ¶¶ 81-

17  86. As Defendants acknowledge, the patent describes different embodiments. Defs.' MSJ Opp.

18  (Dkt. No. 197) at 15-16; Fisher Decl., Ex. 11, ¶¶ 129, 131, 134-136. In one embodiment, the flip

19  chip IC is mounted onto a substrate which is in turn mounted on a PCB; in the other embodiment,

20  the flip chip IC mounted directly to the PCB. *See, e.g.,* '522 Patent, Fisher Decl., Ex. 4, Figs. 2 &

21  8A-8G, 5:60-66, 8:17-18, 8:55-58. The plain and ordinary meaning of "mounted on" encompasses

22  both these embodiments.

23          Defendants seek to construe the term "mounted on" to exclude the preferred embodiment in

24  the patent and to require that the flip chip integrated circuit be "directly placed and soldered onto"

25  the PCB. Nothing in the claim language, specification, or prosecution history requires that the flip

26  chip IC be "directly placed and soldered onto" the PCB. In fact, Defendants' proposed construction

27  excludes what Defendants themselves acknowledge is the preferred embodiment of the '522 Patent.

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS                    - 14 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

Defs.' MSJ Opp. (Dkt. No. 197) at 14. "A construction that would not read on the preferred embodiment . . . would rarely if ever be correct." *Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005).

The specification further compels this conclusion. *See* Szepesi Decl., Ex. 5, ¶¶ 82-83. The specification lacks any support for altering the ordinary meaning or imposing a definition of the claim term requiring "directly placed and soldered onto." In every instance where the specification describes a possible embodiment where the flip chip integrated circuit is mounted ***directly*** to the PCB without an intervening member between the flip chip IC and the PCB, the specification expressly states that the flip chip IC is "mounted directly" on the PCB. '522 Patent, Fisher Decl., Ex. 4, 3:67-4:1, 8:17-18. The inventors therefore used the term "directly mounted on" when they intended to limit what they were describing to this type of embodiment. *See Kara Tech., Inc. v. Stamps.Com, Inc.*, -- F.3d ---, 2009 WL 3030360 (Fed. Cir., Sep. 24, 2009) (refusing to restrict claims that did not recite the use of a "key" to embodiments that required a "key" because when the inventor wished to restrict the claims he did so explicitly).

The prosecution history of the '264 Patent confirms that the inventors would have specified if they wished to limit the claim to being mounted directly on a PCB. As originally filed, the '264 Patent application included a claim (Claim 45 of the original '264 application) expressly claiming "a first flip chip type integrated circuit chip mounted directly on the printed circuit board." Fisher Decl., Ex. 16 at VLTR104. Claim 45 was canceled during prosecution, but the language of this original claim coupled with the specification evidences that Claim 9 cannot be limited to embodiments where the flip chip IC is mounted directly on the PCB. Similarly, a prior art reference cited in prosecution specifically described flip chip ICs as either applied "directly" or "alternatively to an intermediate substrate." U.S. Pat. No. 5,777,383 ("Stager"), Fisher Decl., Ex. 18, 1:44-47. This further confirms that "mounted on" is different from "mounted directly on."

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 15 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

7.   "maintain the DC voltage substantially constant"

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| maintain the DC voltage substantially constant | Volterra believes this term should be given its plain and ordinary meaning. | To maintain a fixed and stable output voltage. |

Claim 9 of the '522 Patent provides that a control circuit must be connected to the gate region of the power switch "to maintain the DC voltage substantially constant." Volterra believes this term does not need construction and its plain and ordinary meaning should apply. Defendants impermissibly attempt to add a "fixed" limitation into the claim term "maintain the DC voltage substantially constant."

Nothing, however, supports an additional requirement that the DC output voltage be "fixed." The term "fixed" does not appear anywhere in the claim language. Defendants' citations to the specification repeat the requirement that the DC voltage be "substantially constant" but have no mention of a requirement that the output voltage be "fixed." By definition, a voltage regulator is designed to maintain a substantially constant DC output voltage. Szepesi Decl., Ex. 5, ¶ 5; ███████████████████████████████████████████████████ Importing the word "fixed" incorrectly limits the plain and ordinary meaning of "substantially constant" and eviscerates the meaning of the word "substantially." *See Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1369 (Fed. Cir. 2004) (reversing district court construction of claim term "substantial helical flow" to be limited to a "perfectly helical flow" because the construction eliminated the modifier "substantial").

