FILED

NOV 1 7 2009

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR CORPORATION, | Case No.  C-08-05129 JCS |
| | REDACTED |
| Plaintiff, | **ORDER DENYING MOTION FOR ENTRY OF PRELIMINARY INJUNCTION  [Docket No. 113], DENYING WITHOUT PREJUDICE MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT AS TO CLAIM 34 OF THE '264 PATENT AND CLAIMS 18 AND 19 OF THE '522 PATENT [Docket No. 112], GRANTING PLAINTIFF'S ADMINISTRATIVE MOTION FOR LEAVE TO FILE RESPONSES TO DEFENDANTS' EVIDENTIARY OBJECTIONS [Docket No. 336] AND GRANTING IN PART AND DENYING IN PART MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS [Docket No. 415]** |
| v. | |
| PRIMARION, INC., ET AL., | |
| Defendants. | |
| _____/ | |

FILED UNDER SEAL

## I.    INTRODUCTION

On November 12, 2008, Plaintiff Volterra Semiconductor Corporation ("Volterra") filed a complaint alleging infringement and contributory infringement by Defendants of the following patents: 1) U.S. Patent No. 6,278,264 (the "'264 patent"); 2) U.S. Patent No. 6,462,522 (the "'522 patent"); 3) U.S. Patent No. 6,713,823 (the "'823 patent"); 4) U.S. Patent No. 6,020,729 (the "'729 patent"); and 5) U.S. Patent No. 6,225,795 (the "'795 patent"). The '264, '522 and '823 patents (collectively, "the Power Stage Patents") are aimed at techniques for integrating high power switches, and other circuitry, on a single integrated circuit ("IC") chip and relate to aspects of integrated power stage products. The '729 and '795 patents (collectively, "the Controller Patents") cover controller products that use a sampling circuit to make and capture a measurement of an electrical characteristic of the voltage regulator at a discrete moment in time.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Two motions are presently before the Court: 1) Volterra's Motion for Entry of Preliminary Injunction ("the Preliminary Injunction Motion"); and 2) Plaintiff's Motion for Partial Summary Judgment as to Claim 34 of the '264 Patent and Claims 18 and 19 of the '522 Patent ("the Summary Judgment Motion"). In the Preliminary Injunction Motion, Volterra asks the Court to enjoin Defendants from making, using, importing, offering for sale, marketing, attempting to sell, or selling their flip-chip integrated power stage products, including the PX4640 and the PX4650. In the Summary Judgment Motion, Volterra asks the Court to hold, as a matter of law, that these same products infringe the '264 and '522 patents.[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

On September 30, 2009, the Court held a 2½ hour hearing on the Motions. At the hearing, the Court announced its intention to grant the preliminary injunction motion. Following the hearing, the parties submitted briefs addressing the appropriate scope of the preliminary injunction and the amount of the bond Volterra would be required to post as a condition of entering the preliminary

---

[1]The parties also filed objections to evidence. In particular, when Volterra filed its Reply brief on the motions, on August 27, 2009, it filed objections to some evidence submitted by Defendants in support of their Opposition briefs. *See* Plaintiff Volterra Semiconductor Corporation's Objections to Evidence Submitted in Support of Defendants' Opposition to Motion for Entry of Preliminary Injunction and Opposition to Motion for Partial Summary Judgment ("Volterra's Objections"), Docket No. 346. Three weeks later, Defendants, requested leave to file a response to Volterra's objections, as well as objections to Volterra's evidence, which the Court granted. *See* Defendants' Response to Plaintiff's Objections ("Defendants' Response"), Docket No. 394; Defendants' Objections to Plaintiff's Evidence ("Defendants' Objections"), Docket No. 395. Defendants filed their objections to Plaintiff's evidence on September 16, 2009. Volterra then filed an Administrative Motion for Conditional Leave to File Response to Defendants' Evidence ("Administrative Motion"), Docket No. 336. In the Administrative Motion, Volterra argued that Defendants' objections were untimely to the extent they were aimed at evidence submitted in support of Volterra's motions, which were filed in July 2009. Volterra also argued that the objections should not be considered because they contained improper argument. If the Court was going to consider Defendants' objections, Volterra argued, it should be given the opportunity to file a response. The Court's clerk informed Plaintiff that it would be permitted to file a response and the on that basis, the Court formally GRANTS Plaintiff's Administrative Motion in this Order. Finally, Volterra filed a Response to Defendants' Objections to Plaintiff's Evidence ("Plaintiff's Response"), Docket No. 337.

The Court rules on the parties' objections only to the extent that it relies on the evidence to which the objections relate, except that it overrules as untimely all of Defendants' objections to evidence submitted by Volterra with its opening papers in support of the motions. This evidence was submitted on July 10, 2009, yet Defendants failed to object to any of Plaintiff's evidence when they filed their Opposition briefs, on August 12, 2009, instead waiting almost two months to raise these objections, which were filed on September 16, 2009. Nonetheless, in light of the extreme nature of the remedy requested by Plaintiff, the Court will address Defendants' untimely objections on the merits, as well, to the extent that it relies in any significant manner on such evidence.

United States District Court

For the Northern District of California

1   injunction.  In addition, Defendants requested permission to file a supplemental brief ("Supplemental

2   Brief"), to address a number of specific arguments on the question of invalidity that had been raised

3   for the first time in Volterra's Preliminary Injunction Reply brief.  Defendants also pointed to

4   evidence cited in Volterra's Reply brief that they asserted had not been provided to them until *after*

5   their Opposition brief had been filed.  Based on its review of the proposed Supplemental Brief, the

6   Court granted Defendants' request.  In addition, the Court held a supplemental hearing on October

7   26, 2009 to address the question of invalidity.

8        Having considered the entire record, and the arguments made at both hearings, the Court

9   DENIES the preliminary injunction motion and DENIES the Summary Judgment Motion without

10   prejudice.

11   **II.**       **BACKGROUND**

12       **A.**      **The Parties**

13          **1.**      **Volterra**

14        Volterra was founded as a start-up company in 1996 by a group of graduate students in U.C.

15   Berkeley's electrical engineering department.  Declaration of Craig Teuscher in Support of

16   Volterra's Motion for Entry of Preliminary Injunction ("Teuscher P.I. Motion Decl."), ¶ 2.  Volterra

17   is based in Fremont, California.  *Id.*, ¶ 2.  Its core business is "the development and sale of small and

18   efficient voltage regulator components, referred to as 'flip chip integrated power products.'" *Id.*, ¶ 3.

19   According to Volterra, its success in developing and marketing these products has "transformed

20   Volterra from a small start-up company such that it has achieved net revenues of $15.7 million in

21   2002, $25.1 million in 2003, $43.9 million in 2004, $53.9 million in 2005, $74.6 million in 2006,

22   $74.7 million in 2007, and $104.2 million in 2008." *Id.*, ¶ 9.

23          **2.**      **Primarion**

24        Primarion was formed in 1999 as a semiconductor manufacturer, in Tempe Arizona.

25   Declaration of Kenneth Ostrom in Support of Defendants' Opposition to Motion for Preliminary

26   Injunction ("Ostrom Decl."), ¶ 3.  Subsequently, Primarion sold off its manufacturing operations and

27   centralized its design operations in Torrance, California.  *Id.*  Primarion now operates as a "fabless"

28   semiconductor manufacturer, that is, a company that designs its chips and has third party companies

manufacture the chips. *Id.*

According to Defendants, ████████████████████████████████
████████████████████████████████████ *Id.,* ¶ 5.[2]  In April 2008, Primarion was
acquired by Infineon Technologies North America Corporation. *Id.,* ¶ 6.  At that time, Primarion
was completing the development of the two accused products, the PX4640 and PX4650, which are
fully integrated power stage products. *Id.,* ¶ 6.  These products first shipped in September 2008. *Id.,*
¶ 8.

Primarion currently has ███ full-time employees. *Id.,* ¶ 4.  ██████████████████
█████████████████████████████████████████████████ Declaration of John Zielinski
in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Zielinski
Decl."), ¶ 7.  According to John Zielinski, Infineon's Vice President, ████████████████
██████████████████████████████████████████████████████████████████████
█████████████████████████████████████ *Id.*

### 3.   Infineon

Infineon Technologies North America Corporation is a wholly-owned subsidiary of Infineon
Technologies AG, a German company.[3]  Zielinski Decl., ¶ 3.  Infineon is a "worldwide company that
sells semiconductors and system solutions for automotive and industrial electronics, chip card and
security applications, as well as applications for communications." *Id.,* ¶ 2.

### B.   Background of the Technology

The instant motions are based on two patents of which Volterra is the assignee: the '264
patent and the '522 patent (collectively, the "Burstein patents").  *See* Combined Declaration of

---

[2]Plaintiff objects to Ostrom's testimony relating to ██████████████████████████
████████ on the grounds that this testimony lacks foundation under Rule 602 of the Federal Rules of
Evidence and is prejudicial under Rule 403.  Plaintiff's Objections at 3.  In particular, Plaintiff points
to statements by Defendants' counsel that Ostrom was not involved in ███████████████.  The
Court overrules this objection.  Ostrom's employment with Primarion commenced in 2000 and he is
Primarion's Vice President of Engineering.  Further, Defendants state that Ostrom, in his capacity as
Vice President of Engineering, could and did authenticate the internal design documents of the company.
Therefore, the Court finds that this testimony meets the requirements of Rule 602.  Nor does the Court
find this testimony to be so prejudicial as to warrant its exclusion under Rule 403.

[3]Hereinafter, the Court refers to the parent and the subsidiary collectively as "Infineon."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Jeffrey M. Fisher in Support of Volterra's Motion for Summary Judgment of Infringement and

2  Preliminary Injunction Motion ("Fisher Motion Decl."), Ex. C ('264 patent) & Ex. D ('522 patent).

3  The '264 patent, entitled "Flip-Chip Switching Regulator," issued August 21, 2001 and lists as

4  inventors Andrew Burstein and Charles Nickel. *Id.*, Ex. C. The '522 patent, entitled "Transistor

5  Pattern for Voltage Regulators," is a continuation of the '264 patent and lists the same inventors. *Id.*,

6  Ex. D. The '522 patent issued October 8, 2002. Because the '522 patent is a continuation of the

7  '264 patent, the specifications for the two patents are identical (though the claims differ).

8       The Burstein patents relate "generally to voltage regulators, and more particularly to a

9  switching voltage regulator at least partially implemented with flip-chip packaging." '522 patent,

10  1:11-12. The patent specification explains that voltage regulators are used to provide a stable

11  voltage that is "particularly needed for battery management in lower power devices, such as laptop

12  notebooks and cellular phones." '522 patent, 1: 14-18. The specification describes switching

13  voltage regulators as follows:

14      A switching regulator generates an output voltage by converting an input DC voltage into a
   high frequency voltage, and filtering the high frequency voltage to generate the output DC
15  voltage. Specifically, the switching regulator includes a switch for alternately coupling and
   decoupling an input DC voltage source, such as a battery, to a load, such as an integrated
16  circuit. An output filter, typically including an inductor and a capacitor, between the input
   voltage source and the load filters the output of the switch and thus provides the output DC
17  voltage. The switch is typically controlled by a pulse modulator, such as a pulse width
   modulator or a pulse frequency modulator, which controls the switch.

18

19  '522 patent, 1: 20-32.

20       One way in which switching voltage regulators can convert the input DC voltage to the

21  output DC voltage is through use of two switches, referred to as high-side and low-side switches.

22  Fisher Motion Decl., Ex. E (Expert Report of Plaintiff Volterra Corporation's Expert: Dr. Thomas

23  Szepesi ("Szepesi Expert Report")), ¶ 27.[4]  These switches are shown in Figure 1 of the '522 and

24

25      [4]Defendants object to ¶¶ 12-47 of the Szepesi Expert Report, that is, to the entirety of the section
   of the report entitled, "Technology Overview." Defendants' Objections at 1. Defendants argue that
26  these paragraphs were not rendered from the standpoint of the hypothetical person of ordinary skill in
   the art and therefore, that they are irrelevant under Rule 402 of the Federal Rules of Evidence.
27  Defendants further assert that Dr. Szepesi provides no opinion as to the correct level of ordinary skill
   in the relevant art. As noted above, this objection is overruled on the basis that it is untimely. In
28  addition, Defendants' argument fails on the merits for several reasons. First, the challenged testimony

United States District Court
For the Northern District of California

1   '264 patents, in which 30 is the high-side switch and 32 is the low-side switch. *See* Declaration of

2   Vanessa Lefort in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary

3   Judgment on Infringement ("Lefort SJ Opposition Decl."), Ex. 1 (Expert Report of R. Jacob Baker

4   Ph.D., P.E. on the Issues of Claim Construction, Indefiniteness, and Noninfringement as to U.S.

5   Patent Nos. 6,278,264 and 6,462,522 ("Baker Expert Report")), ¶ 26.  The switches alternately

6   couple and decouple an input voltage source (such as a battery) to a load (such as a microprocessor)

7   through an output filter.  '522 patent, 1: 24-30.  The output filter typically contains inductors and

8   capacitors, which are energy storage elements.  Fisher Motion Decl., Ex. E (Szepesi Expert Report),

9   ¶ 27.  In particular, inductors can store magnetic energy in the form of flux and capacitors can store

10  charge. *Id.*

11      The power switches described in the Burstein patents are Metal Oxide Semiconductor Field

12  Effect Transistors, or MOSFETs.  Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 33.

13  The specification describes two types of MOSFETs, the PMOS transistor and the NMOS transistor.

14  *Id.; see also* Fisher Combined Motion Decl., Ex. E (Szepesi Expert Report), ¶ 23 (noting that PMOS

15  transistors also may be referred to as p-channel MOSFETs and NMOS transistors may be referred to

16  as n-channel MOSFETs). *Id.*  Defendants' expert describes the operation of these transistors as

17  follows:

18      These transistors have three terminals, known as a drain, source and gate.  The gate terminal
        is like a light switch in a home.  When the gate of the PMOS transistor is grounded, the drain
19      and the source of the PMOS transistor are connected together, allowing current to flow.