Defendants claim that the '522 Patent covers "static" as opposed to "dynamic" voltage regulators. Even assuming there is any such distinction between voltage regulators, Defendants' artificial construction is without avail. The claim language broadly covers voltage regulators that have "a control circuit connected to the gate region to control the power switch to maintain the DC voltage substantially constant" and is not limited to a specific type of voltage regulator. '522 Patent, Fisher Decl., Ex. 4, Claim 9. Indeed, adjustable or digitally programmable voltage regulators that were capable of changing their output voltage at various points in time, including "on the fly" were well known in the art prior to the '264 and '522 Patents, and there is nothing in

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS                    - 16 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1  the Patents that reflects an intent to exclude them from the scope of the claims. *See* Szepesi Decl.,

2  Ex. 5, ¶¶ 5-32.

3        Similarly, Defendants cannot rely on Dr. Stratakos' thesis as extrinsic evidence to alter the

4  plain and ordinary meaning of the asserted claims.  It is well established that the scientific

5  writings of "an inventor named in a patent, or of persons associated with the inventor. . . may not

6  be used to limit the patent's scope."  5A Chisum on Patents at 18.03[2][e][iii] (2005); *see also*

7  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996).  Here, Dr.

8  Stratakos is not even an inventor.  Moreover, Dr. Stratakos' thesis states so-called dynamic

9  voltage converters "***must maintain a substantially DC output voltage***" and that "[b]etween

10  voltage adaptations, the converter maintains *a precisely regulated DC output voltage*."  Fisher

11  Decl., Ex. 21 at 126 & 127 (emphasis added).  Accordingly, Dr. Stratakos' thesis actually

12  supports Volterra's proposed construction.  Defendants' attempt to use Dr. Stratakos' thesis to

13  alter the meaning of a patent claim term contrary to its use in the specification is improper.  *See*

14  *Vitronics*, 90 F.3d at 1585.

15        There is no basis for limiting the claim element "maintain the DC voltage substantially

16  constant" to "maintain a fixed and stable output voltage."  The plain and ordinary meaning of the

17  phrase should apply.

18  **V.**     **THE '823 PATENT**

19       **A.**    **Background of Technology**

20        The '823 Patent relates to unique metal routing structure that channels current from the

21  doped regions to pads to make efficient use of the integrated power stage in a flip chip package

22  and further improve performance of the flip chip integrated power stage.  *See* '823 Patent, Fisher

23  Decl., Ex. 19, 2:19-33.  The '823 Patent describes a novel way of "routing" current in an efficient

24  manner from the doped regions to pads that lie above the doped regions, in contrast to the typical

25  implementation where the pads were arranged along the perimeter of the chip.  *Id.*, 1:27-30.

26        The conductive routing structure disclosed in the '823 patent uses three or more levels of

27  metallization.  *See* Szepesi Decl., ¶ 9.  In one embodiment, the top level metal (M3), has two

28  conductive areas, which may be substantially continuous planes that are electrically isolated from

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 17 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1    one another. *Id.*; *see, e.g.*, '823 Patent, Fisher Decl., Ex. 19, 1:67-2:2; 4:49-52. Each of the two

2    conductive areas in the embodiment may cover approximately half of the area of the MOSFET

3    switch. *See* Szepesi Decl., ¶ 9; *see, e.g.*, '823 Patent, Fisher Decl., Ex. 19, Fig. 1. In a typical

4    embodiment, one of the conductive areas of the top level metal may have connections to the drain

5    regions of the large area MOSFET switch and the other conductive area of the top level metal

6    may have connections to the source regions of the large area MOSFET switch. *See* Szepesi Decl.,

7    ¶ 9, *see, e.g.*, '823 Patent, Fisher Decl., Ex. 19, 5:45-49 & Fig. 1. The two top level conductive

8    areas may have extended regions at the edge of the conductive area, protruding into the other

9    conductive area. *See* Szepesi Decl., ¶ 9; *see, e.g.*, '823 Patent, Fisher Decl., Ex. 19, 4:52-58.