---

20  addresses the background of the technology at issue in this case and therefore is relevant.  Second, in
21  his rebuttal expert reports, Dr. Szepesi makes clear that his opinions regarding claim construction are
    rendered from the perspective of a hypothetical person of ordinary skill in the art at the time of the
22  invention, that is, in the 1998-2000 time frame.  *See* Reply Declaration of Jeffrey M. Fisher in Support
    of Voltera Semiconductor Corporation's Motion for Partial Summary Judgment of Infringement as to
23  claim 34 of the '264 Patent and claims 18 and 19 of the '522 Patent ("Fisher Reply Decl."), Ex. A
    (Expert Report of Plaintiff Volterra Semiconductor Corporation's Expert: Dr. Thomas Szepesi's
24  Rebuttal on Infringement ("Szepezi Rebuttal Report (Infringement)"), ¶ 2; Reply Declaration of James
    W. Morando in Support of Volterra Semiconductor Corporation's Motion for Entry of Preliminary
25  Injunction ("Morando Reply Decl."), Ex. F (Rebuttal Expert Report of Plaintiff Volterra Semiconductor
    Corporation's Expert Dr. Thomas Szepesi Regarding Validity ("Szepesi Rebuttal Report (Validity)"),
26  ¶ 2.  Moreover, in his rebuttal reports, Dr. Szepesi sets forth the qualifications that such a hypothetical
    person would have. *Id.*  Finally, Defendants do not contend that any specific fact set forth in ¶¶ 12-47
27  is inconsistent with the understanding of a hypothetical person of ordinary skill in the art between 1998
    and 2000.  Accordingly, Defendants' objection fails on the merits.
28

6

United States District Court

For the Northern District of California

When the gate of the PMOS transistor is driven to a higher voltage, the drain and source are disconnected and virtually no current flows. Similarly, when the gate of the NMOS transistor is driven above ground, the drain and the source are connected together, allowing current to flow. When the gate of the NMOS transistor is at ground, the drain and source are disconnected and virtually no current flows. This is why these transistors are sometimes referred to in the literature as switches.

Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶¶ 33-34; *see also* Fisher Motion  Decl., Ex. E (Szepesi Expert Report), ¶ 21 (describing operation of MOSFETs).

The switching voltage regulator architecture described in the Burstein patents can be fabricated, in part, as an integrated circuit chip. Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 29. According to Dr. Baker, "an integrated circuit (also known as a chip, die or IC) is a miniaturized electronic circuit consisting mainly of semiconductor devices and passive components (*e.g.*, transistors and resistors) that have been manufactured in, and on, the surface of a thin substrate of semiconducting material." *Id.* The substrate is made from a thin slice of semiconductor material, such as a silicon crystal, known as a "wafer." *Id.*, ¶ 31. The wafer undergoes "many microfabrication process steps such as doping, ion implantation, etching, deposition of various materials, and photolithographic patterning." *Id.* Doping is "the process of intentionally introducing impurities into an extremely pure (also referred to as intrinsic) semiconductor to change the semiconductor's electrical properties." *Id.*, ¶ 32. After the microfabrication process is complete,  the individual IC chip, or die, is removed from the wafer. *Id.*, ¶ 31.

Toward the end of the production process, IC chips are "packaged." Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 35. One of the earliest methods of attaching the chip to a package was through the use of wire bond packaging. *Id.* In this type of packaging, wires are connected from the IC chip to a lead frame, both of which are then encapsulated in plastic. *Id.* Sometimes, multiple chips are bonded directly to a substrate (called a multi-chip module, or MCM substrate), which is then attached to the metal frame. *Id.* This entire structure is then encapsulated in plastic. *Id.* Typically, these packaged parts are then soldered onto a printed circuit board. *Id.*

A problem associated with use of wire bond packaging is the large parasitic inductance and resistance of chips that used such packaging. '522 patent, 1: 39-40. In the specification of the Burstein patents, the problem of parasitic inductance is described as follows:

United Staes District Court
For the Northern District of California

> The parasitic inductance can result in large voltage transients on the integrated circuit. Specifically, although there is an abrupt change in the supply current when switching from the high to low voltage inputs, the current flowing through the parasitic inductor cannot change instantaneously, Thus, some current will continue to flow, causing the voltage on the voltage supply lines to "bounce." If the voltage transients exceed the process limitations of the integrated circuit, there can be damage due to voltage overstress. In addition, if the voltages on the voltage supply lines come too close together or cross, the digital and analog circuitry in the voltage regulator will fail. Furthermore, large voltage transients create noise which can interfere with the normal operation of analog components of the power regulator, Compensating for this noise requires additional circuitry, at the expense of design time, silicon area and power consumption.

'522 patent, 1: 42-57. The patents describe the problem of parasitic resistance as follows:

> The parasitic resistance of the packaging increases energy dissipation, which wastes energy and creates excess heat. This excess heat can degrade circuit performance, and in order to avoid the degraded circuit performance, it is necessary to use expensive heat sinks or cooling systems, or limit the current flowing through the device.

*Id.*, 1:59-64.

A method of packaging that reduces these problems, and which is used in the inventions of the Burstein patents, uses solder balls and flip-chip bonding technology rather than wire bonding. Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 43. This approach uses metal bumps or balls to attach the chip to a substrate carrier or directly to a printed circuit board. Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 36. This is accomplished through use of arrays of metalized pads with solder balls distributed over the active area on the die. Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 43. The chip is then flipped and attached to a printed circuit board ("PCB") such that the solder balls are situated under the active area. *Id.* "By allowing the placement of arrays of solder balls positioned across the die area of the switching transistor, the parasitic resistance and inductance between the drain/source diffusions of the MOSFET switch and the PCB pads and traces are significantly reduced due to the distributed nature of the connection which reduces both the current carried by each solder ball and the distance between the MOSFET cells and the PCB pads." *Id.*, ¶ 44.

## C.     The Accused Products

The PX4640 and PX4650 are power stage products that are integrated circuit packages that contain an integrated circuit chip. Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 149; *see also, id.*, Ex. 37 (Szepesi Depo.) at 215-216 (testifying that PX4650 is an "integrated circuit chip

1  in a package with a lead frame"). They are components that are designed to be used in certain

2  voltage regulator applications but they are not, by themselves, entire voltage regulators. Lefort SJ

3  Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 149. ████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████

6      **D.      The Preliminary Injunction Motion**

7        In the Preliminary Injunction Motion, Volterra asserts that it should be afforded injunctive

8  relief because: 1) it is reasonably likely to prevail on the merits with respect to its claims that

9  Defendants have directly and indirectly infringed claim 34 of the '264 patent and claims 18 and 19 of

10  the '522 patent; 2) Volterra will suffer irreparable harm if a preliminary injunction is not entered

11  against Defendants; 3) the balance of the hardships weighs in favor of Volterra; 4) the public interest

12  favors granting a preliminary injunction against Defendants; and 5) the evidence shows that

13  Defendants copied Plaintiff's invention.

14        With respect to likelihood of success on the merits, Volterra points out that it need only

15  demonstrate a likelihood of success as to *one* of the three claims as to which it seeks summary

16  judgment of infringement. Further, Volterra argues, the asserted claims are presumed valid unless

17  Defendants can come forward with clear and convincing evidence that they are invalid. Volterra's

18  substantive arguments relating to infringement are set forth in its Summary Judgment Motion

19  (discussed below).

20        In support of its assertion that it will suffer irreparable harm if it is not granted injunctive

21  relief, Volterra cites evidence that the inventions taught in the Burstein patents are its core products,

22  developed through the ingenuity and hard work of its engineers over many years, that Volterra has

23  never licensed its products, and that until Defendants began selling the accused products, Volterra

24  was the only company that had ever successfully developed and offered a flip-chip integrated power

25  product. Volterra further cites evidence that there is only a small number of potential purchasers of

26  flip-chip integrated power products. According to Volterra, the largest markets for its products are

27  the industry standard server market and the high-end graphics card market. The target companies in

28  the former market are ████████████████████ while the target companies in the latter are ███████

United Staes District Court
For the Northern District of California

1      ████     According to Volterra, all of these companies are currently Volterra customers, but

2 Defendants are actively marketing their competing products to these companies.

3        Although Defendants have, so far, only had small design wins (at ████ ), the parties are

4 currently competing for a number of large deals that will be awarded in the near future. These design

5 decisions, Volterra asserts, are crucial to its continued success not only because of the magnitude of

6 the deals (close to ████ million in lost revenue over the next two years, according to Volterra) but

7 also, as to at least one of the deals, for a new server platform, because a new generation of server

8 platforms is introduced only every two years. Thus, Volterra will not be able to bid on the next

9 server platform for two years, during which time it will lose substantial revenue and market share, as

10 well as the opportunity to deepen its relationships with its existing key customers. Further, because

11 Defendants have offered the accused products at prices that are ████ less than Volterra's, Plaintiff

12 asserts that it also faces the threat of price erosion and loss of goodwill on the part of existing

13 customers. Finally, Volterra asserts that loss of these deals will damage its reputation as a market-

14 leader and technology innovator.

15        Volterra argues that the balance of the hardships tips in its favor because Volterra's future

16 revenue is almost entirely dependent on sales of its flip-chip integrated power products whereas

17 Defendants are part of a large, diversified business that will not be harmed significantly by an

18 injunction prohibiting the sale of the PX4640 and PX4650.

19        Defendants argue that a preliminary injunction should not be entered because Volterra has

20 not demonstrated a reasonable likelihood of success on the merits. Defendants argue, in particular,

21 that there are substantial questions as to infringement of the asserted claims and the validity of those

22 claims. With respect to non-infringement, Defendants argue that the accused products fail to meet

23 certain limitations of the asserted claims (discussed further below). Defendants argue further that

24 there are substantial questions as to the validity of the asserted claims. First, they argue that the

25 asserted claims are invalid because the term "power switch," which is used in all of the asserted

26 claims, is indefinite under 35 U.S.C. § 112(2). Second, they cite to prior art that Defendants argue

27 renders Plaintiff's invention either anticipated or obvious. Third, Defendants argue that the asserted

28 claims are invalid on the basis of evidence of a public use of the invention more than one year before

1  the earliest priority date, making the invention unpatentable under 35 U.S.C. § 102(b).

2       Even if the Court finds that there is a reasonable likelihood of success on the merits,

3  Defendants argue, the evidence shows that Volterra will not, in fact, suffer irreparable harm if sales

4  of Defendants' accused products are not enjoined.  In particular, Defendants cite a report by their

5  expert, James Malackowski, concluding that ████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████████

7  ██████████████████████████████████  According to Defendants, any harm that

8  might result from Defendants' actions is measurable and therefore not irreparable.  Moreover,

9  Defendants argue, the balance of the hardships tips in Defendants' favor because an injunction would

10  be an "irrecoverable blow" to their business and would also deprive customers of a second source for

11  IPS products.

12       **E.**    **The Summary Judgment Motion**

13       In the Summary Judgment Motion, Volterra argues that Defendants' PX4640 and PX4650

14  meet every element, and therefore infringe, claim 34 of the '264 patent and claims 18 and 19 of the

15  '522 patent.

16       Defendants argue that Volterra is not entitled to summary judgment because the following

17  claim limitations are not met by the accused products: 1)  the "metalized pads" limitation of claim 34

18  of the '264 patent; 2) the limitation of claim 34 of the '264 that the metalized pads must be

19  "fabricated on the surface of the substrate"; 3) the "mounted on" limitation of claims 18 and 19 of

20  the '522 patent; 4) the limitations of claims 18 and 19 of the '522 patent requiring "a substantially

21  DC voltage at the output terminal" and "to maintain the DC voltage substantially constant"; 5) the

22  "alternating pattern" of doped regions limitation of all three asserted claims.  As to the "alternating

23  pattern" limitation, Defendants argue further that Volterra is barred by prosecution history estoppel

24  from asserting infringement under the doctrine of equivalents.  Finally, Defendants  assert that

25  Volterra's summary judgment motion fails because the term "power switch," which is used in all

26  three claims, is indefinite as a matter of law.

27

28

III.    LEGAL STANDARDS

    A.    Preliminary Injunction Standard

    Volterra seeks a preliminary injunction pursuant to 35 U.S.C. § 283, which allows a federal district court to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." Because issuance of a preliminary injunction pursuant to § 283 involves substantive matters unique to patent law, the law of the Federal Circuit governs, except where the issues involved are purely procedural. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988). The grant or denial of a preliminary injunction under § 283 is within the sound discretion of the district court. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted). It is, however, a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI System Technology*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).