10        The middle level metal, located under the top level metal, which can be the second metal

11   layer of the integrated circuit (M2), also has two conductive areas, which may be substantially

12   continuous planes, electrically isolated from one another. *See* Szepesi Decl., ¶ 10; *see, e.g.*, '823

13   Patent, Fisher Decl., Ex. 19, 4:3-5. The two conductive areas of the middle level metal may have

14   extended regions at the edge of the conductive area protruding into the other conductive area. *See*

15   Szepesi Decl., ¶ 10; *see, e.g.*, '823 Patent, Fisher Decl., Ex. 19, 3:64-4:3. The portion of the

16   middle level metal which is a substantially continuous conductive area that is connected to the

17   drain regions of the MOSFET is substantially overlapped by the top level metal conductive area

18   that is connected to the source regions of the MOSFET. *See* Szepesi Decl., ¶ 10. Conversely, the

19   middle level metal which is a substantially continuous conductive area that is connected to the

20   source regions of the MOSFET is substantially overlapped by the top level metal conductive area

21   that is connected to the drain regions of the MOSFET. *Id.*; *see, e.g.*, '823 Patent, Fisher Decl.,

22   Ex. 19, 4:61-65; Figs. 1, 4.

23        The two conductive areas of the middle level metal have discontinuities with "isolated

24   structures." *See* Szepesi Decl., ¶ 11. These isolated structures, together with vias between the

25   first and middle level and between the middle level and top level metal layers, provide direct

26   vertical connections and current flow between the drain and source regions of the MOSFET and

27   the appropriate conductive areas of the top metal layer of the IC. *See* Szepesi Decl., ¶ 11; *see,*

28   *e.g.*, '823 Patent, Fisher Decl., Ex. 19, 4:38-48, 5:20-36. The resulting conductive routing

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF          - 18 -          CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                                        23666\2046782.5

1  structure disclosed in the '823 Patent provides direct low resistance short vertical connections

2  (and corresponding vertical current flow) between the source regions of the MOSFET to the top

3  level metal source area, that is shown as covering approximately half the MOSFET area, and

4  similarly, it provides direct low resistance short vertical connections between the drain regions of

5  the MOSFET to the top level metal drain area, that is shown as covering approximately the other

6  half the MOSFET area. *See* Szepesi Decl., ¶ 11; *see, e.g.,* '823 Patent, Fisher Decl., Ex. 19, 2:19-

7  29; Fig. 1.

8       The '823 Patent describes that the source regions that lay below the top level metal drain

9  area are connected to the top level by the middle level metal source-connected conductive region

10  that is located substantially under the top level metal drain area and may be connected to the top

11  level metal source area through vertical vias connecting to its protrusions that may overlay it. *See*

12  Szepesi Decl., ¶ 12; *see, e.g.,* '823 Patent, Fisher Decl., Ex. 19, 5:8-19.  This results in a lateral

13  (planar) current flow in the substantially continuous conductive areas of the middle level metal

14  layer. *See* Szepesi Decl., ¶ 12; *see, e.g.,* '823 Patent, Fisher Decl., Ex. 19, 6:27-30.  The routing

15  structure is symmetrical, providing a combination of lateral and vertical connections between

16  both the drain and the source regions of the MOSFET switch and the top level drain and source

17  metallization. *See* Szepesi Decl., ¶ 12; *see, e.g.,* '823 Patent, Fisher Decl., Ex. 19, Fig. 1.

18       The embodiment shown in Figure 1 of the '823 Patent shows one implementation of the

19  conductive routing structure disclosed and claimed in the Patent.  A marked up version of Figure

20  1 of the '823 Patent, showing the current flow in an embodiment described in the '823 Patent, is

21  included below for convenience, as Figure A. *See* Szepesi Decl., Fig. A.