    As the moving party, Volterra is entitled to a preliminary injunction if it succeeds in showing that: 1) there is a reasonable likelihood of success on the merits; 2) Volterra will suffer irreparable harm if an injunction is not granted; 3) the balance of hardships tips in Volterra's favor; and 4) entry of an injunction will have a favorable impact on the public interest. *Id.* "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Amazon.com, Inc.*, 239 F.3d at 1350 (quoting *Hybritech*, 849 F.2d at 1451). The moving party must demonstrate both of the first two factors, that is, likelihood of success on the merits and irreparable harm. *Id.* (citation omitted); *see also PHG Technologies v. St. John Companies, Inc.*, 469 F.3d 1361, 1369 (Fed. Cir. 2007) (holding that where there was a substantial question as to invalidity, district court abused discretion in granting preliminary injunction motion because plaintiff had not demonstrated likelihood of success on the merits).

    In order to demonstrate a likelihood of success on the merits, the patentee must show, in light of the burdens and presumptions that will inhere at trial, that it will likely prove that: 1) the defendant infringes the asserted claims; and 2) the patentee's infringement claims will likely

12

United States District Court
For the Northern District of California

1    withstand the defendants' challenges to the validity and enforceability of the patents. *Amazon.com,*

2    *Inc.*, 239 F.3d at 1350.  In cases involving multiple asserted claims, a party seeking a preliminary

3    injunction must show that it will likely succeed in demonstrating infringement of at least one of the

4    claims of the patent-in-suit and that at least one of those same claims will likely withstand the

5    validity challenges of the accused infringer. *Id.*

6          If the accused infringer raises "a substantial question concerning either infringement or

7    validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove 'lacks

8    substantial merit,' the preliminary injunction should not issue." *Id.*  Thus, although the statutory

9    presumption that a patent is valid places the *ultimate* burden on the accused infringer to prove

10   invalidity at trial, because of the extraordinary nature of the relief sought at the preliminary

11   injunction stage, the patentee carries the burden of showing likelihood of success not only as to

12   infringement but also with respect to validity. *See Nutrition 21 v. U.S.*, 930 F.2d 867, 869 (Fed. Cir.

13   1991).  In considering whether a patentee has established a likelihood of success on validity at the

14   preliminary injunction stage, the court must take into account the fact that at trial, an accused

15   infringer must establish invalidity by clear and convincing evidence. *See Computrol, Inc. v.*

16   *Lowrance Electronics, Inc.*, 893 F. Supp. 1440, 1446 (D. Idaho 1994).  Nevertheless, "a showing of a

17   substantial question of invalidity requires less proof than the clear and convincing standard to show

18   actual invalidity." *Erico Intern. Corp. v. Vutec Corp.*, 516 F.3d 1350, 1356 (Fed. Cir. 2008).

19         In determining whether a patentee has established a likelihood of success, both as to

20   infringement and validity, the court must perform a claim-by-claim analysis to determine the

21   meaning and scope of each claim. *Amazon.com*, 239 F.3d at 1351 (*quoting Markman v. Westview*

22   *Instruments, Inc.*, 52 F.3d 967, 996 n. 7, stating that "[a] claim must be construed before determining

23   its validity just as it is first construed before deciding infringement").  However, the court has no

24   obligation to construe claims "conclusively and finally" during a preliminary injunction proceeding.

25   *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221(Fed. Cir. 1996) (holding that

26   *Markman* does not obligate the trial judge to conclusively interpret claims at an early stage in the

27   case").  Rather, the Federal Circuit has explained that the trial court may engage in a "rolling claim

28   construction" as the case proceeds:

13

United States District Court
For the Northern District of California

> District courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves. *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221, 37 USPQ 2d 1529, 1532 (Fed. Cir. 1996). This is particularly true where issues involved are complex, either due to the nature of the technology or because the meaning of the claims is unclear from the intrinsic evidence. Indeed, these difficulties may be even more acute in the preliminary injunction context than at later stages in the litigation because . . . motions for a preliminary injunction may come for decision before significant discovery has occurred. Hence, in reviewing a district court's decision on a motion for a preliminary injunction, we remain "mindful that all findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits."

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).  Thus, the court's claim constructions at the preliminary injunction stage are not binding on the court at summary judgment. *See Mueller Sports Medicine Inc. v. Beveridge Marketing LLC*, 369 F. Supp. 2d 1028, 1034 (W.D. Wis. 2005).

Prior to the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), irreparable harm was presumed when a clear showing of patent validity and infringement had been made.  *See, e.g., id.*  Subsequent to the *eBay* decision, however, there is a split of opinion as to whether this presumption still arises in patent cases. *See Hologic, Inc. v. SenoRx, Inc.*, 2008 U.S. Dist. LEXIS 36693 (N.D. Cal. April 25, 2008) (discussing split following *eBay* and holding in context of preliminary injunction motion that under the reasoning of *eBay*, presumption no longer exists).  In *eBay*, the Supreme Court found that the Federal Circuit had erred in holding that in patent cases, the "general rule" provides that a permanent injunction will issue once infringement and validity have been adjudged.  547 U.S. at 393-394.  The Court reasoned that nothing in the Patent Act indicates that Congress intended that courts depart from traditional equitable principles in determining whether injunctive relief is warranted in cases involving patent infringement. *Id.*  This conclusion applies equally to preliminary injunctions.  Therefore, this Court, like the court in *Hologic*, finds that the existence of irreparable harm in connection with a motion for a preliminary injunction in a patent case should be determined by applying the traditional principles of equity and not on the basis of a presumption arising from a showing that there is a likelihood of success on infringement and validity.

United States District Court
For the Northern District of California

### B.   Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### C.   Infringement Standards

A determination of infringement is a two-step process. *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). The first step is claim construction, which is a question of law to be determined by the court. *Id.* The second step is an analysis of infringement, in which it must be determined whether a particular device infringes a properly construed claim. *Id.* This analysis is a question of fact. *Id.* A device literally infringes if each of the elements of the asserted claims is found in the accused device. *Id.* In the alternative, a device may infringe under the doctrine of equivalents "if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially." *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

United States District Court
For the Northern District of California

Application of the doctrine of equivalents may be limited as a result of the prosecution history of the patent. In particular, "a narrowing amendment made [during patent prosecution] to satisfy any requirement of the Patent Act may give rise to an estoppel." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.* 535 U.S. 722, 736 (2002). "A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Id.* at 737; *see also Felix v. American Honda Motor Co., Inc.,* 562 F.3d 1167, 1182-1183 (Fed. Cir. 2009) (emphasizing that "[i]t is the patentee's response to a rejection — not the examiner's ultimate allowance of a claim-that gives rise to prosecution history estoppel"). Thus, where a narrowing amendment was adopted during prosecution to secure allowance of a claim, a presumption of estoppel arises. *Festo Corp.,* 535 U.S. at 736. This presumption arises "when a patentee cancels an independent claim and rewrites a dependent claim in independent form for reasons related to patentability, even if the amendment alone does not succeed in placing the claim in condition for allowance." *Felix,* 562 F.3d at 1183. "The presumption of surrender applies to all claims containing the added limitation, regardless of whether the claim was, or was not, amended during prosecution." *Id.* (citations omitted). Once a presumption of surrender has been established, the burden of production and persuasion then shifts to the patentee to rebut the presumption by showing that the particular equivalent was not disclaimed. *Festo Corp.,* 535 U.S. at 736.

Infringement may be direct or indirect. *See BMC Resources, Inc. v. Paymentech, L.P.,* 498 F.3d 1373, 1378 (Fed. Cir. 2007); *see also* 35 U.S.C. § 271. "Direct infringement requires a party to perform or use each and every step or element of a claimed method or product." *Id.* A defendant may be liable for indirect infringement if it "participates in or encourages infringement" by another *and* there is "a finding that some party amongst the accused actors has committed the entire act of direct infringement." *Id.* One form of indirect infringement is contributory infringement. *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,* 491 F.3d 1342, 1357-1358 (Fed. Cir. 2007) (explaining that the 1952 Patent Act codified the judicially created doctrine of contributory infringement). Under the Patent Act, contributory infringement is defined as follows:

1   Whoever offers to sell or sells within the United States or imports into the United States a
component of a patented machine, manufacture, combination or composition, or a material or
2   apparatus for use in practicing a patented process, constituting a material part of the
invention, knowing the same to be especially made or especially adapted for use in an
3   infringement of such patent, and not a staple article or commodity of commerce suitable for
substantial noninfringing use, shall be liable as a contributory infringer.

4

5   35 U.S.C. § 271(c).

6   **D.      Claim Construction Standards**

7   "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

8   which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

9   (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

10  1111, 1115 (Fed. Cir. 2004)). Generally, claim terms are given the ordinary and customary meaning

11  that would be ascribed to them by a person of ordinary skill in the field of the invention. *Id.* at 1313.

12  The most "significant source of the legally operative meaning of disputed claim language" is the

13  intrinsic evidence of record, that is, the claims, the specification and the prosecution history.

14  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). This is because "the

15  person of ordinary skill in the art is deemed to read the claim term not only in the context of the

16  particular claim in which the disputed term appears, but in the context of the entire patent, including

17  the specification." *Phillips*, 415 F.3d at 1312. In some cases, the specification may reveal a "special

18  definition" given by the inventor that differs from the meaning the term might otherwise possess. *Id.*

19  at 1316. A specification may also reveal "an intentional disclaimer, or disavowal, of claim scope by

20  the inventor." *Id.* A person of ordinary skill in the art also looks to the prosecution history of a

21  patent to understand how the patent applicant and the Patent Office understood the claim terms. *Id.*

22  at 1313, 1317. In particular, arguments and amendments made during patent prosecution limit the

23  interpretation of claim terms to exclude interpretations that were disclaimed to obtain allowance of a

24  claim. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

25  "[U]nless compelled to do otherwise, a court will give a claim term the full range of its

26  ordinary meaning as understood by an artisan of ordinary skill." *Rexnord Corp. v. Laitram Corp.*,

27  274 F.3d 1336, 1342 (Fed. Cir. 2001) (holding that district court erred in giving claim language

28  narrow interpretation rather than broader interpretation that was also supported by claim language on

United States District Court
For the Northern District of California

17

United Staes District Court
For the Northern District of California

1   the basis that narrow interpretation was consistent with preferred embodiments).  Thus, while claims

2   are to be construed in light of the specification, courts must be careful not to read limitations from

3   the specification into the claim.  *Phillips*, 415 F.3d at 1323.  If a patent specification describes only a

4   single embodiment, that does not mean the claims of the patent necessarily must be construed as

5   limited to that embodiment.  *Id.*  Rather, it is to be understood that the purpose of the specification

6   "is to teach and enable those of skill in the art to make and use the invention" and that sometimes,

7   the best way to do that is to provide an example.  *Id.*  Similarly, the Federal Circuit has cautioned

8   that "patent coverage is not necessarily limited to inventions that look like the ones in the figures,"

9   noting that taking such an approach to claim construction would amount to "import[ing] limitations

10  onto the claim from the specification, which is fraught with danger."  *MBO Laboratories, Inc. v.*

11  *Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

12        Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as

13  such evidence is not used to "vary or contradict the terms of the claims."  *Markman,* 52 F.3d at 980.

14  The Federal Circuit has warned, however, that such evidence is generally "less reliable than the

15  patent and its prosecution history."  *Phillips*, 415 F.3d at 1318.  Courts may consider expert

16  testimony, the testimony of the inventor, and prior art, whether or not it is referenced in the

17  specification or prosecution history.  *Vitronics*, 90 F.3d at 1584.  Courts are also free to consult

18  dictionaries and technical treatises so long as they are careful not to elevate them "to such

19  prominence that it focuses the inquiry on the abstract meaning of the words rather than on the

20  meaning of the claim terms within the context of the patent."  *Phillips*, 415 F.3d at 1321-22.  As the

21  court explained in *Markman*, "[extrinsic] evidence may be helpful to explain scientific principles, the

22  meaning of technical terms, and terms of art that appear in the patent and prosecution history."  52

23  F.3d at 980.

24        E.    **Invalidity Standards**

25              1.    **Indefiniteness**

26        The requirement that claims be sufficiently "definite" is set forth in 35 U.S.C. § 112, ¶ 2,

27  which provides that, "[t]he specification shall conclude with one or more claims particularly pointing

28  out and distinctly claiming the subject matter which the applicant regards as his invention."  "The

United States District Court
For the Northern District of California

1   definiteness inquiry focuses on whether those skilled in the art would understand the scope of the

2   claim when the claim is read in light of the rest of the specification." *Union Pacific Resources Co. v.*

3   *Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001). In order to "accord respect to the

4   statutory presumption of patent validity," a claim should be found indefinite "only if reasonable

5   efforts at claim construction prove futile." *Exxon Research and Engineering Co. v. United States,*

6   265 F.3d 1371, 1375 (Fed. Cir. 2001). Thus, a claim is not indefinite simply because its meaning is

7   not ascertainable from the face of the claims. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d

8   1313, 1342 (Fed. Cir. 2003). Further, where a claim is fairly susceptible of two constructions,

9   courts should attempt to preserve its validity, reading the claim in light of the specification. *See*

10  *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999). A claim is

11  indefinite, however, if it is "insolubly ambiguous, and no narrowing construction can properly be

12  adopted." *Id.* (citations omitted).