22       ///

23       ///

24       ///

25       ///

26       ///

27       ///

28       ///

OPENING CLAIM CONSTRUCTION BRIEF          - 19 -          CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                                      23666\2046782.5



**Figure A. Marked up Figure 1 of '823 showing drain and source current paths**

Figure A shows three metal layers on top of a silicon substrate (20) of the integrated circuit. *See* Szepesi Decl., ¶ 15.  The silicon substrate contains the first plurality and the second plurality of doped regions arranged in a checkerboard pattern, the source and drain regions of the MOSFET power switch of the integrated circuit of the '823 Patent. *Id*.  Although the embodiment shown in Figure 1 of the Patent depicts the doped regions and first metal layer in a checkerboard pattern, the '823 Patent makes clear that "many other layouts of the doped regions and the first conductive layer 30 are possible.  For example, the doped regions and first conductive layer 30 could be alternating stripes instead of a checkerboard pattern." *Id*.; *see* '823 Patent, Fisher Decl., Ex. 19, 5:58-62.

The first metal layer, shown above the silicon substrate in Figure A, has metal areas connected to both the source and drain regions, in a checkerboard pattern following the source

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 20 -

23666\2046782.5

1  and drain regions.  *See* Szepesi Decl., ¶ 16.  The next layer above is the second (middle) metal

2  layer, having two isolated substantially continuous conductive areas, the first and second

3  conductive areas (42a and 42b respectively).  *Id*.  The first and second conductive areas are

4  connected to the source regions and the drain regions of the MOSFET transistor respectively

5  through vertical vias (62a, 62b).  *Id*.  The first and second substantially continuous conductive

6  areas of the second (middle) metal layer have discontinuities (46a, 46b) with isolated conductive

7  areas or inserts (48a, 48b).  *Id*.  These isolated conductive areas together with vias (66a, 66b)

8  provide direct vertical connections between the drain areas that lie under the first conductive area

9  and the third conductive area of the top (third) metal layer and the source areas that lie under the

10  second conductive area and the fourth conductive area of the top (third) metal layer.  *Id*.  All four

11  of the substantially continuous conductive metal areas of the second and third metal layers have

12  extended regions at their edges.  *Id*.  These are protruding into the opposite conductive areas of

13  the same metal layer.  *Id*.  The substantially continuous conductive areas of the second (middle)

14  and third (top) metal layers are cross coupled (cross stitched) by vertical vias (60) connecting

15  their respective overlaying extended regions.  *Id*.

16           The current flows in the embodiment shown in Figure 1 of the '823 Patent are shown with

17  dotted lines in Figure A above.  Szepesi Decl., ¶ 17.  The drain current from the MOSFET area

18  under the third conductive area is flowing directly from the first metal layer to the top (3rd) metal

19  layer through vertical vias and isolated metal structures in the first conductive area of the second

20  level (middle) metal layer, as indicated by the red colored dotted arrow in Figure A.  *Id*.  The

21  drain current from the MOSFET area under the fourth conductive area is flowing from the first

22  metal layer to the second conductive area of the second (middle) metal layer.  *Id*.  The drain

23  current flows laterally in the metal layer toward the extended region at its edge, from the extended

24  region of the second conductive area to the overlaying extended region of the third conductive

25  area of the top (3rd) metal layer through vias, as indicated by the teal colored dotted arrow in

26  Figure A.  *Id*.  Similarly and symmetrically, the source current from the regions under the fourth

27  conductive area of the top (3rd) metal flows directly vertically, as indicated by the purple colored

28  dotted arrow, and from the other side of the MOSFET it flows vertically from the source areas to

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF                    - 21 -         CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                                          23666\2046782.5

1   the first conductive area, then laterally toward the extended regions at the edge of the first

2   conductive area, continuing vertically from the extended region of the first conductive area to the

3   overlaying extended region of the fourth conductive area of the top metal, as shown by the blue

4   colored dotted arrow. *Id.*

5       **B.   Claim Construction**

6           1.   "substantially continuous plane"/ "isolated structure"

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| substantially continuous plane | A substantially continuous plane of conductive material is a plane of conductive material, e.g., metal, which has one or more discontinuities that include isolated structures to provide a vertical conductive coupling between conductive elements located below and above the substantially continuous plane of conductive material. The one or more discontinuities have a total area that is a relatively small portion of the area of the substantially continuous plane of conductive material. The one or more isolated structures that are included in the one or more discontinuities are electrically isolated from the substantially continuous plane of conductive material that includes them. The '823 Patent describes and claims two separate, electrically isolated substantially continuous planes of conductive materials next to each other. The isolated structures inside one substantially continuous plane of conductive material are electrically connected to the other substantially continuous plane of conductive material. | A large uninterrupted surface, relative to the extended regions at the edge of the surface, such that a straight line that joins any two of its points lies wholly in that surface, except for: (1) isolated structures within the boundaries of the surface; and (2) small extended regions, relative to the uninterrupted surface, at the edge of the surface. |
| isolated structure | | A relatively small conductive insert (i.e., island of metal) bounded on all sides by a window-like cutout in the relatively large conductive area, wherein the conductive insert is electrically isolated from the conductive area by an insulator. |