13     2.  **Obviousness and Anticipation**

14    A patent may be invalid because the invention is not literally new (in which case, it may be

15  anticipated) or because, although the invention is literally new, it is an obvious variation or

16  modification of old products, processes, and technology. *See* Donald S. Chisum, *Sources of Prior*

17  *Art in Patent Law*, 52 Wash. L. Rev. 1, 2 (1976). The standards governing these two doctrines are

18  set forth below.

19     a.  **Anticipation**

20    A patent is anticipated under 35 U.S.C. § 102 if "(a) the invention was known or used by

21  others in this country, or patented or described in a printed publication in this or a foreign country,

22  before the invention thereof by the applicant for patent, or (b) the invention was patented or

23  described in a printed publication in this or a foreign country or in public use or on sale in this

24  country, more than one year prior to the date of the application for patent in the United States . . . ."

25  The general rule for determining priority of invention is set forth in § 102(g), which provides, in part,

26  as follows:

27     In determining priority of invention under this subsection, there shall be considered not only
   the respective dates of conception and reduction to practice of the invention, but also the

28

United States District Court
For the Northern District of California

1    reasonable diligence of one who was first to conceive and last to reduce to practice, from a
2    time prior to conception by the other.

3    35 U.S.C. § 102(g). In other words, "priority of invention 'goes to the first party to reduce an

4    invention to practice unless the other party can show that it was the first to conceive the invention

5    and that it exercised reasonable diligence in later reducing that invention to practice.'" *Mahurkar v.*

6    *C.R. Bard., Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) (quoting *Price v. Symsek*, 988 F.2d 1187, 1190

7    (Fed. Cir. 1993)).

8        "To have conceived of an invention, an inventor must have formed in his or her mind 'a

9    definite and permanent idea of the complete and operative invention as it is hereafter to be applied in

10   practice.'" *Id.* (quoting *Burroughs Wellcome Co. v. Barr Labs, Inc.*, 40 F.3d 1223, 1228 (1996)).

11   Where a party seeks to establish conception through the oral testimony of the inventor, corroboration

12   of the inventor's story must be presented. *Id.* In assessing corroboration of oral testimony, a "rule of

13   reason" is applied whereby all pertinent evidence is analyzed to determine whether the inventor's

14   story is credible. *Id.* To show reduction to practice, "an inventor must demonstrate that the

15   invention is suitable for its intended purpose." *Id.* at 1578.

16       In order for prior art to be "known" under § 102(a), it must be publically accessible and it

17   must be sufficient to enable one with ordinary skill in the art to practice the invention. *Minnesota*

18   *Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). "Public use under 35

19   U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is

20   under no limitation, restriction or obligation of frequency." *Id.* Alternatively, a patent may be

21   invalid under the "on-sale-bar" codified in § 102(b) if there was a "definite sale or offer to sell more

22   than one year before the application for the patent and . . . the product sold or offered for sale

23   anticipated the claimed invention or rendered it obvious." *Id.* The on-sale-bar is usually triggered by

24   the actions of the inventor. *See* Chisum, *Sources of Prior Art in Patent Law*, 52 Wash. L. Rev. at 7.

25   As Chisum notes, "most things 'in public use or on sale' within the meaning of Section 102(b)

26   would also be 'known or used' within the meaning of Section 102(a)." *Id.*

27       In order to establish anticipation under § 102(a) on the basis of a printed publication, a

28   defendant must demonstrate in the publication "each and every limitation of the claimed invention."

20

1  *Novo Nordisk Pharms., Inc. v. Bio-Techn. Gen. Corp.*, 424 F.3d 1327, 1354 (Fed. Cir. 2005).  Thus,

2  "each and every limitation [must be] found either expressly or inherently in a single prior art

3  reference."  *Oakley Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (quotations

4  omitted).  A limitation is "inherent" if it is "necessarily present" in the prior art invention.

5  *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005).

6       Similarly, under § 102(b), a device that is used in public or sold may render a patent invalid

7  on the basis of anticipation only if the device includes every limitation of the later claimed invention.

8  *See Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002).

9                     **b.    Obviousness**

10      The standard regarding obviousness is set forth in 35 U.S.C. § 103(a), which provides, in

11  relevant part, as follows:

12              A patent may not be obtained though the invention is not identically
                disclosed or described as set forth in section 102 of this title, if the
13              differences between the subject matter sought to be patented and the
                prior art are such that the subject matter as a whole would have been at
14              the time the invention was made to a person having ordinary skill in
                the art to which said subject matter pertains.
15

16  35 U.S.C. § 103(a).  In *Graham v. John Deere Co.*, the Supreme Court instructed courts to address

17  the question of obviousness against the "background" of three inquiries: 1) the scope and content of

18  the prior art; 2) differences between the prior art and the claims at issue; and 3) the level of ordinary

19  skill in the pertinent art. 383 U.S. 1, 17 (1966).  In addition, under *Graham* courts are to consider

20  "secondary considerations" that may be relevant to obviousness, such as "commercial success" and

21  "long felt but unsolved needs." *Id.*

22      In *Great Atl. & Pac. Tea Co. v. Supermarket Equip.*, the Court explained the policy on which

23  the nonobviousness requirement is based:

24              The function of a patent is to add to the sum of useful knowledge. Patents cannot be
                sustained when, on the contrary, their effect is to subtract from former resources
25              freely available to skilled artisans. A patent for a combination which only unites old
                elements with no change in their respective functions . . . obviously withdraws what
26              already is known into the field of its monopoly and diminishes the resources available
                to skillful men.
27

28

United States District Court
For the Northern District of California

1  340 U.S. 147, 152-153 (1952). On the other hand, "a patent composed of several elements is not

2  proved obvious merely by demonstrating that each of its elements was, independently, known in the

3  prior art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). For example, "when the prior art

4  teaches away from combining certain known elements, discovery of a successful means of

5  combining them is more likely to be nonobvious." *Id.* at 416. It may also be "helpful" to ask

6  whether there was a "teaching, suggestion, or motivation to combine known elements" that would

7  have rendered an invention obvious ("the TSM test"). *Id.* at 418.

8      In *KSR*, the Supreme Court decided that the Federal Circuit had applied the TSM test too

9  rigidly by holding that the patent examiner should look only to the question the patentee was trying

10  to resolve in determining whether there was a motivation to combine elements found in prior art. *Id.*

11  at 1742. The Court explained, "[t]he question is not whether the combination was obvious to the

12  patentee but whether the combination was obvious to a person with ordinary skill in the art." *Id.*

13  Therefore, "any need or problem known in the field of the endeavor at the time of the invention and

14  addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*

15      While the ultimate conclusion of obviousness is a legal question, it is based upon underlying

16  facts. *In re Icon Health & Fitness*, 496 F. 3d 1374, 1378 (Fed. Cir. 2007). "Underlying facts

17  include the scope and content of the prior art, the level of ordinary skill in the art at the time of the

18  invention, objective evidence of nonobviousness, and differences between the prior art and the

19  claimed subject matter." *Id.* (citing *Graham*, 383 U.S. at 17-18). The presence or absence of a

20  motivation to combine is also a question of fact, *see In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir.

21  2000), as are the "secondary considerations" discussed in *Graham*. *See PharmaStem Therapeutics v.*

22  *ViaCell, Inc.*, 491 F.3d 1352, 1359 (Fed. Cir. 2007).

23  **IV.    THE PRELIMINARY INJUNCTION MOTION**

24      **A.    Likelihood of Success on the Merits**

25          **1.    Infringement**

26      Volterra asserts that it is entitled to a preliminary injunction on the basis of three asserted

27  claims that it alleges are infringed: claim 34 of the '264 patent, and claims 18 and 19 of the '522

28  patent. Below, the Court tentatively construes the disputed terms of these claims, then looks to the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  evidence presented by the parties with respect to the accused devices to determine whether Volterra

2  is likely to succeed in demonstrating infringement of any or all of the three claims.

3            **a.**      **Claim 34**

4                  **i.**      **Background**

5       Volterra asserts that the PX4640 and PX4650 meet every element of claim 34 of the '264

6  patent.[5]  claim 34 depends from claim 26, which provides as follows:

7       An integrated circuit chip with a power switch for a voltage regulator fabricated thereon,
     comprising:

8

9       a substrate having a first plurality of doped regions and a second plurality of doped regions,
     the first and second pluralities of doped regions arranged in a first alternating pattern; and

10       an array of metalized pads fabricated on a surface of the substrate, the array including a first
     plurality of pads and a second plurality of pads, with the first and second pluralities of pads

11       arranged in a second alternating pattern;

12       wherein the first plurality of pads are electrically connected to the first plurality of doped
     regions and the second plurality of pads are electrically connected to the second plurality of

13       doped regions, and wherein the first plurality of pads are connected to a first terminal of the
     voltage regulator and the second plurality of pads are connected to a second terminal in the

14       voltage regulator.

15  '264 patent, claim 26.  Claim 34 provides:

16       The chip of claim 26, wherein the first plurality of pads are connected to a first plurality of
     solder balls and the second plurality of pads are connected to a second plurality of solder

17       balls interleaved with the first plurality of solder balls across a surface on the chip.

18  '264 patent, claim 34.

19       Volterra cites the following evidence in support of its assertion that Defendants' accused

20  products meet all of the elements listed above:

21     •   **"An integrated circuit chip with a power switch for a voltage regulator fabricated
     thereon" (Claim 26):**   In his expert report, Dr. Szepesi relies on the datasheet for the

22       PX4650 in support of his conclusion that the accused products are integrated circuit chips
     with a power switch for a voltage regulator. *See* Fisher Motion Decl., Ex. E (Szepesi Expert

23       Report), ¶ 66.  In particular, he points to Figure 2 of the datasheet, which shows ████████
     ████████████████████████████████████ *Id.*  According to Dr. Szepesi, ██

24       ██████████████████████████ is the power switch that is called for under claims 26 and 34.

25       *Id.*

26  ████████████████████████████████████████████████████████████████████████████████

27  Further, the parties have not distinguished between the PX4650 and 4640 with respect to any of the
    issues raised in the motions.  Accordingly, the Court treats the two devices as being the same in ruling

28  on the Preliminary Injunction Motion.

United States District Court
For the Northern District of California

- "A substrate having a first plurality . . . and a second plurality of doped regions . . . arranged in a first alternating pattern" (Claim 26): In his expert report, Dr. Szepesi relies on layout plots of the PX4650 provided to Volterra by Defendants, in support of his conclusion that this limitation is met. Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 67; *see also id.*, Ex. O (CD with color copies of layout plots produced by Defendants). In particular, he points to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 67. According to Dr. Szepesi, the first plurality of doped regions are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ while the second plurality of doped regions are ▮▮▮▮▮▮▮▮▮▮

- "An array of metalized pads fabricated on a surface of the substrate . . . including a first plurality . . . and a second plurality of pads . . . arranged in a second alternating pattern" (Claim 26): Dr. Szepesi explains that "pads" in an IC "are commonly understood in the art to mean openings in the top passivation layer that allow connection to the top metal layer to enable the formation of connections between the integrated circuit and external circuit elements." Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 62 n. 2. He construes "metalized pads" as "pads that include an under-bump metalization layer (UMB) that forms an interface between the top metal layer of the integrated circuit and the solder balls (bumps) that are often used in flip-chip type integrated circuits." *Id.*, ¶ 62 (citing '264 patent, 7: 4-7, which states, "as shown in Fig. 4A, each pad includes a final metal layer 80, such as aluminum, a nitride passivation layer 82, and an under-bump metalization (UBM) layer 40"). He relies on a die photograph of the PX4650 to show that the limitation quoted above is met. *Id.*, ¶ 69. According to Dr. Szepesi, the photo shows ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
*Id.* Further, Dr. Szepesi concludes that the pads are "metalized" on the basis of the testimony of Defendants' 30(b)(6) witness, Laura Carpenter, that ▮▮▮▮▮▮▮▮▮▮▮ ("UBM"). *Id.* (citing Fisher Motion Decl., Ex. F (Carpenter Depo.) at 173-174).[6]

- "The first plurality of pads are electrically connected to the first plurality of doped regions and the second plurality of pads are electrically connected to the second plurality of doped regions and wherein the first plurality of pads are connected to a first terminal in the voltage regulator and the second plurality of pads are connected to a second terminal in the voltage regulator" (Claim 26): In his expert report, Dr. Szepesi points to die photos, as well as an x-ray of the PX4650, to show that the first plurality of metalized pads and the second plurality of metalized pads are connected to: 1) the first and second pluralities of doped regions (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, respectively; and 2) the first and second terminals of the voltage regulator, respectively. Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 70. According to Dr. Szepesi, the photos show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Further, the datasheets that show ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6]In her deposition, Carpenter testified that a "pad" is "an opening in the passivation layer through which you make contact to the chip metalization." Fisher Motion Decl., Ex. F (Carpenter Depo.) at 173. She further testified that in the PX4640, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

24

1      ████████████████████████████████████████████████████

2      ████████████. *Id.*

•    "[T]he first plurality of pads are connected to a first plurality of solder balls and the

3      second plurality of pads are connected to a second plurality of solder balls interleaved
with the first plurality of solder balls across a surface on the chip" (Claim 34):  Relying

4      on the same die photos and x-ray of the PX4650 as above, Dr. Szepesi concludes that this
limitation is met, █████████████████████████████████████████

5      ███████████████████████████████████████████

6      ██████████████████████████ *Id.*, ¶ 72.