23      The parties disagree as to the construction of the claim elements "substantially continuous

24  plane" and "isolated structure" used in independent claim 23 (from which all asserted claims of

25  the '823 Patent depend) as well as dependent claims 24 and 25. Volterra believes "substantially

26  continuous plane" and "isolated structure" must be construed together because the "substantially

27  continuous planes" are only "substantially" – not wholly – continuous planes of conductive

28  material because they have discontinuities accommodating (including) the "isolated structures."

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF          - 22 -          CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                                      23666\2046782.5

1    Volterra's construction is supported by the claims and specification of the '823 Patent

2    which describes one embodiment of the invention as including a substantially continuous plane,

3    such as a metal layer, that may have one or more isolated structures. *See* '823 Patent, Fisher

4    Decl., Ex. 19, 4:38-48; *see also* Szepesi Decl., ¶ 20. The isolated structures are electrically

5    isolated from the substantially continuous plane which includes them. *See* '823 Patent, Fisher

6    Decl., Ex. 19, 5:20-58; Szepesi Decl., ¶ 20. These isolated structures are electrically connected to

7    the other substantially continuous plane of conductive material formed by the same metal layer

8    (i.e. M2 in Figure 1 of the '823 Patent). *Id.; see also* '823 Patent, Fisher Decl., Ex. 19, 6:19-36;

9    8:1-5; Figs. 1 & 3. The one or more discontinuities in the substantially continuous plane have a

10   total area that is a relatively small portion of the area of the substantially continuous plane of

11   conductive material. <u>Webster's Ninth New Collegiate Dictionary</u> supports this construction by

12   defining "substantially" as "being largely but not wholly that which is specified." *See* Fisher

13   Decl., Ex. 20 at VLTS00052179; Szepesi Decl., ¶ 20.

14   Defendants' proposed construction of a "substantially continuous plane" -- "a large

15   uninterrupted surface, relative to the extended regions at the edge of the surface, such that a

16   straight line that joins any two of its points lies wholly in that surface, except for: (1) isolated

17   structures within the boundaries of the surface; and (2) small extended regions, relative to the

18   uninterrupted surface, at the edge of the surface" – is confusing and wrong.

19   The preferred embodiment as depicted in Figure 1 provides that the substantially

20   continuous plane (elements 42a or 42b) is "interrupted" by windows 46a or 46b that include

21   conductive inserts 48a or 48b, which correspond to the isolated structures of the asserted claims.

22   *See, e.g.,* '823 Patent, Fisher Decl., Ex. 19, 5:20-24; *see also* Szepesi Decl., ¶ 21. Accordingly,

23   the "substantially continuous plane" is clearly interrupted. Defendants' construction of the

24   "substantially continuous plane" as "a large uninterrupted surface" reads out the preferred

25   embodiment and therefore, "would rarely if ever be correct." *Chimie,* 402 F.3d at 1377. The word

26   "uninterrupted" is absent from the specification or the asserted claims of the '823 Patent and none

27   of Defendants' cited intrinsic or extrinsic evidence includes a requirement that the substantially

28   continuous plane be "uninterrupted." Fisher Decl., Ex. 1-A at 11-16.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS                    - 23 -                    CONTAINS HIGHLY CONFIDENTIAL INFORMATION
                                                                    23666\2046782.5

1      Defendants' use of the phrase "such that a straight line that joins any two of its points lies

2  wholly in that surface" is similarly unsupported.  Not only is it confusing and ambiguous, but

3  Defendants' proposed exceptions for the "isolated structure" and "small extended regions" render

4  Defendants' "straight line" requirement meaningless.  Indeed, if a straight line intersected an

5  isolated structure in the substantially continuous plane (as is clearly possible based on the

6  preferred embodiment depicted in Figure 1), it would not "lie[] wholly within" the surface of the

7  substantially continuous plane.  Defendants' construction is therefore wrong, unhelpful and

8  should not be adopted.  *See Dayco Prods. v. Total Containment, Inc.*, 258 F.3d 1317, 1324 (Fed.