7         In their Opposition, Defendants assert that the accused products do not infringe claim 34

8 because: 1) they do not include "metalized pads"; 2) even if they did, the metalized pads are not

9 "fabricated on a surface of the substrate;" and 3) the accused products do not meet the limitation

10 requiring an "alternating pattern" of doped regions.

11            ii.     "metalized pad"

12               A.     Arguments

13         Defendants argue that the "metalized pad" requirement of claim 26 is not met by the accused

14 products.  Defendants' position is based on its expert's construction of the term "metalized pad."  In

15 particular, Dr. Baker, construes the term "metalized pads" as "an array of 'metalized pads' wherein

16 each pad in the array consists of: (i) an individual and distinct raised island of metal separated a fixed

17 distance from the other metalized pads; (ii) a passivation layer that lies partially over the island of

18 metal; and (iii) an under-bump metal (UBM) that partially overlays both the island of metal and the

19 passivation layers." Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 110.

20         Dr. Baker points to the specification in support of his proposed construction, noting that

21 "metalized pads" was not a common term of art in 1998.[7] *Id.*, ¶ 111.  First, Dr. Baker asserts that

22 Figure 2 of the patents shows raised islands of metal just above the solder bumps 56. *Id.*, ¶ 113.

23 Second, Dr. Baker argues that Figure 3A shows an array of metalized pads with a spacing between

24 the metalized pads of 295 microns in the horizontal direction and 250 microns in the vertical

---

26      [7] Dr. Baker looks to 1998 rather than the application date of the earlier of the two patents based

27 on his belief that Volterra "may be taking the position that the claims of the '264 and '522 patents were
first conceived of on April 3, 1998." Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 13.
He notes, however, that he believes the "understanding of the claim terms in the asserted claims to one

28 of skill in the art would not have changed between 1998 and 2000. *Id.*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  direction, indicating that the metalized pads must be a fixed distance from one another. *Id.*, ¶ 114.

2  Third, Dr. Baker points to Figures 4A and B of the patents, as well as the accompanying description

3  in the specification. *Id.*, ¶¶ 115-116.   Figure 4A is described in the specification as a "schematic

4  side view of a pad from the flip-chip of Fig. 3A," ('522 patent: 4: 33-35), while Figure 4B is a top

5  view of the metalized pad.   The description of Figures 4A and B in the specification states as

6  follows:

7       Each row of drain or source pads 70, 72, 74, 76 may contain a number of **individual pads**,
         e.g., four pads (as shown in FIG. 3A) to six pads (as shown in FIG. 3B).   The center-to-center

8       distance between each row of pads in a row may be about 300 microns, and the center-to-
         center distance between each row of pads may be about 250 microns.   As shown in FIG. 4A,

9       **each pad includes a final metal layer 80, such as aluminum, a nitride passivation layer**
         **82, and an under-bump metalization (UBM) layer 84.**   As shown in FIG. 4B, although the

10      pads are illustrated in FIG. 3 as square, each pad may be octagonal, or some other shape that
         is appropriate to maximize circuit performance for a particular application.   The UBM layer

11      84 can have an edge-to-edge distance of about 200 microns, and **the final metal layer 80 can**
         **have an edge-to-edge distance of about 115 microns.**

12

13  '264 patent, 6:66 - 7:13 (emphasis added in Baker Expert Report).   Dr. Baker acknowledges that the

14  specification does not require that the pads be rectangular or octagonal, *see* '264 patent, 9: 11-14

15  (stating that the pads can be shapes "other than rectangular or octagonal"), but asserts that in all of

16  the embodiments, the pads are "distinct raised islands of metal separated from each other by some

17  fixed distance." *Id.*, ¶ 116. Finally, Defendants point to Dr. Szepesi's testimony, in his deposition,

18  that Figure 5 of U.S. Patent No. 6,713,823 (the "Nickel Patent") is the same as Figure 4 of the '264

19  patent, and that in both figures, the "final metal layer" described in the specification is a "separate

20  structure that sits on top of [metal layer three]." *Id.*, ¶ 117 (citing Lefort SJ Opposition Decl., Ex. 37

21  (Szepesi Depo.) at 185-191 & Ex. 6 (Nickel Patent)).

22       Looking to the accused products, Dr. Baker points to layer plots showing that the accused

23  product do not have ███████████████████████████, the "final metal layer 80"

24  described in the '264 and '522 specification and shown in Figure 4A. *Id.*, ¶ 157.[8]   Instead, the ███████

25

26  ────────────────

     [8]Volterra objects to the colorized figures found in ¶ 157 of Dr. Baker's Expert Report, namely,

27  a modified version of Figure 4A and a figure depicting a corresponding side view of the accused devices,
     on the basis that Defendants have shown element 80 in a different color than ███████████████

28  ███████   As a result, Volterra asserts, the figures are misleading and prejudicial because they suggest
     that final metal layer 80 cannot be ███████████████████.   The objection is overruled.   The

United States District Court
For the Northern District of California

1   ██████████████████████████████████████████████████

2   ████████████████████████████████████████████   *Id.* Dr.

3   Baker also points to a magnified photo of a cross-section of ███████████ PX4650

4   to illustrate his argument. *Id.*

5       Volterra argues in response that Defendants' proposed construction reads into the claim

6   limitations that are not in the claim language and are not supported by the specification.[9]  In

7   particular, Volterra points out that the claim itself does not require that the pads be distinct raised

8   islands of metal, and the specification requires only three structures: a final metal layer, a passivation

9   layer and an under-bump metalization. *See* Fisher Reply Decl., Ex. A (Szepesi Rebuttal Expert

10  Report (Infringement)), ¶ 73 (citing '264 patent, 7: 5-7). According to Volterra, Defendants' expert

11  is attempting to add a *fourth* structure that is not required under claim 34. *Id.*  In fact, Volterra

12  asserts, it is undisputed that the accused products have ████████████████████████████

13  ████████████████████████████  and therefore, those products infringe claim

14  34. *Id.*, ¶ 74, 79 (citing Declaration of Laura Carpenter in Support of Defendants' Opposition to

15  Plaintiff's Motion for Partial Summary Judgment of Infringement ("Carpenter Opposition Decl."), ¶

16  11).[10]

17      In support of his conclusion, Dr. Szepesi quotes an excerpt of Dr. Baker's own textbook

18  showing that it was well-known in the art that the external connections to an integrated circuit are

19  provided through pad openings that connect to the exposed top – or final – level of metal, which is

20  labeled in accordance with the number of layers of metal used in the circuit. *Id.* (quoting CMOS

21  _____

22  Court understands that the colors used by Defendants in these diagrams reflect their position regarding
    the construction of term "metalized pad" and does find these figures to be prejudicial or misleading.

23  

24      [9]Volterra's proposed construction of "pads" and "metalized pads" is found in the Szepesi Expert
    Report at 32 and is quoted above.

25      [10]Defendants object to paragraphs 69 and 74 of Dr. Szepesi's rebuttal expert report on the basis

26  that these paragraphs include statements that are not based on the understanding of a person of ordinary
    skill in the art at the time of the invention and therefore, are irrelevant. The Court finds this evidence
    to be relevant. In determining whether a device infringes, the Court is not limited to the understanding

27  of a person of ordinary skill in the art at the time of the invention. In addition, the quotations from Dr.
    Baker's 2005 textbook that appear to contradict his opinion in his expert report are relevant to his

28  reliability. The objection is overruled.

United States District Court
For the Northern District of California

1  Circuit Design, Layout and Simulation, IEEE 2005, second edition).  Thus, the "final metal layer" in

2  the accused product is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.*  Volterra also

3  cites to the testimony of Primarion's program manager, Laura Carpenter, who states that a cross-

4  sectional photograph of the PX4650 shows ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶ 79 (citing Declaration of Laura Carpenter in Support of

6  Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment of Infringement

7  ("Carpenter SJ Opposition Decl."), ¶ 11).

8         Dr. Szepesi rejects Dr. Baker's assertion that Figure 2 of the patents depicts "distinct raised

9  islands of metal" just above the solder bumps 56.  *Id.*, ¶ 76 (citing Baker Expert Report at 51).

10  Rather, Dr. Szepesi finds that these structures are the under-bump metal, which provides the

11  interface between the top level (final) metal layer of the integrated circuit and the solder ball.  *Id.*  As

12  to Defendants' reliance on Figure 4 of the '264 patent, Volterra argues that even if that figure does

13  depict "an individual and raised island of metal," this is merely one possible embodiment and this

14  limitation should not be imported into the claim.  Volterra further notes that Defendants themselves

15  contend that U.S. Patent No. 5,945,730 ("Sicard") meets the "metalized pad" requirement of claim

16  26 even though the invention disclosed in that patent does not include distinct raised islands of metal

17  separated by fixed distances.  *Id.*, ¶ 78.

18                              B.      Analysis

19         Based on its consideration of the evidence cited by the parties, the Court tentatively

20  concludes that Defendants' construction of "metalized pads" includes limitations that are not

21  supported by the evidence and further, that when the term is construed properly, the limitation is met

22  by the accused devices.

23         As noted above, "unless compelled to do otherwise, a court will give a claim term the full

24  range of its ordinary meaning as understood by an artisan of ordinary skill." *Rexnord Corp. v.*

25  *Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  Here, Defendants' expert has offered a

26  construction of "metalized pads" that includes a limitation that is not found in the claims or the

27  specification of the patents, namely, the requirement that the metalized pads must be "distinct islands

28  of metal."  The specification, however, describes the various configurations of pads in language that

28

United States District Court
For the Northern District of California

1   conveys that these are merely embodiments that are not intended to limit the scope of the term. *See,*

2   *e.g.,* 522 patent, 9: 11-13 ("The pads can be shapes other than rectangular or octagonal. Other

3   configurations are possible for the distributed array of transistors, and other patterns are possible for

4   the contact pads"); 7: 3-6 ("The center-to-center distances between each pad in a row *may* be about

5   300 microns, and the center-to-center distance between each row of pads *may* be about 250

6   microns") (emphasis added). Nor does the Court find persuasive Defendants' reliance on Figure 2 or

7   Figure 4 of the '264 patent. Even assuming these figures show pads that are "distinct island[s] of

8   metal," they represent embodiments of the invention only. The fact that the accused devices may not

9   look like these figures does not mean they fall outside the scope of the claims. *MBO Laboratories,*

10  *Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323, 1333 (Fed. Cir. 2007). Indeed, the Federal Circuit

11  has warned against taking such an approach to claim construction, which raises the risk of importing

12  limitations from the specification into the claims. *Id.* Furthermore, as to Figure 2, the Court is

13  persuaded that the structures Dr. Baker identifies as the metalized pads in that figure are, in fact, the

14  under-bump metalization. Therefore, the Court tentatively construes the term "metalized pads" as

15  follows:

> openings in the top passivation layer that allow connection to the top metal layer, to enable the formation of connections between the integrated circuit and external circuit elements, wherein the interface between the top metal layer of the integrated circuit and the solder balls is formed using an under-bump metalization layer

19  Applying this construction, the Court finds that Volterra will likely prevail in establishing that the

20  accused devices satisfy this limitation.[11]

21              iii.    **"fabricated on a surface of the substrate"**

22                      A.    Arguments

23      Defendants argue that even if the accused products include "metalized pads," these pads are

24  not "fabricated on a surface of a substrate." In particular, Defendants assert that the phrase,

25  "fabricated on a surface of a substrate" means "formed directly upon the base layer of the integrated

---

27      [11]The Court notes that the parties agree that the dispute regarding the "metalized pad" limitation turns entirely on the Court's construction of the term and that there are no factual disputes as to the
28  structure of the accused devices in this respect.

United States District Court
For the Northern District of California

1   circuit chip." Summary Judgment Opposition Brief at 10. ████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████ the accused products do

4   not meet this limitation.

5       Defendants' position is based, in part, on Dr. Baker's construction of the term "substrate"

6   when used in the patents in connection with the IC chip (rather than the packaging of the chip). In

7   particular, Dr. Baker construes "substrate" as "the base layer of an integrated circuit chip that

8   contains the doped regions, and above which are deposited additional layers, such as metal and

9   insulators, to form the whole integrated circuit chip. Lefort SJ Opposition Decl., Ex. 1 (Baker

10  Expert Report), ¶ 61. Thus, under Defendants' proposed construction, the "substrate," as used in

11  claim 26, "is not the sum of all of the layers of the integrated circuit chip, but is only the base or

12  bottom layer of the chip that contains the doped regions." *Id.*, ¶ 63.

13      In support of his construction of "substrate," Dr. Baker points to the language of claim 26,

14  which expressly provides that the "substrate" has "doped regions," as well as several references in

15  the specification in which the "substrate" is described as the layer containing the doped region, *id.*

16  (citing '522 patent, 3: 3-8, 6: 3-8). Dr. Baker also points out that the patent specification

17  distinguishes between the "surface of the chip" and the "surface of the substrate" in several places.

18  *See id.*, ¶ 64 (citing '264 patent, 6: 9-13, 6: 22-25, 6: 26-28).[12]   Based on this language, he asserts

19  that "where the specification uses the term substrate in the context of the integrated circuit chip . . .,

20  it is discussing the doped regions (n or p regions) which are either implanted or diffused into the base

21  layer of the chip. *Id.*, ¶ 65. He continues, "when the specification is referring to 'pads,' it describes

22  them as residing 'on the surface of the chip,' which in my opinion is correct." *Id.* He acknowledges

23  that there is one statement in the Summary that does not support his construction, referring to "an

24  array of metalized pads fabricated on a surface of the substrate." '264 patent, 2: 54-55. He argues,

25

26      [12]In their Opposition brief, Defendants also cite to claim 34 of the '264 patent in support of their
   proposed construction. In particular, they note that claim 34, which depends on Claim 26, refers to

27  "solder balls across a surface of the chip," reflecting that the inventors knew the difference between the
   "surface of the substrate" and the "surface of the chip." Summary Judgment Opposition at 12. In his
   Expert Report, however, Dr. Baker does not cite to claim 34 in support of his proposed construction of

28  the claim term "fabricated on a surface of the substrate."