9  Cir. 2001) ("If an argument offered in support of a particular claim construction is so convoluted

10  and artificial that it would not be apparent to a skilled artisan reading the patent and the

11  prosecution history, the argument is simply unhelpful to the performance of our task.").

12      Similarly, Defendants' inclusion of the phrase "within the boundaries" as a part of the

13  construction of a "substantially continuous plane" is not supported by the claims or intrinsic and

14  extrinsic evidence.  The specification describes isolated structures that are electrically isolated

15  from the substantially continuous plane which includes them (*see* '823 Patent, Fisher Decl., Ex.

16  19, 5:20-58), but nowhere is there any requirement that the isolated structure be only "within the

17  boundaries" of the substantially continuous plane, or that it should be "bounded on all sides" by

18  the substantially continuous plane that includes it.  *See* Szepesi Decl., ¶ 23; *see generally* '823

19  Patent, Fisher Decl., Ex. 19.  Defendants' proposed construction of "substantially continuous

20  plane" therefore imports unnecessary limitations.

21      Similarly, Defendants' construction of "isolated structure" improperly attempts to limit

22  the '823 Patent claims as "a relatively small conductive insert (i.e., island of metal) bounded on

23  all sides by a window-like cutout in the relatively large conductive area, wherein the conductive

24  insert is electrically isolated from the conductive area by an insulator."  There is no mention of

25  "islands" or "islands of metal" in the '823 Patent when discussing the isolated structures.  *See*

26  Szepesi Decl., ¶ 25; *see generally* '823 Patent, Fisher Decl., Ex. 19.  Similarly, there is no

27  mention in the specification or any requirement in the asserted claims that the isolated structure

28  would have to be "bounded on all sides" by the conductive area or the substantially continuous

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF
Case No. CV-08-5129 JCS

- 24 -

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
23666\2046782.5

1   plane of conductive material. *Id.* Defendants' construction of these terms is based on the

2   preferred embodiment of the '823 Patent, not on the limitations expressed in the asserted claims.

3   *Id.* Accordingly, Defendants' proposed construction should be rejected.

4            2.   "lateral protrusion"

| Claim Term | Volterra's Construction | Defendants' Construction |
|---|---|---|
| lateral protrusion | Volterra believes this term should be given its plain and ordinary meaning. | A region of a conductive area that juts out of the side of that conductive area. |

7            Volterra does not believe "lateral protrusion" requires any construction and the plain and

8   ordinary meaning of "lateral protrusion" should apply. One of skill in the art would have

9   understood the use of the term "lateral protrusion" in Claims 29 and 34 to refer to extended

10  regions of the conductive areas of the second and third metal layers. Szepesi Decl., ¶ 27.

11           Defendants, on the other hand, propose that "lateral protrusion" be construed to mean "a

12  region of a conductive area that juts out of the side of that conductive area." The intrinsic

13  evidence cited by Defendants does not support their construction. *See* Szepesi Decl., ¶ 29. The

14  '823 Patent does not use the term "jutting" or provide any explanation which suggest how the

15  word "jutting" should be interpreted in the context of the claims of the '823 Patent. *See id.*

16  Moreover, there is no limitation on the shape of the "lateral protrusion" or "extended region" in

17  the patents. *See id.*, ¶ 30. Defendants' construction, therefore, is unhelpful and confusing.

18           Accordingly, the plain and ordinary meaning of "lateral protrusion" should apply, and

19  Defendants' proposed construction should be rejected.

20  DATED:  October 22, 2009                    FARELLA BRAUN & MARTEL LLP

21

22                                              By:      /s/ Jeffrey M. Fisher
                                                     Jeffrey M. Fisher
23

24                                              Attorneys for Plaintiff
                                                VOLTERRA SEMICONDUCTOR
25                                              CORPORATION

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

OPENING CLAIM CONSTRUCTION BRIEF          - 25 -          CONTAINS HIGHLY CONFIDENTIAL INFORMATION
Case No. CV-08-5129 JCS                                   23666\2046782.5