1    however, that one of ordinary skill in the art would read on to the Detailed Description of the patent

2    specification and on that basis conclude that the "substrate" of the IC referred to in claim 26 is the

3    base layer of the chip.

4           Dr. Baker also points to extrinsic evidence in support his construction.  First, he cites to the

5    IEEE Standard Dictionary of Electrical and Electronics Terms" (1996), which defines "substrate" in

6    several ways, including  "(1) the supporting material upon or within which an integrated circuit is

7    fabricated or to which an integrated circuit is attached," and "(4) the base material upon which or in

8    which a transistor or integrated circuit is fabricated or to which an integrated circuit is attached."  *Id.*,

9    ¶ 67 (citing Lefort SJ Opposition Decl., Ex. 34).  Second, he cites to his own textbook, "CMOS

10   Circuit Design, Layout, and Simulation," published in October 1997, in which a substrate is depicted

11   as "the base layer of an integrated circuit chip, where additional insulator and metal layers are

12   deposited to form the whole integrated circuit chip."  *Id.*, ¶ 68 (citing Lefort SJ Opposition Decl., Ex.

13   22).

14          Volterra argues that Defendants are, again, adding a limitation that is not found in the claim

15   language or the specification, noting that neither refer to the pads being fabricated *directly* on the

16   base layer of the IC chip.  In particular, Volterra asserts that the use of the phrase "*a surface*" in the

17   claim implies that there can be more than one surface of the substrate upon which the metalized pad

18   can be fabricated.   In its support, Volterra cites to a line of case law holding that "the article 'a'

19   receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent

20   to so limit the article."  *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir.

21   2000) (citing *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *Abtox, Inc. v.

22   Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997); *North Am. Vaccine, Inc. v. American

23   Cyanamid Co.*, 7 F.3d 1571, 1575-76 (Fed.Cir.1993)).  Thus, according to Volterra's expert, the

24   phrase "fabricated on a surface of the substrate" means "formed above the metal conductive layer of

25   the integrated circuit."  *See* Fisher Reply Decl., Ex. A (Szepesi Rebuttal Expert Report

26   (Infringement)), ¶ 89.

27          Volterra argues further that Defendants' proposed construction is contrary to law because it

28   reads out the preferred embodiments, citing *Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1377

United States District Court
For the Northern District of California

1  (Fed. Cir. 2005) ("a construction that would not read on the preferred embodiment would rarely if

2  ever be correct and would require highly persuasive evidentiary support "). *Id.* ¶ 88. Specifically,

3  Dr. Szepesi asserts that the portions of the specification on which Defendants rely actually describe

4  metalized pads layered *on top* of metalization layers and not placed directly on the base surface of

5  the substrate, thus supporting Volterra's position. *Id.,* ¶ 87. *See* '264 patent, 6: 9-13 ("the IC chip

6  can include two or more metalization layers, e.g., three layers, formed over the semiconductor

7  substrate to carry current from the doped regions to the electrode pads on the surface of the chip"); 6:

8  22-25 ("[u]nillustrated metalization layers formed over the semiconductor substrate can carry current

9  from the doped regions to the electrode pads on the surface of the chip"). In fact, Dr. Szepesi

10  concludes that Defendants' proposed construction would "read *every* integrated circuit out of the

11  claim language because even if an integrated circuit was manufactured using a single metal layer,

12  and the pads were formed using that single metal layer, this pad would not meet Defendants'

13  proposed construction." *Id.* (emphasis added). He explains:

14      The pad would be located over thick field oxide, not "directly" on the substrate (the thick
        field oxide layer would be between the single (top) metal layer and the surface of the
15      substrate). Locating the pad over thick field oxide is mandated by every semiconductor
        process I have seen, for reliability reasons and to make sure that the bonding process does not
16      damage underlying circuitry (if any).

17  *Id.* Finally, Volterra argues that when the limitation is properly construed, it is undisputed that the

18  accused products meet this limitation.

19                                    B.      Analysis

20          As noted above, courts generally give claim terms their full range of meanings, unless

21  compelled to do otherwise. Further, a claim construction that reads out a preferred embodiment – let

22  alone all of them – is rarely correct and must be supported by strong evidence. *See Chimie v. PPG*

23  *Industries, Inc.,* 402 F.3d 1371, 1377 (Fed. Cir. 2005). Here, Defendants have proposed a

24  construction that reads out the preferred embodiments and have not provided the strong evidentiary

25  basis that is necessary to support such a construction. First, the specification does not state anywhere

26  that the metalized pads must be fabricated "directly" on the base layer of the chip and indeed, the

27  Summary contradicts Defendants' proposed construction. Second, the claim language supports

28  Volterra's broader construction of the claim term, particularly the use of the indefinite "a" modifying

1   "surface of the substrate," indicating that there may be more than one such surface.  Further, in the

2   absence of strong intrinsic evidence in support of Defendants' proposed construction, the Court

3   declines to adopt that construction on the basis of the extrinsic evidence cited by Defendants' expert.

4   Therefore, the Court tentatively adopts Volterra's proposed construction of the phrase "fabricated on

5   a surface of the substrate" as meaning "formed above the metal conductive layers of the integrated

6   circuit."  It is undisputed that under this construction, the accused devices meet this limitation.

7   Therefore, Volterra is likely to succeed on this question.

8                              iv.      "alternating pattern"

9                              A.      Arguments

10        Defendants argue that the "alternating pattern" of doped regions required under claim 26 of

11  the '264 patent (as well as claims 18 and 19 of the '522 patent) is not met by the accused products.

12  According to Dr. Baker, a doped region is a "region of the semiconductor substrate that contains

13  either a p-type or n-type impurity that changes the electrical characteristics of the substrate."  Lefort

14  SJ Opposition Decl., Ex. 1 (Baker Expert Report),  ¶ 77.  Further, he opines that one of ordinary skill

15  in the art would understand that "a first plurality of doped regions" means " a set of identical,

16  repeated doped regions that collectively form a terminal of a device, e.g., the drain," while "a second

17  plurality of doped regions" means "a set of identical, repeated doped regions that collectively form

18  another terminal of a device, e.g., the source."  Id., ¶¶ 78-79.  Finally, he asserts that "alternating

19  pattern" would be understood by one skilled in the art to mean "either (i) an "a" "b" "a" "b" pattern

20  of parallel stripes, or (ii) a checkerboard pattern of rectangles."  Id., ¶ 84.  Volterra does not assert

21  that the accused products have a checkerboard pattern, and therefore, Defendants argue, the accused

22  products must have a pattern of parallel stripes to satisfy this claim requirement.  Defendants argue

23  that they do not.

24        According to Defendants' expert, the "a" "b" "a" "b" pattern of parallel stripes ▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1   ████████████████████████████████████████   *Id.* Defendants further

2   assert that Plaintiff is barred under the doctrine of prosecution history estoppel from asserting that

3   the "alternating pattern" is anything other than the "a" "b" "a" "b" pattern of alternating stripes

4   because the claims were specifically allowed on the basis of the alternating pattern of drains and

5   sources. *Id.*, ¶¶ 99-108, 189-191.

6       Volterra argues that Defendants have construed the claim language associated with the

7   "alternating pattern" limitation too narrowly, importing limitations from the preferred embodiments

8   described in the specification. Dr. Szepesi is prepared to accept, for the purposes of his infringement

9   analysis, that the term "alternating pattern" should be construed as "either (i) an "a" "b" "a" "b"

10  pattern of parallel stripes, or (ii) a checkerboard pattern of rectangles." Fisher Reply Decl., Ex. A

11  (Szepesi Rebuttal Expert Report (Infringement)), ¶56. He rejects, however, Dr. Baker's

12  construction of "a first plurality of doped regions" and "a second plurality of doped regions" for two

13  reasons. *Id.*, ¶ 54. First, he disagrees with Dr. Baker that these phrases require that the doped

14  regions form a terminal of the device, although they may do so. *Id.*  Second, he finds no basis for

15  the requirement that the doped regions must be identical, though they may be. *Id.* While Dr. Szepesi

16  acknowledges that these features are found in the preferred embodiment, he finds no basis for

17  importing these limitations into the construction of these claim terms. *Id.*



27  To the extent that claim 26 was never amended during prosecution, however, Dr. Szepesi concludes

28  that claim 26 requires only an "alternating pattern of doped regions." *Id.* Volterra cites to *Fiskar*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  *Inc. v. Hunt Manufacturing Co.*, 221 F.3d 1318, 1322 (Fed. Cir. 2000) (affirming district court

2  holding that where a claim was not amended during prosecution, doctrine of prosecution history

3  estoppel did not apply, even though other claims were amended to gain allowance).

4  B.    Prosecution History

5      The prosecution history of the '264 patent is as follows.  There were 45 claims in the original

6  '264 application.  Lefort SJ Opposition Decl., Ex. 4 ('264 file history) at PRIM 4172-4178.  Original

7  claim 1 claimed a "voltage regulator having an input and an output terminal, comprising" various

8  elements, including "a first-flip-chip type integrated circuit chip mounted on the substrate, the first

9  integrated circuit chip including a first power switch fabricated thereon to alternately couple and

10  decouple the input terminal to the output terminal." *Id.* at PRIM 4172.  Original claim 1 did not

11  include a limitation calling for metalized pads or requiring that the first and second pluralities of

12  pads be arranged in a first and second "alternating pattern."  The next 25 claims depended from

13  Original claim 1.  The second independent claim in the application was Original claim 27, which

14  issued, unamended, as claim 26.  In contrast to Original claim 1, that claim calls for metalized pads

15  arranged in alternating patterns (see above).

16      The Patent Examiner rejected all of the original claims, finding that claims 1-7 were obvious,

17  under 35 U.S.C. § 103(a), in light of U.S. Patent No. 5,959,442 ("Hallberg") and U.S. Patent No.

18  5,777,383 ("Stager").  The Examiner rejected the remaining claims, including Original claim 27, as

19  obvious "over Hallberg et al. in combination with Stager et al. and further in combination with" U.S.

20  Patent No. 4,074,342 ("Honn").  *Id.* at PRIM 4207-4208.  In response to the rejection, the

21  applicants amended Original claim 1 of the '264 patent to overcome the prior art by, *inter alia*,

22  adding the following limitation:

23         wherein the flip-chip type integrated circuit chip includes a p-type region and an n-type
           region, and the first power switch includes a plurality of p+ regions fabricated in the n-type
24         region in a first array, and a plurality of n+ regions fabricated in the p-type region in a second
           array, and wherein alternating p+ regions are connected to the input terminal and to an
25         intermediate terminal, and alternating n+ regions chip are connected to the intermediate
           terminal and to ground.
26

27  *Id.* at PRIM 4212.  They also canceled Original claims 5 and 45.  *Id.*  The applicants argued that

28  with these changes, all the remaining claims should be allowed because the prior art did not "teach

35

United States District Court
For the Northern District of California

1   or suggest the various limitations relating to the layout of the doped regions and pads and their

2   connections to the terminals." *Id.* at 4214. The applicants continue, "For example, Hallberg, Stager

3   and Honn do not teach doped regions in an array with alternating regions of the array connected to

4   different terminals, an array of pads with two pluralities of pads arranged in an alternating pattern

5   and electrically connected to two doped regions, or two electrodes having interdigited fingers." *Id.*

6        In response, the Examiner allowed the claims, providing the following "Reasons for

7   Allowance:"

8        Applicants['] invention claims that a voltage regulator with input and output terminals has a
         printed circuit board[,] a substrate mounted on printed circuit board, a first flip-flop type

9        integrated circuit chip mounted on the substrate. The first integrated circuit chips includes a
         first power switch fabricated therein to alternately couple decouple the input terminal to the

10       output terminal. A filter disposed to provide a substantially DC voltage at the output
         terminal, and a control circuit controls the power switch to maintain the DC voltage

11       substantially constant. Where in the flip chip type integrated circuit chip includes a p-type
         region and an n-type region, and a plurality of p= [sic] regions fabricated in the n-type region

12       in a first array and a plurality of n= [sic] regions fabricated in the p-type region in a second
         array wherein alternating p= [sic] regions are connected to the input terminal, and alternating

13       n=[sic] regions connected to intermediate terminal and to ground. None of the cited art
         overcomes the limitation explained, since the claims are allowed.

14

15   *Id.* at 4217.

16                                        C.      Analysis

17       The Court concludes that Defendants' proposed construction adds limitations to the claim

18   that are not supported by the language of the claim or the specification. In particular, neither the

19   claim nor the specification require that the doped regions must be identical. Nor do they support

20   Defendants' assertion that one set of doped regions must be a drain region and the other a source

21   region of a MOSFET. Rather, the claim merely calls for an alternating pattern of doped regions.

22   Plaintiffs have pointed to evidence showing that ███████████████████████████████████

23   ██████████████████████████████████  This is sufficient evidence to establish direct

24   infringement.

25       Nor does the Court find persuasive Defendants' assertion that under the doctrine of

26   prosecution history estoppel, the inventor's amendment to claim 1 of the '264 patent limits the

27   "alternating pattern" of doped regions called for in claim 26 of the '264 patent and claims 18 and 19

28   of the '522 patent to a device in which the alternating pattern meets the limitation of claim 1, that is,

United States District Court
For the Northern District of California

1   that the p+ regions must be fabricated in the n-type region and the n+ regions must be fabricated in

2   the p-type region.  Defendants rely heavily on *Felix v. American Honda Motor Co., Inc.,* 562 F.3d

3   1167, 1182-1183 (Fed. Cir. 2009), in which the Federal Circuit emphasized that "[t]he presumption

4   of surrender applies to all claims containing the added limitation, regardless of whether the claim

5   was, or was not, amended during prosecution." *Id.*  Here, however, claim 26 not only was not

6   amended but also does not contain the limitation of claim 1 requiring that the p+ regions must be

7   fabricated in the n-type region and the n+ regions must be fabricated in the p-type region.  Rather,

8   claim 26 claims more broadly an "alternating pattern" of doped regions.

9        Further, the arguments of the applicants in obtaining allowance of the rejected claims do not

10  reflect an intent to disclaim an interpretation of claim 26 that would cover embodiments in which the

11  p+ and n+ regions are *not* bounded by the opposite type of doping.  *See id.* (noting that it is the intent

12  of the applicants, not the Examiner, that determines whether an estoppel arises).  Instead, the

13  applicants argued generally that the rejected claims should be allowed based on "the various

14  limitations relating to the layout of the doped regions."  Given that claim 26 is an independent claim,

15  this statement suggests that the inventors intended to frame the limitations relating to layout of the

16  doped regions contained in the different claim with varying degrees of narrowness, thus preserving

17  the broader interpretation in claim 26 while framing Claim 1 more narrowly.  Therefore, the Court

18  rejects Defendants' assertion that claim 26 does not encompass the accused devices,

19

20       The Court concludes that Volterra is likely to succeed on the merits on the question of

21  whether the accused device meets this claim limitation.

22                              **v.    Conclusion**

23       For the reasons stated above, the Court concludes that Volterra has shown a likelihood of

24  success as to infringement of claim 34 of the '264 patent.

25

26

27

28

United States District Court
For the Northern District of California

###### b.   Claims 18 and 19

###### i.   Background

Volterra asserts that the undisputed evidence shows that Defendants' devices infringe claims 18 and 19 of the '522 patent.  Claim 19 depends from claim 18, which in turn depends from claims 9 and 17.  Claim 9 requires the following:

A voltage regulator having an input terminal and an output terminal, comprising:

a printed circuit board;

a first flip-chip type integrated circuit chip mounted on the printed circuit board, the first integrated circuit chip including a first power switch fabricated therein to alternately couple and decouple the input terminal to the output terminal, wherein the power switch includes

a chip substrate having a first plurality of doped regions and a second plurality of doped regions, the first plurality of doped regions and the second plurality of doped regions being arranged in an alternating pattern, the first plurality of doped regions coupled to the input terminal, the second plurality of doped regions coupled to the output terminal, and

a gate region on the chip substrate separating the first plurality of doped regions and the second plurality of doped regions;

a filter disposed to provide a substantially DC voltage at the output terminal; and

a control circuit connected to the gate region to control the power switch to maintain the DC voltage substantially constant.

Claim 9, '522 patent.

Claim 17 states as follows:

The voltage regulator of claim 9, wherein the first power switch intermittently couples an intermediate terminal to the input terminal.

Claim 17, '522 patent.

Claim 18 states as follows:

The voltage regulator of claim 17, wherein the first flip-chip type integrated circuit chip has a second power switch fabricated therein to alternately couple and decouple the intermediate terminal to ground.

Claim 18, '522 patent.

Claim 19 states as follows:

The voltage regulator of claim 18, wherein the filter is electrically coupled between the output terminal and the intermediate terminal.

United States District Court

For the Northern District of California

Claim 19, '522 patent.

Volterra's expert finds that the PX4650, "when used in the manner intended by Defendants . . ., as Defendants themselves must have previously used it . . :, and as their customers may have used it in evaluating it for design-in in accordance with instructions provided by Defendants in their Datasheet and customer presentations, infringes claims 18 and 19 of the '522 Patent.  Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 73 & Ex. 5 (PX4650 Datasheet).  In particular, Volterra points to the following features of the accused devices (or intended applications of the accused devices) to show that all of the claim limitations of claims 18 and 19, as well as the claims upon which they depend (claims 9 and 17) are met:

- **"Voltage regulator having an input terminal and an output terminal"** (Claim 9): Dr. Szepesi points ███████████████

  ████████████████████ to show that this limitation is met.  Fisher Motion Decl., Ex. E (Szepesi Expert Report), ¶ 76 & Ex. 5 (PX4650 Datasheet) at 2.

- **"a printed circuit board"** (Claim 9):Dr. Szepesi points to ████████████

  ████████████████████████████████████

  *Id.,* ¶ 77 & Ex. 5 (PX4650 Datasheet) at 9.

- **"a first flip-chip type integrated circuit chip mounted on the printed circuit board, the first integrated circuit chip including a first power switch fabricated therein to alternately couple and decouple the input terminal to the output terminal"** (Claim 9): According to Dr. Szepesi, this limitation is met because:

  ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████
  ████████████ *Id.,* ¶¶ 78-79.

- **"wherein the power switch includes a chip substrate having a first plurality of doped regions and a second plurality of doped regions, the first plurality of doped regions and the second plurality of doped regions being arranged in an alternating pattern, the first plurality of doped regions coupled to the input terminal, the second plurality of doped regions coupled to the output terminal"** (Claim 9):  According to Dr. Szepesi, these limitations are met for the following reasons: ███████████████

  ████████████████████████████████████
  ████████████████████████████████████

United States District Court
For the Northern District of California

- "a gate region on the chip substrate separating the first plurality of doped regions and the second plurality of doped regions" (Claim 9):  Dr. Szepesi relies on ███████████

- "a filter disposed to provide a substantially DC voltage at the output terminal"(Claim 9):  Dr. Szepesi points to ███████████

- "a control circuit connected to the gate region to control the power switch to maintain the DC voltage substantially constant" (Claim 9):  Dr. Szepesi points to ███████

- "The voltage regulator of claim 9, wherein the first power switch intermittently couples an intermediate terminal to the input terminal" (Claim 17): Dr. Szepesi points to ███████

- "The voltage regulator of claim 17, wherein the first flip-chip type integrated circuit chip has a second power switch fabricated therein to alternately couple and decouple the intermediate terminal to ground" (Claim 18): Dr. Szepesi points to ███████

40

United States District Court
For the Northern District of California

██████████████████████████████████████████████████

• **"The voltage regulator of claim 18, wherein the filter is electrically coupled between the output terminal and the intermediate terminal" (Claim 19):** Dr. Szepesi points to ██████

██████████████████████████████████████████████████

In their Opposition, Defendants assert that the accused products do not infringe claims 18 and 19 of the '522 patent because they do not meet: 1) the "mounted on" limitation found in Claim 9, upon which claims 18 and 19 depend; 2) the limitations in claim 9 requiring "a substantially DC voltage at the output terminal" and "to maintain the DC voltage substantially constant;" and 3) the "alternating pattern" of doped regions limitation in claim 9, for the same reasons discussed above.

### ii.    "mounted on"

#### A.    Arguments

Defendants argue that the limitation of claim 9 requiring "a first flip-chip type integrated circuit chip mounted on the printed circuit board" is not met by the accused products because ██████

██████████████████████████████████████████████████

████████████████████████████ Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 166.

In support of their construction of the claim term "mounted on," Defendants points to the claims of the '264 patent, arguing that they describe two mounting options – a preferred embodiment in which the chip is mounted onto a substrate, which is then mounted onto the printed circuit board (depicted in Figure 2) (hereinafter, "Option 1"), and an alternative embodiment in which the chip is mounted directly on a printed circuit board (depicted in Figure 9) (hereinafter, "Option 2"). *Id.* ,¶¶ 126-137. According to Dr. Baker, the two mounting options can be seen in claims 18, 19, 21 and 22 of the '264 patent. Those claims provide as follows:

Claim 18:  The voltage regulator of claim 17, wherein the inductor is mounted on the substrate.

41

United States District Court

For the Northern District of California

1

Claim 19: The voltage regulator of claim 17, wherein the inductor is mounted on the printed circuit board.

2

3

Claim 21: The voltage regulator or claim 20, wherein the capacitor is mounted on the substrate.

4

Claim 22: The voltage regulator or claim 20, wherein the capacitor is mounted on the printed circuit board.

5

6

Dr. Baker reasons that claims 18 and 21 correspond to Option 1, while claims 19 and 22 correspond

7

to Option 2. *Id.*, ¶ 129. He asserts that if the term "mounted on" encompassed both direct and

8

indirect mounting, claims 19 and 22 would be superfluous. *Id.*, ¶ 130.

9

Dr. Baker also cites to the specification of the patents in support of his construction, noting

10

that the Abstract, as well as the majority of the specification, describes the preferred embodiment

11

depicted in Figure 2, in which the chip is mounted on a substrate and the substrate is then mounted

12

on the printed circuit board. *Id.*, ¶ 131. According to Dr. Baker, when the applicants meant to refer

13

to the combination of the integrated circuit chip and the substrate, they referred to it as a "package."

14

*Id.*, ¶ 133 (quoting '264 patent, 5: 47-50, stating in reference to Figure 2 that "the switching circuit

15

16 can be fabricated in a flip-chip package 40 that includes an integrated circuit chip 42 and a

16

substrate 44. The flip-chip package 40 is attached to a printed circuit board (PCB) 46 . . . "). Dr.

17

Baker further notes that when the applicants described mounting Option 2, used in the alternative

18

embodiment, they explained that the chip was to be mounted "directly on" the printed circuit board.

19

*Id.*, ¶ 134. In particular, he points out that Option 2 is depicted in Figures 8A-G, which are described

20

as follows:

21

In another implementation, the integrated circuit chip 42" may be *mounted directly on* a printed circuit board. As shown in FIGs. 8A-8G, the printed circuit board may have an input voltage electrode '90, a ground electrode 92', and an intermediate voltage electrode 94'.

22

23

*Id.* (quoting '264 patent, 8:15-19) (emphasis added in Baker Expert Report). Elsewhere in the

24

specification, Figures 8A-8G are described as follows:

25

FIGS. 8A-8G are schematic plan views of several configurations for the drain and source pads and the overlying electrodes *to enable direct mounting of a flip chip to a printed circuit board.*

26

27

*Id.* (quoting '264 patent, 4: 43-46). Thus, based on the claims and specification of the two patents,

28

Dr. Baker concludes that one of ordinary skill in the art would have understood that "claim 9 of the

42

United States District Court
For the Northern District of California

1   '522 patent claims this alternate embodiment described and illustrated in the specification whereby

2   the flip-chip type integrated circuit is directly placed and soldered onto the printed circuit board, ie.,

3   without any intervening packaging, such as a substrate)." *Id.*, ¶ 137.

4          Turning to the accused devices, Dr. Baker states that ███████████████████████

5   ████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ███████████████████████████ *Id.*; *see also* Declaration of Kenneth Ostrom in Support of

9   Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment of Infringement

10  ("Ostrom SJ Opposition Decl."), ¶ 20.

11         Volterra argues that Defendants are attempting to read into claim 9 a limitation that does not

12  exist in arguing that the term "mounted on" requires a *direct* connection to the PCB. Fisher Reply

13  Decl., Ex. A (Szepesi Rebuttal Expert Report (Infringement)), ¶ 81.  Rather, its expert asserts, the

14  patents clearly envision two embodiments, one in which the chip is mounted to a substrate and one in

15  which it is mounted to the printed circuit board, and the words "mounted on" can cover either. *Id.*,

16  ¶¶ 81-82.  Volterra argues that when the applicants described in the specification embodiments that

17  required that the chip be mounted *directly* on the PCB, they were limiting what they were describing

18  to this type of embodiment. *Id.*  They also point out that one of the original claims in the application,

19  Original claim 45, claimed a "first flip-chip type integrated circuit chip mounted *directly* on the

20  printed circuit board," indicating that they used this phrase when they wanted to limit the term

21  "mounted on" to an embodiment in which the chip is mounted directly on the PCB. *See* Summary

22  Judgment Reply at 5 (citing Lefort SJ Opposition Decl., Ex. 4 ('264 prosecution history) at PRIM

23  4177).  In addition, Volterra argues that Defendants' proposed construction should be rejected

24  because it excludes the preferred embodiment, which is rarely correct. *Id.*, ¶ 83.

25         Volterra rejects the argument of Defendants' expert that claims 19 and 22 would be

26  superfluous unless Defendants' construction is adopted. *Id.*, ¶¶ 84-85.  Rather, Volterra asserts,

27  claims 18 and 21 require that the chips be mounted to a substrate in order to mount them to printed

28  circuit boards whereas claims 19 and 22 do not *require* that a substrate be used. *Id.*  In other words,

United Staes District Court
For the Northern District of California

1   Volterra asserts, the claims simply differ in scope.  *Id.*  Volterra also asserts that Defendants have

2   implicitly conceded that the term "mounted on" does not require that the chip be "directly placed and

3   soldered onto" by arguing that U.S. Patent No. 5,945,730 ("Sicard") meets the "mounted on"

4   limitation even though the flip-chip integrated circuit is not directly mounted on the PCB.  *Id.*, ¶ 86.

5                                   B.       Analysis

6          The Court finds Volterra's position to be persuasive.  In particular, neither the claims nor the

7   specification require that the term "mounted on" be construed to impose a requirement that the chip

8   be "directly placed and soldered onto" the PCB.   Nor does the Court find that claims 19 and 22 are

9   superfluous without such a limitation.  Rather, the claims simply have a broader scope than the

10  claims that immediately precede them.  Therefore, the fact that the accused devices are ███████████

11  ████████████████████████████████████████████████ does not place them outside the

12  scope of claims 18 and 19 of the '522 patent.  Rather, the Court concludes that Volterra will likely

13  prevail on this question.

14                          iii.     **"a substantially DC voltage at the output terminal" and "to**

15                                   **maintain the DC voltage substantially constant"**

16                                  A.       Arguments

17         Defendants argue that the accused devices do not meet the requirements of claim 9 calling for

18  "a filter disposed to provide a substantially DC voltage at the output terminal" and "a control circuit

19  connected to the gate region to control the power switch to maintain the DC voltage substantially

20  constant."  In particular, Defendants' expert argues that a person of ordinary skill in the art would

21  have understood that this claim language referred to ████████████████████████████████████

22  ███████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████   Lefort SJ

24

25         [13]It is undisputed that the accused devices are not, themselves, voltage regulators but rather, are
    used with other components that, together with the accused devices, make up the voltage regulator.
26  Therefore, to establish infringement, Plaintiff will be required to show that Defendants have tested the
    accused devices in applications that meet all of the claim limitations.  Alternatively, Plaintiff can
27  establish contributory infringement by showing that the accused devices were designed in order to be
    used in applications that infringe and that Defendants' customers have, in fact, used the devices in an
28  infringing manner.

                                        44

United States District Court

For the Northern District of California

1  Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 142. Dr. Baker notes that the distinction between

2  these two types of voltage regulators was highlighted in the dissertation of Volterra's founder, Dr.

3  Anthony Stratakos, in which Dr. Stratakos states as follows:

4      To dynamically trade performance for decreased energy consumption at system run-time, a
       new type of DC-DC converter, called a *dynamic DC-DC converter or tracking converter*, is
5      required. A dynamic DC-DC converter is quite different from a conventional static DC-DC
       converter. Whereas a static DC-DC converter must maintain a substantially DC output, a
6      dynamic DC-DC converter must be capable of rapidly slewing its output.

7  *Id.,* ¶ 146 (quoting Lefort SJ Opposition Decl., Ex. 33 (*High-Efficiency Low-Voltage DC-DC*

8  *Conversion for Portable Applications*, Anthony Stratakos, University of California, Berkeley, Fall

9  1998) ("Stratakos Dissertation") at PRIM 1387).

10     In support of his opinion regarding infringement, Dr. Baker construes the phrase "a

11  substantially DC voltage at the output terminal" in claim 9 as meaning "a fixed and stable output

12  voltage." *Id.,* ¶ 141. He construes the phrase "to maintain the DC voltage substantially constant" as

13  meaning "to maintain a fixed and stable output voltage." *Id.* He cites to the specification in support

14  of his construction, pointing to instances in which the applicants referred to "a substantially DC

15  output voltage," or stated that the output voltage is "maintained at a substantially constant level."

16  *Id.,* ¶ 144 (quoting '264 patent, 5: 20-33 & 38-36). He also cites to extrinsic evidence. First, he

17  points to Dr. Szepesi's deposition testimony that a person of ordinary skill in the art would

18  understand that a substantially constant output voltage for a switching voltage regulator would stay

19  within 5% of the (nominal) target output voltage. *Id.,* ¶ 171 (citing Lefort SJ Opposition Decl., Ex.

20  37 at 234:10-20). Second, he cites the McGraw-Hill Electronic Dictionary, Fifth Edition (1994),

21  which defines a voltage regulator as follows:

22     A circuit that includes a sensor capable of monitoring the load and restoring the output
       voltage to close tolerance limits despite changes in both the load and input voltage. This
23     circuitry is now available in low-cost integrated circuits capable of holding DC output
       voltage levels of 3 to 30 V constant within +2%.
24

25  *Id.,* ¶ 145 (quoting Lefort SJ Opposition Decl., Ex. 35 at PRIMC202).

26     Turning to the accused products, Dr. Baker notes that ████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

45

United States District Court

For the Northern District of California

1  ████████████████████████ Lefort SJ Opposition Decl., Ex. 1 (Baker

2  Expert Report), ¶ 169; *see also* SJ Opposition at 19 (citing *Dynacore Holdings Corp. v. U.S. Philips*

3  *Corp.*, 363 F.3d 1263 (Fed. Cir. 2004) for the proposition that where the accused products do not

4  necessarily infringe, the patent holder must point to a specific instance of direct infringement and

5  restrict its suit to liability stemming from that specific instance).  Dr. Baker argues that because the

6  evidence shows that █████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████ *Id.*

10  Dr. Baker relies on a declaration by Primarion's Vice President of Engineering, Kenneth

11  Ostrom, as the basis for his opinions regarding █████████████████████████████

12  ███████  *See* Declaration of Kenneth Ostrom in Support of Defendants' Opposition to Plaintiff's

13  Motion for Partial Summary Judgment of Infringement ("Ostrom SJ Opposition Decl."). ████████

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

1

2

3

4

5

6

7     Volterra's expert rejects Dr. Baker's construction of these phrases, asserting that there is no

8  basis for the requirement that the DC current be "fixed," either in the patent or in the extrinsic

9  evidence.  Fisher Reply Decl., Ex. A (Szepesi Rebuttal Expert Report (Infringement)), ¶ 5.

10  According to Dr. Szepsi, it was well-known in the prior art that voltage regulators, including

11  switching voltage regulators, were divided into fixed and adjustable types.  *Id.*, ¶ 7.  For example, the

12  MAX749, manufactured by Maxim Integrated Products, Inc., with a datasheet date of 1995, allowed

13  the output voltage of the regulator to be digitally adjusted in a wide range, providing a regulated

14  substantially constant output voltage, before and after their output voltage was changed by digital

15  command.  *Id.*, ¶ 11.[14]  Given that such switching voltage regulators were known, Dr. Szepesi argues,

16  there would have been no reason to exclude this type of voltage regulator from the scope of the

17  Burstein patents.  *Id.*  Further, Dr. Szepesi argues, the intrinsic evidence does not suggest that the

18  applicants limited the scope of their invention in this way.  *Id.*  Therefore, he asserts, Defendants'

19  contention that claim 9 of the '522 patent requires a "fixed" output is incorrect.  *Id.* ¶ 5.  Dr. Szepesi

20  notes that although Defendants' expert takes the position that the reference to a "voltage regulator"

21  in the preamble of claim 26 of the '264 patent is a claim limitation – a point on which the parties are

22  in agreement – Dr. Baker *did not* include the "voltage regulator" as one of the missing claim

23  limitations in connection with the alleged infringement of claim 34.  *Id.*, ¶¶ 14-18.

24

25

26

27  _____

[14]Defendants object to Dr. Szepesi's statements regarding the MAX749 on the basis that the datasheet was not included as an exhibit to his report.  Volterra produced the datasheet prior to the hearing on the instant motions, however, and has attached it as an exhibit to its responses to Defendants' objections.  Therefore, the objection is overruled.

28



1
2
3
4
5
6
7
8
9
10
11
12
13                           Fisher Reply Decl., Ex. A (Szepesi Rebuttal Expert Report
14 (Infringement)), ¶ 27.   Defendants also cite to Dr. Baker's testimony, in his deposition, that
15
16
17 Fisher Reply Decl., Ex. B (Baker Depo.) at 42-43.
18
19

20                           B.       Analysis

21       The Court rejects Defendants' position that the phrases "substantially DC voltage at the

22 output terminal" and "to maintain the DC voltage substantially constant" requires a "fixed" voltage

23 wherein the target voltage cannot be changed.   Neither the claims nor the specification suggest that

24

25       [15]Defendants object to Dr. Szepesi's opinions relating to ███████████ in
26 paragraphs 11, 25-27, 29-30 and 34-35 of his rebuttal report on infringement, asserting that the opinions stated therein are "conclusory and unsupported by any facts, evidence, or analysis" and therefore fail to satisfy the requirements of Rule 702 of the Federal Rules of Evidence.   Defendants further assert that
27 these opinions should be excluded under Rule 403 on the basis of prejudice.   The objection is overruled. The Court finds that the opinions stated in these paragraphs are supported by specific facts.   Nor have
28 Defendants established that Dr. Szepesi's opinions give rise to undue prejudice under Rule 403.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   the invention is limited to such a voltage regulator.  Further, to the extent that both of the types of

2   regulators described by Dr. Baker – the so-called "static" and "dynamic" regulators – were known by

3   those of ordinary skill in the art at the time of the invention, the Court concludes that these claim

4   terms would have been understood to encompass both.[16]  Therefore, the Court finds unpersuasive

5   Defendants' assertion that ███████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████  Therefore, the Court concludes that Volterra

9   is likely to prevail on the merits in showing that this limitation is met by the accused devices for the

10  purposes of showing both direct and contributory infringement.

iv.   Conclusion

12      For the reasons stated above, the Court concludes that Volterra is likely to succeed on the

13  merits on the question of infringement of claims 18 and 19 of the '522 Patent.

2.   Invalidity

a.   Whether the term "power switch" is indefinite

i.   Arguments

17      Defendants argue that all of the asserted claims are invalid because the term "power switch"

18  is indefinite.  In particular, according to Defendants' expert, the term is used in two inconsistent

19  ways in the patents.  Lefort SJ Opposition Decl., Ex. 1 (Baker Expert Report), ¶ 46.  In particular, in

20  some places in the patents, the term "power switch" refers to a combination of both the high-side

21  switch and the low-side switch, whereas in other places the term refers to only a single switch, either

---

23      [16]At the September 30 hearing, Defendants raised -- for the first time – an enablement defense
    in response to Plaintiff's argument that claims 18 and 19 cover both static and dynamic voltage
24  regulators, asserting that the specification does not disclose how a dynamic embodiment would work.
    Given that Defendants failed to raise this defense in any of their briefs, they have waived this argument
25  for the purposes of the instant motions.  In any event, the Court finds that Plaintiff's response at oral
    argument is persuasive.  In particular, Volterra responded that the specification shows how to connect
26  the switches to the control circuitry and to use the control circuitry to open and close the high and low-
    side switches, pointing to Figure 1 of the '264 patent as one example of this.  Volterra also noted that
27  Dr. Szepesi testified in his deposition that one of ordinary skill in the art would understand how to use
    this control circuitry to set or change the target voltage.  Therefore, the Court finds that Volterra is likely
28  to prevail on this issue.

49

United States District Court

For the Northern District of California

1  the high-side switch or the low-side switch. *Id.* As a result, Defendants assert, one of ordinary skill

2  in the art could not conclusively determine the meaning and scope of the asserted claims. *Id.*, ¶ 52.

3      In support of his assertion that the term "power switch" is used inconsistently in the patent,

4  Dr. Baker points to what he asserts are inconsistent uses of the term in the claims. First, he argues

5  that "power switch" as used in claim 1 of the '264 Patent is internally inconsistent with dependent

6  claims 12 and 14. *Id.*, ¶ 53. Claim 1 includes the following limitation:

7      wherein the flip-chip type integrated circuit chip includes a p-type region and an n-type
       region, and **the first power switch includes a plurality of p+ regions fabricated in the n-**
8      **type region in a first array, and a plurality of n+ regions fabricated in the p-type region**
       **in a second array,** and wherein alternating p+ regions are connected to the input terminal
9      and to an intermediate terminal; and alternating n+ regions chip are connected to the
       intermediate terminal and to ground.

10

11  '264 patent, claim 1 (excerpt) (emphasis added). Dr. Baker takes the position that one of ordinary

12  skill in the art would understand that the "first power switch" includes *both* the "plurality of p+

13  regions fabricated in the n-type region in a first array" and the "plurality of n+ regions fabricated in

14  the p-type region in a second array" and therefore, that the term "power switch" means the

15  combination of the high-side switch and the low side switch. *Id.* [17] However dependent claim 12 is

16  _____

17      [17]Dr. Baker also points to claims 35 and 43 of the '264 patent as examples of claims in which
       the term "power switch" means the combination of the high-side switch and the low-side switch. *Id.* ¶
18      47. Claim 35 states, in part, as follows:

19      A power switch for a voltage regulator having an input terminal and an output terminal,
       comprising:
20
       a PMOS switch fabricated on a chip with a first alternating pattern of source pads and drain pads;
21
       an NMOS switch fabricated on the chip with a second alternating pattern of source pads and
22      drain pads;

23      . . .

24  '264 patent, claim 35 (excerpt). Claim 43 provides as follows:

25      A power switch for a voltage regulator, comprising:

26      a chip having an array of pads formed thereon, each pad connected to a plurality of doped regions
       to create a distributed array of transistors; and
27
       a substrate having a signal layer formed thereon, the signal layer having a first electrode and a
28      second electrode, the first electrode having a body and a plurality of fingers that extend from the