# FILED

SEP 2 4 2013

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>PRIMARION, INC., et al.,<br><br>                    Defendants. | Case No.  08-cv-05129-JCS<br><br>REDACTED<br><br>**ORDER RE DAUBERT MOTIONS AND DEFENDANTS' SUMMARY JUDGMENT MOTION**<br><br>Re: Dkt. Nos. 1910, 1915<br><br>~~FILED UNDER SEAL~~ |

United States District Court
Northern District of California

## I.    INTRODUCTION

In this patent infringement action, the Court found in favor of Plaintiff Volterra Semiconductor Corporation ("Volterra Semiconductor" or "Volterra") on its infringement claims based on the stipulation of the parties, in part, and on summary judgment. In its summary judgment order, the Court also ruled in favor of Volterra as to certain invalidity challenges. *See* Docket No. 1318. Subsequently, in May 2011, a jury found in favor of Volterra with respect to Defendants' remaining invalidity challenges. The case is now in the damages phase and a trial is scheduled to begin on November 4, 2013. Before the Court are the following motions: 1) Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Damages Experts' Opinions ("Defendants' Summary Judgment/*Daubert* Motion"); and 2) Plaintiff Volterra Semiconductor Corporation's *Daubert* Motion to Exclude Dr. Matthew Lynde from Testifying as to Certain Opinions in his Expert Report ("Plaintiff's *Daubert* Motion"). A hearing on the Motions was held on Friday, September 20, 2013 at 9:30 a.m. For the reasons stated below, Defendants' Summary Judgment/*Daubert* Motion is GRANTED in part and DENIED in part.

United States District Court
Northern District of California

1    Plaintiff's *Daubert* Motion is GRANTED in part and DENIED in part.[1]

2    **II.    BACKGROUND**

3        **A.    The Damages Expert Reports**

4            **1.    Expert Report of Michael J. Wagner**

5        Michael Wagner was retained by Volterra "to provide an opinion regarding price erosion

6    caused by the infringement" by Defendants of the asserted claims of Volterra's U.S. Patent No.

7    6,278,264 Patent ("the '264 Patent") and U.S. Patent No. 6,462,522 ("the '522 Patent").[2]  Mr.

8    Wagner's expert report is based on the following understanding of Volterra's damages theory:

> I understand that Volterra Semiconductor is claiming that price
> erosion occurred as a result of Defendants' infringement which has
> already been determined based on sales after October 14, 2008 and
> anticipated future shipments of certain of its VT1100 and VT1600
> multiphase power switch products to its customers IBM and HP for
> use in voltage regulator sockets in industry standard servers on a
> number of specific projects for those customers. I understand that
> Volterra Semiconductor is not claiming that price erosion occurred
> with respect to sales of all of its products or even all of its flip chip
> integrated power switch products. Instead, I understand Volterra
> Semiconductor is claiming that price erosion occurred with respect
> only to sales of specific power switch products sold for specific
> projects for IBM and HP for which Volterra contends the pricing
> was lower than it would have been "but for" the Defendants' acts of
> infringement and illegal competition from Defendants' infringing
> products. . . . Volterra Semiconductor is claiming that price erosion
> occurred both on: (1) sales made directly by Volterra
> Semiconductor; and (2) sales made through a wholly owned
> subsidiary corporation, Volterra Asia Pte. Ltd. ["Volterra Asia"].

19    Declaration of David Wille in Support of Defendants' Motion for Summary Judgment and to

20    Exclude Plaintiff's Damages Experts' Opinion ("Wille Motion Decl."), Ex. B (Expert Report of

21    Michael J. Wagner, May 3, 2013 ("Wagner Report"), ¶ 2.

22        Mr. Wagner was asked to "determine whether price erosion was experienced with respect

23    to sales on certain IBM and HP projects after October 14, 2008" and to "quantify the amount of

24    additional revenue that would have been obtained by Volterra Semiconductor and Volterra Asia

25    respectively on such sales 'but for' this price erosion caused by Defendants' infringement." *Id.*, ¶

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

[2] The Court refers to the '522 Patent and the '264 Patent collectively as "the Burstein Patents."

9. His conclusions as to the amount of additional revenue that would have been received by Volterra but for Defendants' infringement (including projections as to future lost revenue) are reflected in Schedule 1.1 of his report, which reflects a total of $99,340,965.00[3] in lost revenue. *Id.*, Sch. 1.1. Of this amount, $12,282.00 is attributed to price erosion as to sales made directly to IBM and HP by Volterra Semiconductor and $99,328,682.00 is attributed to price erosion on sales to IBM and HP by Volterra Asia. *Id.*

### 2.  Expert Report of Dr. Christine Siegwarth Meyer

Dr. Christine Siegwarth Meyer was retained by Volterra to provide an expert opinion regarding the "economic harm to Volterra Semiconductor as a result of price erosion caused by Defendants' infringement on certain sales by its subsidiary, Volterra Asia." Wille Motion Decl., Ex. C (Expert Report of Dr. Christine Siegwarth Meyer ("Meyer Report")), ¶¶ 5-6.  In particular, Dr. Meyer addresses in her expert report:

> (1) whether Volterra Semiconductor itself has suffered economic injury as a result of the price erosion on past sales and anticipated future sales by Volterra Asia caused by Defendants' infringement of the asserted claims of the Burstein Patents; and, if so, (2) the amount of an appropriate damages award necessary to fairly compensate Volterra Semiconductor for the economic injury to it as a result of the price erosion on sales made by Volterra Asia caused by Defendants' infringement of the Burstein Patents.

*Id.*, ¶ 6. Dr. Meyer did not evaluate the "underlying price erosion claimed by Volterra Semiconductor and Volterra Asia caused by Defendants' infringement" but instead relied on Mr. Wagner's expert report and supporting schedules as to the amount of the lost profits due to price erosion. *Id.*, ¶ 7. Further, she provided no opinions about the lost profits that resulted from price erosion on sales made directly by Volterra Semiconductor. *Id.*

In the Summary of Opinions section of her report, Dr. Meyer describes the economic harm to Volterra Semiconductor resulting from price erosion on sales made by Volterra Asia as follows:

---

[3] Based on the amounts listed in Schedule 1.1 for the specific items of lost revenue, it appears that this amount should be $99,340,964.00 rather than $99,340,965.00.  The one-dollar discrepancy is a result of a computation error as to the total additional revenue for sales to IBM, which is the sum of Volterra Asia's lost revenue ($58,648,257.00) and Volterra Semiconductor's lost revenue ($3,190.00), that is, $58,651,447; Schedule 1.1 lists the sum of these two amounts as $58,651,448.00.  This error has no bearing on the resolution of the Motions before the Court.

> It is my opinion that the patent holder Volterra Semiconductor has suffered economic injury and harm as a result of Defendants' infringement assuming, as I have, that Defendants' infringement of the Burstein Patents caused price erosion on the sales of certain power switch products by Volterra Asia resulting in the loss of revenue to Volterra Asia as reflected in the Wagner Opening Report. Volterra Semiconductor has suffered economic injury and harm because if the price erosion caused by Defendants' infringement had not occurred, Volterra Semiconductor's wholly owned subsidiaries, Volterra International, Ltd. ("Volterra International") and Volterra Asia, which are assets of Volterra Semiconductor, would have had more cash and would have been worth more. From an economic perspective, having assets (in this case the subsidiaries) which would have had more cash and been worth more, would have resulted in an improved economic and financial position for Volterra Semiconductor had Defendants' infringement not occurred. In such circumstances, Volterra Semiconductor would have had a variety of economic options with respect to the additional cash held in the subsidiaries and additional value of its wholly owned assets, its subsidiaries, if Defendants' infringement had not occurred.

*Id.,* ¶ 11.

Dr. Meyer's conclusion that Volterra's financial position would have been better if Volterra Asia and Volterra International had held more cash is based, in part, on the understanding that "Volterra Semiconductor has the ability to fully control both Volterra International and Volterra Asia as a result of its sole ownership of Volterra International and Volterra International's sole ownership of Volterra Asia." *Id.,* ¶ 46. She illustrates her conclusion that "Volterra Semiconductor's economic and financial position would have been significantly better had Defendants' infringement not occurred" with three hypothetical examples. *Id.,* ¶¶ 46-50. First, she opines that "Volterra Semiconductor would likely have been able to obtain a significantly higher amount for a sales transaction in which its assets, Volterra International and Volterra Asia, were sold to a third party either separately or as part of a consolidated sales transaction involving the entire company." *Id.,* ¶ 48. Second, "Volterra Semiconductor would have had the ability to use this additional cash to make investments or to make acquisitions through the use of the additional cash." *Id.,* ¶ 49. Finally, "Volterra Semiconductor could have elected to declare dividends to itself from the subsidiaries of the additional cash they would have had but for the infringement." *Id.,* ¶ 50. According to Dr. Meyer, "whether Volterra Semiconductor would have actually undertaken or exercised any of these hypothetical economic and financial options is irrelevant . . . [because] [s]imply being deprived of these options constitutes a form of economic

United States District Court
Northern District of California

4

1   harm." *Id.* ¶ 51.

2        Dr. Meyer further opines that in order to make Volterra Semiconductor whole, it is

3   necessary to award it "the net amount of additional cash that its assets, Volterra Asia and Volterra

4   International would and should have respectively obtained had the Defendants' infringement not

5   occurred. *Id.*, ¶ 12. She concludes in her report that this amount is $56.5 million for the period

6   October 2, 2008 through March 31, 2013. *Id.*, ¶ 14. She further finds that Volterra Semiconductor

7   will suffer damages based on anticipated future sales in the amount of $41.7 million. *Id.*, ¶ 16.

8   Dr. Meyer calculates the amount of additional cash that Volterra Asia would have had by

9   subtracting from the total additional revenue Mr. Wagner found Volterra Asia would have

10   received but for the infringement the ▉ royalty that it would have owed to Volterra International

11   and then deducting the amount in taxes Volterra Asia would have owed on the remaining amount

12   under the law of Singapore, where Volterra Asia is based. *Id.*, ¶¶ 55-57. As to Volterra

13   International, Dr. Meyer opines that the amount of additional cash that entity would have had but

14   for the infringement would have been the ▉ royalty that Volterra Asia would have owed to it,

15   which she concludes would not have been subject to taxation. *Id.*, ¶¶ 58-60.

16        **3.   Expert Report of Matthew R. Lynde, Ph.D.**

17        Dr. Matthew R. Lynde was retained by Defendants to respond to Volterra's price erosion

18   theory of damages and the report of Mr. Wagner. Declaration of James W. Morando in Support of

19   Plaintiff Volterra Semiconductor Corporation's *Daubert* Motion to Exclude Dr. Matthew Lynde

20   from Testifying as to Certain Opinions in his Expert Report ("Morando Motion Decl."), Ex. 1

21   (Expert Report of Matthew R. Lynde, Ph.D. ("Lynde Report")), ¶ 6. In his report, Dr. Lynde

22   challenges Mr. Wagner's opinions as to price erosion on the basis that the price reductions upon

23   which Mr. Wagner relies are not the result of Defendants' infringement but of other factors,

24   including  a world-wide recession, "cost pressures from customers and constant standard price

25   drops expected in the industry," competition with non-infringing alternatives, a desire to expand

26   market share, and Volterra's decision to replace existing products with new products that were

27   designed to be cheaper to manufacture and had additional features. *Id.* at ¶ 55. Dr. Lynde's

28   opinion that the reduction in Volterra's prices was not the result of infringement is based, in part,

on the understanding that "[t]o recover price erosion damages, [Volterra] must show that it reduced its prices in response to direct competition from an infringer." *Id.* ¶ 53. Dr. Lynde also challenges Mr. Wagner's opinions and methodology on numerous other grounds.

### B. Defendants' Summary Judgment/*Daubert* Motion

#### 1. Summary Judgment

In their Motion, Defendants' seek summary judgment as to both components of Volterra's damages claim, that is, the damages that Volterra Semiconductor claims it suffered due to price erosion as to sales by Volterra Asia ("the Volterra Asia damages") and those it claims to have suffered based on its own direct sales ("the Volterra Semiconductor damages"). Defendants' Summary Judgment/*Daubert* Motion at 2.

Defendants contend they are entitled to summary judgment as to the Volterra Asia damages because Volterra Semiconductor is attempting to recover damages that were suffered by separate corporate entities, in violation of the Federal Circuit's decisions in *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) and *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008). *Id.* at 5. More generally, Defendants contend, Volterra's damages theory conflicts with well-established principles of corporate law that bar the "kind of derivative recovery" Volterra seeks. *Id.* at 7-10. In particular, Defendants argue Volterra Semiconductor lacks standing to assert a claim for harm to Volterra International or Volterra Asia because at most, Volterra Semiconductor is a mere shareholder (and as to Volterra Asia, it is not even that) and corporations and their shareholders are distinct entities. *Id.* (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003); *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983). Further, Defendants assert, a shareholder does not have standing to sue on its own behalf for injury to the corporation based on diminution in the value of its own shares or loss of a dividend. *Id.* at 8-9 (citing *Hometown Fin., Inc. v. United States*, 56 Fed. Cl. 477, 486 (Fed. Cl. 2003); *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 606 (2d Cir. 1994)). According to Defendants, Volterra's theory of recovery is based on the same type of derivative harms that courts have rejected as being too indirect to confer standing. *Id.* at 9. Further, Defendants assert, it violates the principal of fairness that underlies both the Federal Circuit's decisions and the more

United States District Court
Northern District of California

general corporate shareholder cases, namely, that "a corporation cannot obtain the benefits of adopting a corporate form but then disregard that corporate form when convenient for its recovery." *Id.* at 9.

To the extent Volterra Semiconductor relies on Dr. Meyer's hypotheticals to establish that it has been *directly* harmed as a result of price erosion on products sold by Volterra Asia, Defendants assert, these scenarios are too speculative and unforeseeable to support an award of damages. *Id.* at 10-12. Defendants point out that Dr. Meyer's hypotheticals are offered only as scenarios that *could* have happened and that, by Dr. Meyer's own admission, there is no factual basis showing that any of them *would* have happened. *Id.* at 10-11 (citing Meyer Report, ¶ 47). Further, Defendants assert, these scenarios are unlikely because: 1) there is no evidence Volterra International has ever issued a dividend to Plaintiff, *id.* (citing Wille Motion Decl., Ex. T (Plaintiff's Response to Defendants' Request for Admissions, No. 29); *id.*, Ex. F (Burns Dep.) at 48:16-25, 185: 18-22); 2) Volterra Semiconductor's CFO testified Volterra Semiconductor has never attempted to sell its shares of Volterra International, *id.* (citing Wille Motion Decl., Ex. T (Plaintiff's Response to Defendants' Request for Admissions, No. 60); *id.*, Ex. F (Burns Dep.) at 72: 23-73:1); and 3) Volterra Semiconductor has stated in its SEC filings that it plans to permanently invest its foreign subsidiaries' earnings outside the United States. *Id.* (citing Wille Motion Decl., Ex. S (Volterra Semiconductor Corp. 2012 10-K, p. 33, 52)). Defendants also contend Dr. Meyer has made no attempt to assess the value of these options. *Id.* at 11. Finally, Defendants assert lost dividends or a loss in value of stock is unforeseeable, as a matter of law, and therefore the scenarios offered by Dr. Meyer cannot support a damages award. *Id.* at 11-12 (citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1546 (Fed. Cir. 1995); *Ajimoto Co. v. Archer-Daniels-Midland Co.*, 1996 WL 621835, at *4 (D.Del. Oct. 21, 1996)).

Defendants seek summary judgment as to the Volterra Asia damages for the additional reason that these damages are based on price erosion on foreign sales. *Id.* at 12-15. According to Defendants, the Federal Circuit has barred claims for damages based on lost profits on sales made outside of the United States and that holding is applicable here. *Id.* at 12 (citing *Power Integrations, Inc. v. Fairchild Semiconductor, Inc.*, 711 F.3d 1348, 1370-72 (Fed. Cir. 2013)).

United States District Court
Northern District of California

1     Defendants further contend all of Volterra's damages are barred because Volterra has

2  failed to link the price reductions that allegedly resulted in lost revenues to "any domestic

3  infringing acts by Defendants." *Id.* at 13 (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437,

4  456 (2007)). In particular, Defendants argue Volterra is required to show that prices were reduced

5  in response to "direct competition" that constitutes an infringing act; to be infringing, Defendants

6  assert, the act must be performed in the United States. *Id.* at 12-13 (citing *Wechsler v. Macke Int'l*

7  *Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007); Vulcan *Eng'g Co. v. Fata Aluminum, Inc.*, 278

8  F.3d 1366, 1377 (Fed. Cir. 2002); *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214,

9  1218 (Fed. Cir. 1993)). Therefore, Defendants argue, Volterra must show that infringing sales or

10  offers for sale were made in the United States. *Id.* at 13. According to Defendants, Volterra has

11  failed to establish such a link because it has asserted that it lowered prices when it "heard about a

12  *non-infringing* act – a foreign offer for sale that was miscommunicated to Volterra Asia by a third

13  party." *Id.* at 14 (citing Wagner Report, ¶¶ 131, 133-134) (emphasis added). Defendants contend

14  that because they sold only $2,500 worth of infringing devices in the United States and Plaintiff

15  has "not cited a single domestic sale or domestic offer for sale by Defendants to which [Volterra]

16  claims to have reduced its pricing in response," Volterra's claim for damages based on price

17  erosion fails as a matter of law. *Id.* (citing Declaration of Ralf Sambeth in Support of Defendants'

18  Motion for Summary Judgment and to Exclude Plaintiff's Damages Expert Opinions ("Sambeth

19  Decl."), ¶ 9).

20     Finally, Defendants challenge Volterra's claim for $12,282.00 in damages based on price

21  erosion as to Volterra Semiconductor's own sales of the patented products. *Id.* at 15. Defendants

22  point to evidence that the actual prices Volterra Semiconductor pays Volterra Asia for the patented

23  products are variable, depending on the revenues of both companies. *Id.* (citing Wille Motion

24  Decl., Ex. O (Andrews Dep.) 62:11 - 78:6, 113:21 - 119:5). According to Defendants, "[t]o show

25  price erosion lost profits where the underlying costs are variable, Plaintiff must show the

26  difference between the *profits* it would have made but for the alleged infringement (but-for-

27  revenue less but-for costs), and the *profits* it actually made (actual revenue less actual costs)." *Id.*

28  (emphasis in original). Defendants contend Volterra cannot prove the amount of its lost profits

1   because it has provided no evidence of its actual costs, thus rendering its damages figure

2   speculative. *Id.*

3          **2.**   ***Daubert***

4        As an additional ground for entry of summary judgment, Defendants assert that Volterra

5   has offered no admissible evidence to support its damages theory because the opinions of Mr.

6   Wagner and Dr. Meyer are inadmissible under *Daubert v. Merrell Dow Pharmaceuticals*, 509

7   U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. *Id.* at 16. Defendants contend

8   Mr. Wagner's opinions are inadmissible because he: 1) failed to consider other market factors that

9   account for Volterra's price reductions; 2) inflated the amount of price erosion damages by

10   "cherry-picking" data; and 3) failed to conduct the required elasticity analysis. *Id.* at 16-22.

11        Defendants further assert that Dr. Meyer's opinions should be excluded because she relies

12   on Mr. Wagner's opinions and fails to "independently identify any connections between

13   Defendants' infringing acts and any economic injury to Plaintiff." *Id.* Defendants also challenge

14   the admissibility of Dr. Meyer's opinions on the ground that her conclusion that harm to a

15   subsidiary is the same as harm to the parent is not based on any meaningful valuation of the parent

16   but rather, is simply a legal conclusion that she is not qualified to offer. *Id.* at 16-17. Finally,

17   Defendants contend Dr. Meyer's opinions are unreliable because in opining that Volterra

18   Semiconductor would have been harmed in an amount equal to 100% of the post-tax lost profits

19   calculated by Mr. Wagner, she "ignores the fact that this 'additional cash' would have been owned

20   by Volterra foreign subsidiaries, not Plaintiff" and likely would have been treated as "permanently

21   reinvested offshore earnings." *Id.* at 17 (citing Wille Motion Decl., Ex. W (Baliban Dep.) at 9:19-

22   10:4; *id.*, Ex. X (Expert Report of Jeffrey Baliban ("Baliban Report"), ¶¶ 30-38 (Dep. Ex. 1208)).

23   As such, Defendants contend, there would have been restrictions on the use of this cash,

24   "precluding [Dr.] Meyer's dollar-for-dollar valuation." *Id.* at 17.

25     **C.**   **Volterra's Opposition to Defendants' Summary Judgment/*Daubert* Motion**

26        Volterra asserts Defendants have mischaracterized its damages theory to the extent they

27   have argued that Volterra is seeking the lost profits of its subsidiaries and has not alleged any

28   direct harm to itself. Opposition to Defendants' Summary Judgment/*Daubert* Motion at 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Volterra contends its damages theory is based on direct harm to Volterra Semiconductor not only

2    because it is seeking lost profits due to price erosion on its own sales but also because the Volterra

3    Asia damages reflect "damages for the economic injury to Volterra Semiconductor *itself* as a result

4    of price erosion on sales made by its subsidiary, Volterra Asia." *Id.* (emphasis in original).  Thus,

5    as to the latter category of damages, it is not relying on the "more typical lost profits or reasonable

6    royalty claims asserted by patentees." *Id.*  Nonetheless, Volterra asserts, this category of harm is

7    compensable under 35 U.S.C. § 284.

8            First, Volterra rejects Defendants' assertion that the shareholder standing doctrine prohibits

9    Volterra Semiconductor from seeking damages based on Volterra Asia's sales. *Id.* at 2.  This

10   doctrine does not apply here, Volterra asserts, because Volterra's standing in this case derives

11   directly from the Patent Act, which "imposes no limitation on the types of harm resulting from

12   infringement that the statute will redress." *Id.* at 4 (quoting *King Instruments Corp. v. Perego*, 65

13   F.3d 941, 947 (Fed. Cir. 1995)).  Further, Volterra asserts, the Supreme Court has made clear that

14   the statutory language of the Patent Act providing for "adequate" damages entitles a patentee to

15   damages that will "fully compensate the patentee for infringement." *Id.* (quoting *Rite-Hite v.*

16   *Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995)).  Because the source of a plaintiff's claim to

17   relief is critical to the prudential standing inquiry, Volterra asserts, the shareholder standing cases

18   cited by Defendants, which did not involve claims asserted under the Patent Act, do not apply

19   here. *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  Volterra also challenges Defendants'

20   argument that the shareholder standing doctrine should be applied here for reasons of "fairness."

21   According to Volterra, the shareholder standing doctrine is "premised on the prohibition against

22   duplicate recovery." *Id.* at 5 (quoting *Stein v. United Artist Corp.*, 691 F.2d 885, 896-897 (9th Cir.

23   1982)).  Volterra argues that there is no risk of duplicate recovery here because Volterra's

24   subsidiaries are non-exclusive licensees and therefore cannot assert any claim for damages based

25   on the infringed patents. *Id.*

26           Second, Volterra argues that under *Rite-Hite* and § 284 of the Patent Act, "a particular

27   injury suffered by the patent holder as a result of the infringement 'is generally compensable

28   absent a persuasive reason to the contrary.'" *Id.* at 6 (quoting *Rite-Hite*, 56 F.3d at 1546).  Here,

Volterra contends, there is no reason to limit its right to full compensation for its injury resulting

from Defendants' infringement. *Id.* Volterra rejects Defendants' argument that its injuries are

remote and speculative, arguing that the injury to Volterra found by Dr. Meyer – that Volterra's

financial position would have been better absent the infringement – is neither remote nor

unforeseeable. *Id.* Volterra notes that Defendants do not dispute that Volterra would have been

better off if its subsidiaries had more cash. *Id.* Further, Volterra argues, Dr. Meyer was able to

calculate the precise amount of "additional cash and value the subsidiaries would have had if the

infringement had not occurred." *Id.* at 6-7. Because Volterra has full control over the

subsidiaries, it argues, the injury Volterra Semiconductor has suffered because of the price erosion

on Volterra Asia sales is direct. *Id.* at 7.

Volterra  also argues that under *Rite-Hite*, the fact that it licensed its patents to its

subsidiaries is not a persuasive reason to deny Volterra Semiconductor its statutory right to receive

full compensation. *Id.* at 7-8. The type of arrangement used by Volterra is similar to the structure

of many multinational corporations headed by U.S. companies, Volterra asserts, and thus it is not

unforeseeable that a parent corporation in the United States would be harmed by acts of

infringement that affected the sales of the subsidiary. *Id.* at 8. Further, Volterra argues, the

Federal Circuit recognized that there is no requirement that the patentee itself must make, use, or

sell its patented invention as "a patent is granted in exchange for a patentee's disclosure of the

invention, not for the patentee's use of the invention." *Id.* (quoting *Rite-Hite*, 56 F.3d at 1547).

Thus, injury to a parent corporation based on a subsidiary licensee's lost revenue is not the sort of

damages claim that is barred under *Rite-Hite*, Volterra argues. *Id.* Nor have Defendants identified

any policy reason that would justify denying Volterra full compensation. *Id.* To the contrary,

Volterra argues, barring its damages claims based on Volterra Asia sales would unfairly permit

Defendants to infringe while avoiding an award of the full scope of damages because Volterra's

subsidiaries have no standing to sue for infringement. *Id.* at 9.

Third, Volterra argues that the Federal Circuit's decisions in *Mars* and *Poly-America* do

not apply to its Volterra Asia damages claim because those cases only held that a corporation may

not recover the lost profits of a subsidiary or sister corporation. *Id.* at 9. Volterra contends it does

United States District Court
Northern District of California

1   not seek the lost profits of Volterra Asia and Volterra International. *Id.* at 9-10.   Further, Volterra

2   asserts, the Federal Circuit made clear in *Mars* that while a parent may not seek lost profit

3   damages based on the lost profits of a subsidiary, "patentees may be entitled to damages above a

4   reasonable royalty on theories entirely distinct from lost profits." *Id.* at 10 (quoting *Mars*, 527

5   F.3d at 1366).   According to Volterra, its own theory is such a theory and therefore falls outside

6   the holdings of *Mars* and *Poly-America*. *Id.* at 10-11.

7          Volterra also rejects Defendants' challenges under *Daubert* and Rule 702 to Dr. Meyer's

8   opinions about the injury to Volterra caused by price erosion on Volterra Asia's sales. *Id.* at 11-

9   13.   Volterra argues that there is nothing improper about Dr. Meyer relying on the opinions of

10   Dr. Wagner as to the amount of the price, which is a separate issue. *Id.* at 12-13.   Further, Volterra

11   contends, Dr. Meyer's methodology is not flawed to the extent she did not perform a valuation of

12   the subsidiaries because such a valuation was not required. *Id.* at 12.   In particular, Volterra cites

13   Dr. Meyer's opinion that "what is relevant is to value the *net or incremental amount of additional*

14   cash that Volterra Semiconductor's assets, Volterra International and Volterra Asia, would have

15   had but for Defendants' infringement." *Id.* at 12 (quoting Declaration of Dr. Christine Siegwarth

16   Meyer in Opposition to Defendants' Motion for Summary Judgment and to Exclude Plaintiff's

17   Damages Expert Opinions ("Meyer Decl."), Ex. 2 (Reply Expert Report of Dr. Christine

18   Siegwarth Meyer ("Meyer Reply Report"), ¶¶ 37-38) (emphasis added in brief).   Because Dr.

19   Meyer is evaluating an "assumed incremental amount of cash, an asset-based valuation approach

20   is the appropriate approach," according to Volterra. *Id.*   Moreover, Volterra rejects Defendants'

21   assertion that Dr. Meyer gave "no consideration" to the fact that the cash was held by foreign

22   subsidiaries and that there would have been tax consequences to repatriating the cash. *Id.* at 13

23   (citing Meyer Decl., Ex. 2 (Meyer Reply Report), ¶¶ 19-32, 33-36).   Volterra also contends Dr.

24   Meyer is qualified to testify as an expert based on the experience set forth in the report and her

25   CV. *Id.* (citing Meyer Decl., Ex. 1, ¶ 2 & Ex. 1; *PixArt Imaging, Inc. v. Avago Tech. Gen. IP*

26   *(Singapore) Pte. Ltd.*, 2011 WL 5417090 (N.D. Cal. Oct. 27, 2011); *Hangarter v. Provident Life*

27   *& Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004)).

28          Volterra argues that Defendants are incorrect in their assertion that Volterra cannot show a

12

United States District Court
Northern District of California

causal link between any infringing act – that is, an act that occurred in the United States – and the claimed price erosion. *Id.* at 13-16. According to Volterra, it has offered substantial evidence that its decisions to lower its prices on the products sold on the IBM and HP products were caused by acts of infringement that occurred in the United States and this evidence is sufficient to create a jury question. *Id.*; *see also* Declaration of James W. Morando in Support of Plaintiff Volterra Semiconductor Corporation's Opposition to Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Damages Expert Opinion ("Morando Opposition Decl.");[4] Declaration of William G. Numann in Opposition to Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Damages Expert Opinions ("Numann Opposition Decl."), ¶¶ 5-6. Volterra points to *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1580-81 (Fed. Cir. 1992), which it contends presented a similar price erosion claim. *Id.* In that case, the Federal Circuit found that the question of whether an announcement by an infringer of its intent to sell infringing products was sufficient to show causation as to price erosion damages presented a "classical jury question." *Id.* at 14. Volterra also rejects Defendants' assertion that there is an independent requirement that the patentee show "direct competition" to establish causation on price erosion damages, asserting that there is no such requirement. *Id.* at 14 n. 15.

Similarly, Volterra argues that Defendants are incorrect in their assertion that under the

---

[4] The Morando Opposition Declaration contains a detailed summary of the evidence that Volterra contends will establish that Defendants committed acts of infringement in the United States. The evidence cited in the declaration is attached as exhibits. Defendants have objected to the Morando Opposition Declaration, in its entirety, asserting that it contains legal conclusions that are not based on personal knowledge and violates the Court's 25-page limit for briefs. *See* Docket No. 1968. Defendants have also objected to certain specific exhibits, arguing that they are not relevant to the question of whether Defendants committed acts of infringement in the United States. The Court sustains Defendants' objection to the extent Mr. Morando's declaration contains legal argument and conclusions that are properly included in Volterra's legal brief (which is subject to a 25-page limit) rather than a supporting declaration. The Court does not rely on these conclusions in evaluating the significance of the evidence attached to the Morando Opposition Declaration. The Court overrules the objection in all other respects. At least some of the evidence attached to the declaration goes to the heart of whether Defendants committed acts of infringement in the United States. *See, e.g.,* Morando Opposition Decl., Ex. 5 (deposition excerpts of Jason Bone, a Field Application Engineer for Defendants, based in Austin Texas, who testified that he tested the infringing products in Texas in order to prepare evaluation boards for those products and visited multiple IBM facilities in the United States as part of an effort to persuade IBM and HP to use Defendants' infringing products in their servers). The Court declines to consider each individual exhibit to determine its relevance; rather, to the extent some of the documents may not show that infringing activities occurred in the United States, the Court simply does not rely on them.

United States District Court
Northern District of California

1    Federal Circuit's decision in *Power Integrations*, a patentee cannot assert a claim for price erosion

2    based on underlying sales outside of the United States. *Id.* at 16-19. Rather, "the language of

3    Section 284, its legislative history and multiple decisions of the U.S. Supreme Court all make

4    clear that there is no geographical limitation on where the injury or harm occurs." *Id.* at 17. Thus,

5    because there is substantial evidence that Defendants committed acts of infringement in the United

6    States, Volterra asserts, it can recover damages on sales of the infringing product outside of the

7    United States. *Id.* at 17-18. Volterra contends the facts in *Power Integrations* are distinguishable

8    from the facts of this case because in that case there was no evidence presented at trial that the

9    foreign sales that were lost were lost as a result of infringing activity that took place in the United

10   States. *Id.* at 18-19.

11        Volterra also rejects Defendants' challenges to the Wagner Report under *Daubert* and Rule

12   702. *Id.* at 19-25. In response to Defendants' assertion that Mr. Wagner did not consider other

13   factors besides Defendants' infringement that may have affected Volterra's pricing, Volterra

14   asserts this is not a proper subject of a *Daubert* challenge and, in any event, is inaccurate.

15   According to Volterra, Mr. Wagner reconstructed a hypothetical market without infringement and

16   considered the factors raised by Defendants. *Id.* at 20 (citing Declaration of Michael J. Wagner  in

17   Opposition to Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Damages

18   Expert Opinions ("Wagner Decl."), Ex. 1 (Wagner Report), ¶¶ 110, 281-292, 307-399, Schedules

19   4.1-7.8 and 9.1-10.4; *id.*, Ex. 2 (Reply Expert Report of Michael J. Wagner ("Wagner Reply

20   Report")), ¶¶ 94-98, 28-35, and 75-76). Volterra further contends Defendants' arguments about

21   why they disagree with Mr. Wagner should be addressed through cross-examination at trial and

22   not by means of a *Daubert* challenge. *Id.* at 20-21.

23        Volterra also reject Defendants' assertion that Mr. Wagner "cherry-picked" the data he

24   relied upon, arguing that this challenge, like the one discussed above, is both incorrect and not

25   appropriately the subject of a *Daubert* challenge. *Id.* at 21-22. According to Volterra, Mr.

26   Wagner's opinions are based on historical trend data for six similar products. *Id.* (citing Wagner

27   Decl., Ex. 1 (Wagner Report), ¶ 320, Sch. 3.1, 3.3; *id.*, Ex. 2 (Wagner Reply Report), ¶¶ 94-98).

28   Defendants' challenge to the start and end dates for one of those products does not show that Mr.

1    Wagner's opinions are unreliable, Volterra argues. *Id.* at 21.  Furthermore, Defendants' assertion

2    that Mr. Wagner ignored certain statements by Volterra about price attrition is incorrect, Volterra

3    asserts; Mr. Wagner simply has a different understanding of the underlying facts. *Id.*

4         Volterra further asserts that Mr. Wagner did, in fact, consider the price elasticity of

5    demand, as is required under *Crystal Semiconductor*. *Id.* at 22-24. In particular, Volterra contends

6    Mr. Wagner considered this question at two levels of analysis: the server level and the voltage

7    regulator level. *Id.* at 22-23 (citing Wagner Decl., Ex. 1 (Wagner Report), ¶¶ 239-260, 273, 298,

8    328-333, Sch. 4.1-7.8, 9.1-10.4; *id.*, Ex. 2 (Wagner Reply Report), ¶¶ 13-27, 36-47, 110-115).

9         Finally, Volterra rejects Defendants' assertion that its claim for the Volterra

10   Semiconductor damages fails because it has not provided evidence of the actual cost of the

11   products sold by Volterra Asia to Volterra Semiconductor. *Id.* at 25.  According to Volterra, the

12   actual cost of the products is irrelevant because Volterra's price erosion claim is based on the

13   difference between the actual price paid and the higher "but for" price that would have been paid

14   absent the infringement. *Id.* at 25.

15        **D.    Plaintiff's *Daubert* Motion**

16        Volterra seeks the exclusion of certain opinions of Defendants' expert, Dr. Lynde, under

17   Rules 403 and 702 of the Federal Rules of Evidence and *Daubert* on the grounds that they will not

18   "assist the trier of fact to understand or determine a fact in issue" and their probative value will be

19   outweighed by their prejudicial effect.  Plaintiff's *Daubert* Motion at 1-2.  First, Volterra criticizes

20   Dr. Lynde's expert report on the basis that instead of reconstructing a hypothetical market to

21   determine the amount of sales that would have occurred but for the infringement, he offers

22   opinions about "why Volterra decided to offer substantially lower prices on its power switch

23   products to IBM and HP after learning of Defendants' infringing products in the marketplace." *Id.*

24   at 4.  These opinions, according to Volterra, are not based on any economic analysis or

25   hypothetical reconstruction of the market but instead, on Dr. Lynde's "subjective interpretations of

26   narrow portions of evidence" as to "Volterra's decision making, motivations, and state of mind."

27   *Id.*   Volterra contends, Dr. Lynde "did not even select which evidence to review; rather it was

28   provided to him by counsel for the Defendants in response to his general request for 'evidence

15

1    relevant to the damages question.'" *Id.* (citing Morando Motion Decl., Ex. 2 (Lynde Dep.) at

2    9:10-18).

3            Volterra argues that Dr. Lynde's testimony about Volterra's motivations in lowering its

4    prices should not be admitted because Rule 702 requires that courts exclude expert testimony

5    regarding a party's state of mind. *Id.* at 5 (citing *Conceptus, Inc. v. Hologic, Inc.*, Case No. C-09-

6    02280-WHA, *slip op.* at 2 (N.D. Cal. Sept. 27, 2011)). Further, Volterra asserts, experts are

7    limited to offering opinions based on their "scientific, technical or other specialized knowledge"

8    and are not permitted to usurp the jury's role by making credibility determinations as to other

9    witnesses. *Id.* at 6 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 242 (1986); *U.S. v. Todd*,

10   884 F.2d 583 (9th Cir. 1989 (unpublished); *Ellis v. Navarro*, 2012 WL 3580284, at *6 (N.D. Cal.

11   Aug. 7, 2012)). According to Volterra, an expert witness has no more ability than the jury to

12   weigh the credibility of witnesses. *Id.* Similarly, it asserts, an expert witness should not be

13   permitted to opine about what documents one would expect a business to possess on a particular

14   subject if the expert has no more expertise than the jury as to the types of documents businesses

15   typically possess in a given field. *Id.* at 6. Finally, Volterra contends, an expert should not be

16   permitted to "step into the role of counsel and argue a party's case from the witness stand"

17   because "such testimony is unfairly prejudicial, needlessly cumulative, and risks misleading the

18   jury" thus warranting exclusion under Rule 403 of the Federal Rules of Evidence. *Id.* at 7.

19           Based on these principles, Volterra seeks exclusion of opinions expressed by Dr. Lynde in

20   his expert report that the reason that Dr. Teuscher and Mr. Numann decided to offer lower pricing

21   to IBM and HP was not Defendants' infringement but rather, other factors, including an

22   established pricing strategy of offering improved "price performance" with each new generation,

23   planned lower manufacturing costs or anticipated lower margins, a desire to lower market share

24   through lower pricing, efforts to compete with lower cost traditional "discrete" voltage regulator

25   solutions, an economic recession and cost pressures from customers. *Id.* at 9-20.

26           With respect to Dr. Lynde's opinions about Volterra's pricing strategy, Volterra contends

27   Dr. Lynde simply relies on his own "subjective interpretation of the meaning of certain Volterra

28   documents," and that these interpretations are directly contrary to the testimony of witnesses who

were asked about the documents in deposition. *Id.* at 9-10. Further, Volterra objects to Dr. Lynde's reliance on Volterra's "Product Vision Statements." *Id.* at 10 (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 11, 45, 46, 53-61, 65, 69, 76, 79, 81, 83-85, 87-88, 96-96, 98-101, 104, 108-114, 116, 123, 128, 132, 141-143, 166, 182, 183-185, 194-195, 197, 201, 218, 219, 221, 237). Volterra argues that these Product Vision Statements are, as Dr. Lynde acknowledged, "nothing more than an early document prepared in the initial stages of the product development cycle at Volterra and merely involve an early assessment of whether the potential economic return on investment of the possible 'new product makes sense.'" *Id.* (citing Morando Motion Decl., Ex. 2 (Lynde Dep.). As such, Volterra contends, Dr. Lynde's reliance on these documents as a reflection of what Volterra intended as to the pricing of these future products is speculative and improper. *Id.* at 10-11. Further, it asserts, Dr. Lynde's "speculation is also inconsistent with the testimony of the former Volterra employees who actually prepared the documents." *Id.* at 11. Similarly, Volterra contends Dr. Lynde's opinion that Volterra had an established policy of offering "price-performance" improvements is improper because it is based on his "subjective, speculative interpretation of the meaning of several Volterra documents and presentations." *Id.* at 11-12 (citing Morando Decl., Ex. 1 (Lynde Report), ¶¶ 361, 362, 365). Also improper, Volterra asserts, is Dr. Lynde's opinion that Volterra was attempting to develop new power switch products that could be manufactured at a lower cost. *Id.* at 13-14 (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 99, 104, 106, 360, 366).

Next, Volterra challenges Dr. Lynde's opinion that it lowered prices in an effort to increase revenues by growing its market share. *Id.* at 15 (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 155, 225, 405, 454-554). According to Volterra, these opinions are merely Dr. Lynde's speculation and are unreliable in light of the testimony of Dr. Teuscher and Mr. Numann that they made pricing decisions because they believed Defendants would offer infringing products to HP at prices lower than Volterra's. *Id.*

Volterra also challenges Dr. Lynde's opinion that it lowered its pricing to HP and IBM in part because it was attempting to compete with lower-cost traditional "discrete" voltage regulator solutions. *Id.* at 15-17 (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 29, 175, 241-243,

247-248, 249, 475, 476-478).  According to Volterra, Dr. Lynde's grounds for these opinions are only his "review of a handful of selected Volterra e-mails and his interpretation of deposition testimony, including his subjective views of how to weigh the deposition testimony of one witness over the testimony of another."  *Id.*  This is not a proper subject of expert opinion, Volterra asserts. *Id.* at 17.

Volterra argues that Dr. Lynde's opinions about the impact of the global recession on Volterra's pricing also should be excluded.  *Id.* at 17-18.  According to Volterra, Dr. Lynde's opinions on this issue are based on his review of three documents and none supports his opinion. *Id.* at 17.  The three documents are: 1) a 2008 forecast by International Data Corporation ("IDC") that predicted ███████████████████████████████████████████ 2) Volterra's 2008 10-K filing, in which Volterra stated that the semiconductor industry has experienced "significant downturns"; and 3) an email from a Volterra employee describing a conversation with an employee at Foxconn, a server ODM.  *Id.* (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 58 n. 61, 61, 256-257).  According to Volterra, none of these documents addresses Volterra's motivations regarding its pricing strategy and therefore, they do not provide adequate support for Dr. Lynde's opinions.  *Id.*  Volterra asserts, "Dr. Lynde offers no economic analysis regarding a recession or any effect of a recession on Volterra's prices in his report and he has admitted that he did not conduct any economic or expert analysis to arrive at his opinion that the economic recession affected Volterra's pricing strategy."  *Id.* at 18 (citing Morando Motion Decl., Ex. 2 (Lynde Dep.) at 290: 13-23).

Volterra further asserts that Dr. Lynde's opinion that it lowered its prices in response to "cost pressures from customers moving 'some server design efforts and purchasing decisions to ODMs in Taiwan'" should be excluded as speculative.  *Id.* at 18-20 (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 25, 95, 163, 165, 200, 201).  Volterra points in particular to Dr. Lynde's reliance on the Naruwan server project, which was being planned by a Taiwan-based ODM, as an example of this trend.  *Id.* (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 165, 201).  According to Dr. Lynde, the fact that ████████████████████████████ ████████████████████████████████████████ showed that

United States District Court
Northern District of California

Volterra's pricing strategy was affected by cost pressures from customers. *Id.* (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 165, 201). Volterra asserts this opinion is speculative, is not based on any special expertise, and makes no sense because "[a]s Dr. Lynde himself acknowledged later in his report, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶ 200).

Volterra also argues that many of Dr. Lynde's opinions about the other factors he believes caused Volterra to lower its prices are based on the "nature, content and extent of the 'contemporaneously created' documents in Volterra's files supporting Volterra's claims – a subject in which he has no specialized knowledge. *Id.* at 20. For example, in his report Dr. Lynde rejects a number of Mr. Wagner's opinions based on testimony of Volterra witnesses, citing the absence of contemporaneous records corroborating the opinions of those witnesses and opining he "would have expected to see a contemporaneously-created document." *Id.* (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 193, 243, 249, 259, 285, 295, 306, 326, 409, 436). Volterra contends these opinions are mere "speculation about the record-keeping habits of employees in the sales and marketing department of a semiconductor company such as Volterra regarding the expected contents in documents they would prepare." *Id.* (citing *United States v. Change*, 207 F.3d 1169, 1173 (9th Cir. 2000)). Volterra also argues Dr. Lynde's opinions are improper under Rule 702 to the extent that he "openly opines about the credibility of Volterra witnesses" regarding the reason Volterra lowered its prices. *Id.* at 21 (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 27, 99, 178-179, 198, 237, 315, 438, 501).

Moreover, Volterra asserts, Dr. Lynde "improperly speculates about the beliefs, thoughts, and state of mind of other parties and witnesses aside from Volterra." *Id.* at 22-23. For example, Volterra points to Dr. Lynde's opinions that Infineon Technologies AG "acquired Primarion, Inc. to strengthen its presence in the power management sector," that "Defendants were supposedly no longer 'focused' on promoting the infringing products after the Court's consideration of Volterra's motion for a preliminary injunction," and that in November 2009, Infineon "stopped" promoting its flip chip products and "began promoting DrMOS as its solution at IBM." *Id.* at 22 (citing

19

Morando Motion Decl., Ex. 1 (Lynde Report),  ¶¶ 13, 335, 466).  Volterra also objects that Dr.

Lynde "repeatedly opines about the thinking and state of mind of customers." *Id.* at 22-23 (citing

Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 135, 216, 226 239).  As these constitute

impermissible expert testimony about the state of mind of corporations, Volterra argues, these

opinions should be excluded. *Id.* at 23.

Volterra's second broad challenge to Dr. Lynde's opinions is that they are based on an

erroneous understanding of the law.    *Id.* at 5, 23-25.  In particular, Dr. Lynde "opines that

Volterra did not suffer price erosion based on the instruction he was given that the law supposedly

requires Volterra to show that it lowered its prices in response to something called "direct

competition from an infringer." *Id.* at 2.    According to Volterra, there is no such requirement.

*Id.* at 23.  Rather, to establish causation as to price erosion damages, Volterra contends, a patentee

is only required to demonstrate a "factual basis for causation" by showing that "'but for' the

infringement, the patent owner would have made the sales that the infringer made, charged higher

prices, or incurred lower expenses." *Id.* at 23-24 (citing *Lam, Inc. v. Johns-Manville Corp.*, 728

F.2d 1056, 1067 (Fed. Cir. 1983)).  Volterra points to *Brooktree Corp. v. Advanced Micro*

*Devices, Inc.*, 977 F.2d 1555, 1580 (Fed. Cir. 1992) to illustrate this point, arguing that in that

case, "the Federal Circuit expressly affirmed a damages award based on a theory of price

reduction due to AMD's mere announcement and promotion of infringing products, which caused

Brooktree to reduce its prices in response." *Id.* at 24.

According to Volterra, the situation here is analogous to the facts of *Brooktree* and therefore

Dr. Lynde should not be permitted to testify that Volterra has not shown price erosion because

"there is no evidence of the Defendants submitting a specific bid or quote for a particular project

on which Volterra claims price erosion . . . or because he believes Volterra may not have had

specific knowledge of particular quotes or actions taken by the Defendants." *Id.* (citing Morando

Motion Decl.), Ex. 1 (Lynde Report), ¶¶ 28, 172, 226, 295, 435, 450-453, 525).  Nor should Dr.

Lynde be allowed to "suggest that Volterra cannot recover for price erosion based on his surmise

that following the Court's consideration of the preliminary injunction the Defendants either were

not focusing on or supposedly stopped promoting the infringing products such that there was no

1    longer 'direct competition' with the infringing products." *Id.* (citing Morando Motion Decl., Ex. 1

2    (Lynde Report), ¶¶ 335, 466, 527, 547). Finally, for the same reason, Volterra asserts that Dr.

3    Lynde should not be permitted to opine that "Volterra cannot show causation for reduced prices on

4    sales to HP on projects using microprocessors made by AMD because . . . Defendants' controllers

5    which might have been sold with the infringing products did not meet AMD specifications." *Id.*

6    (citing Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 226, 450-453). According to Volterra,

7    Dr. Lynde's opinion is based on the incorrect premise that Primarion's infringing products could

8    not have directly competed with Volterra's products because they did not meet AMD

9    specifications, whereas Volterra's products did. *Id.* at 24-25.

10       **E.   Defendants' Opposition to Plaintiff's *Daubert* Motion**

11          Defendants reject Volterra's position that Dr. Lynde offers opinions pertaining to motive or

12    credibility. Opposition at 1. Rather, Defendants argue, Dr. Lynde "provides a balanced analysis

13    of the evidentiary record, noting where differences exist between what Volterra witnesses now

14    claim and what their own contemporaneous documents say." *Id.* With respect to Dr. Lynde's

15    opinions about factors other than Defendants' infringement that may have contributed to the

16    reduction in Volterra's prices, Defendants contend an expert who is creating a hypothetical

17    market "*must* account for and consider 'the many other factors that could cause a manufacturer of

18    a product to lower its prices.'" *Id.* at 7 (quoting *Ericsson, Inc. v. Harris Corp.*, 2001 WL

19    36131932, at *7 (E.D. Tex. Mar. 13, 2001)). Thus, Dr. Lynde appropriately opines about these

20    other factors, Defendants contend. *Id.* In contrast, Defendants assert, Volterra's price erosion

21    expert, Mr. Wagner, "blindly adopt[s] the testimony of interested witnesses regarding the cause of

22    a price reduction without independent verification and analysis." *Id.* at 8.   Further, Defendants

23    assert, Dr. Lynde's methodology, relying on a review of documents and deposition testimony, as

24    well as consideration of macroeconomic factors, has been approved by other courts. *Id.* at 9-10

25    (citing *Playtex Products, Inc. v. Proctor & Gamble*, 2004 WL 1658377, at *6 (S.D.N.Y. July 26,

26    2004)).

27          Defendants reject Volterra's assertion that Dr. Lynde cannot properly rely on documents

28    drafted by Volterra employees, arguing that it is proper to draw inferences from evidence in the

United States District Court
Northern District of California

21

1    record. *Id.* at 11 (citing *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987)).

2    Thus, Defendants assert, Dr. Lynde's reliance on Volterra's Product Vision Statements in support

3    of his opinions is proper. *Id.* at 12.  Similarly, Defendants assert Dr. Lynde's reliance on Volterra

4    documents in support of opinions about historical pricing trends – such as documents showing

5    Volterra advertised "a ▮▮▮ performance improvement with each generation" – is proper. *Id.* at

6    13.  According to Defendants, the degree to which these documents support their expert's opinion

7    goes to the weight of the evidence, not the admissibility. *Id.* at 12-13.

8          Defendants further contend Dr. Lynde's opinions about Volterra's production costs and

9    margins are a proper subject of expert opinion and not, as Volterra contends, "a divination of

10   Plaintiff's intent." *Id.* at 13-14 (citing *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358

11   Fed. App'x 643, 654 (6th Cir. 2009); *Polaroid Corp. v. Eastman Kodak Co.*, 1990 WL 324105 (D.

12   Mass. Oct. 12, 1990); *Tama Plastic Indus. v. Pritchett Twine & Net Wrap, LLC*, 2012 WL

13   3264570, at *10 (S.D. Ind. Aug. 9, 2012)).  Defendants assert Volterra has cited no case that holds

14   cost margins and production costs are an improper subject of expert opinion and that Volterra's

15   challenge goes to the weight of Dr. Lynde's opinion, not its admissibility. *Id.* at 14.  Dr. Lynde's

16   opinions about the impact of the volume of Volterra Asia's sales on prices are also proper,

17   Defendants argue, because this relationship is based on well-established economic principles;

18   indeed, this relationship is relevant to the price elasticity of demand, Defendants assert, which

19   *must* be considered to determine causation based on price erosion. *Id.* at 15 (citing *Crystal*

20   *Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001);

21   *Andrew Corp. v. Gabriel Electronics, Inc.*, 785 F. Supp. 1041, 1052 (D. Me. 1992)).

22         Defendants argue Dr. Lynde's consideration of evidence that Volterra lowered the prices it

23   offered to HP and IBM to compete with "discrete" voltage regulator solutions is proper because a

24   lost profits analysis *must* consider the effects of non-infringing competition. *Id.* at 16-17 (citing

25   *Panduit Corp. v. Stalin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978); *Milos Misha*

26   *Subotincic v. 1274274 Ontario, Inc.*, 2013 WL 3964994, at *15 (C.D. Cal. Apr. 9, 2013)).  To the

27   extent Dr. Lynde relied, in part, on Volterra documents and deposition testimony, Defendants

28   argue there is nothing improper about this. *Id.* at 17 (citing *Playtex Prods.*, 2004 WL 1658377, at

*6).  Defendants argue that Volterra's challenge, again, goes to weight of Dr. Lynde's opinions rather than their admissibility.  *Id.*

Defendants also reject Volterra's challenge based on Dr. Lynde's opinions regarding the impact of the worldwide recession.  *Id.* at 17-19.  According to Defendants, Volterra's arguments that Dr. Lynde's opinion is deficient to the extent that he did not quantify the effects of the worldwide recession or show a direct tie between the recession and Volterra's pricing should be rejected because it is Volterra's burden to show the prices it would have obtained in a hypothetical market.  *Id.* at 18.  Defendants contend Dr. Lynde's opinion is simply pointing out that Mr. Wagner did not factor the recession into his analysis.  *Id.* at 18.  Further, Defendants assert, consideration of macroeconomic factors is required to evaluate a price erosion claim.  *Id.* (citing *Rowlplug Co., Inc. v. Illinois Tool Works Inc.*, 1994 WL 202600, at *2 (S.D.N.Y. May 23, 1994)).

Customer initiated cost-pressures are also a proper subject of expert opinion, Defendants argue, and Dr. Lynde's opinions on this question are proper.  *Id.* at 19-20.  In particular, while the question of "*whether* customer's applied price pressures  is not the type of testimony that requires specialized knowledge," the "effect of that price pressure, combined with other economic factors, on a party's pricing *is* the kind of testimony that requires specialized knowledge."  *Id.* at 20 (emphasis in original).  This is also a necessary consideration in determining price erosion, Defendants contend, and to the extent Volterra challenges the factual basis for Dr. Lynde's opinions, this goes only to the weight of Dr. Lynde's opinions.  *Id.* at 19.

Defendants also reject Volterra's argument that Dr. Lynde may not rely on the absence of contemporaneous records showing Volterra was making pricing decisions in response to Defendants' sales or offers for sale of infringing products.  *Id.* at 20.  Defendants contend Dr. Lynde does not "offer an opinion on expected record-keeping or the types of documents Plaintiff *ought* to keep . . .[but] simply notes that *no* contemporaneously created documents state that Volterra was reducing prices in response to Defendants' accused products."  *Id.*  This is another challenge Defendants assert goes to the weight of Dr. Lynde's opinion rather than its admissibility.  *Id.* at 20-21.

Defendants also argue Dr. Lynde is not presenting opinions about the state of mind of

United States District Court
Northern District of California

Volterra's witnesses; he is simply "as an economist, considering *all* the available evidence to critique Mr. Wagner's opinion on price erosion." *Id.* at 21. Even if Dr. Lynde's review of the documents "lead[s] to conclusions that cannot be squared with Volterra's witnesses' litigation testimony, that does not mean he is testifying about state of mind." *Id.* Defendants assert that the cases cited by Volterra to support the argument that an expert witness may not opine about witness credibility are distinguishable because they hold that "a party may not offer an expert who purports to have expertise *solely* about whether a witness is believable." *Id.* at 21-22 (citing *United States v. Todd*, 884 F.2d 583, at *3 (9th Cir. 1989) (unpublished); *Ellis v. Navarro*, 2013 WL 3580284, at *6; *United States v. Whitted*, 11 F.3d 782, 785 (8th Cir. 1993)).

Finally, Defendants argue Dr. Lynde's understanding that the "law requires some modicum of direct, actual competition to prove causation of price erosion" is correct. *Id.* at 22-25 (citing *Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1377 (Fed. Cir. 2002); *Engineered Products Co. v. Donaldson Co.*, 147 Fed. App'x 979, 990 (Fed. Cir. 2005); *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007)). In particular, Defendants contend, "[t]he law requires a plaintiff to prove that it reduced its prices in response to actual, direct competition – not *fear* or *belief* of competition." *Id.* at 24 (emphasis in original). This point is important, Defendants assert, "because, as Dr. Lynde points out in his report, Wagner considered no evidence that Volterra competed with Defendants' infringing products on *any* of the projects for which Volterra claims price erosion." *Id.* According to Defendants, "Wagner cites only a single instance of actual competition between Volterra and Defendants' accused products, for a never-completed IBM server project being designed by a Taiwanese firm called Wistron. . . Wagner claims over $40 million of price erosion for Volterra Asia's sales to HP . . .even though *he did not identify a single instance of actual competition at HP*." *Id.* at 24 (emphasis in original).

## III. ANALYSIS

### A. Legal Standards

#### 1. Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

United States District Court
Northern District of California

law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

the absence of a genuine issue of material fact with respect to an essential element of the non-

moving party's claim, or a defense on which the non-moving party will bear the burden of

persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

made this showing, the burden then shifts to the party opposing summary judgment to designate

"specific facts showing there is a genuine issue for trial."  *Id.*  "[T]he inquiry involved in a ruling

on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof

that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252

(1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the

non-movant.  *Id.* at 255.

### 2.   Rule 702 and *Daubert*

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

F.R.Evid. 702.  In determining whether expert testimony meets the requirements of Rule 702,

courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the

Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial
> judge must determine . . . whether the expert is proposing to testify
> to (1) scientific knowledge that (2) will assist the trier of fact to
> understand or determine a fact in issue.  This entails a preliminary
> assessment of whether the reasoning or methodology underlying the
> testimony is scientifically valid and of whether that reasoning or
> methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge,"

the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the

25

methods and procedures of science . . . [while] the word 'knowledge' connotes more than

subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to

any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id.* at 590

(quoting Webster's Third New International Dictionary 1252 (1986)).   The Court declined to set

forth a definitive test but offered some "general observations" about the types of factors that might

be considered in determining whether this requirement is met. *Id.* at 593. These include: 1)

whether the methodology can be or has been tested; 2) whether the theory and technique has been

subjected to peer review; 3) if a "particular scientific technique" is involved, the known or

potential rate of error; and 4) the degree of acceptance in the relevant scientific community.

*Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by

"[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the

expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").  However, when such evidence is not

available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how

they went about reaching their conclusions and point[ing] to some objective source – a learned

treatise, the policy statement of a professional association, a published article in a reputable

scientific journal or the like – to show that they have followed the scientific method, as it is

practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact

to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id.* at

591. This is a question of "fit," and "is not always obvious." *Daubert*, 509 U.S. at 591. The

Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for

other, unrelated purposes." *Id.* To meet this requirement there must be "a valid scientific

connection to the pertinent inquiry." *Id.* In other words, the expert testimony must "logically

advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This

requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of

Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.,*

United States District Court
Northern District of California

933 F.Supp. 894, 900 (N.D. Cal., 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Id.* (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

### B.  Defendants' Summary Judgment/*Daubert* Motion

As discussed above, Defendants seek summary judgment as to both the Volterra Asia damages and the Volterra Semiconductor damages.  As to the Volterra Asia damages, the Court does not accept all of Defendants' challenges to Volterra's damages theory.  Ultimately, however, it concludes that the theory upon which Dr. Meyer relies to establish that Volterra Semiconductor was injured as a result of price erosion on the sales that were made by Volterra Asia is inconsistent with the reasoning of the Federal Circuit in *Poly-America* and *Mars*.  Further, because Volterra has not pointed to any other evidence from which a jury could reasonably conclude that Volterra Semiconductor suffered *direct* injury as a result of the alleged price erosion on these sales, Defendants are entitled to summary judgment as to these damages.  On the other hand, the Court rejects Defendants' arguments as to the Volterra Semiconductor damages and finds that Volterra has pointed to sufficient evidence to survive summary judgment as to those damages.

#### 1.  Whether Volterra Semiconductor is Precluded from Recovering Damages Based on Volterra Asia Sales Because Volterra Asia is a Separate Corporate Entity

##### a.  Legal Standards Governing Patent Infringement Damages under § 284 of the Patent Act

Section 284 of the Patent Act provides, in part, as follows:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284. In *Rite-Hite*, the Federal Circuit found that in "mandat[ing] that claimant receive damages 'adequate' to compensate for infringement . . . the language of the statute is expansive

27

rather than limiting." 56 F.3d 1538, 1544 (Fed. Cir.1995). The *Rite-Hite* court further pointed out that § 284 "affirmatively states that damages must be adequate, while providing only a lower limit and no other limitation." *Id.*; *see also General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654-55 (1983) (holding that under § 284, "Congress sought to ensure that the patent owner would in fact receive full compensation for 'any damages' he suffered as a result of the infringement"). Thus, "[d]amages" in § 284 "encompasses an amount necessary to redress any direct injury from infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995). Section 284 does not, however, create a remedy for "every conceivable harm that can be traced to an alleged wrongdoing." *Rite-Hite*, 56 F.3d at 1546. For example, it does not reach "remote consequences, such as a heart attack of the inventor or loss in value of shares of common stock of a patentee corporation caused indirectly by infringement." *Id.*

"Despite the broad damages language of § 284, patentees tend to try to fit their damages cases into the 'lost profits' framework or else fall back on the statutory grant of a reasonable royalty." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1366 (Fed. Cir. 2008). To recover lost profits, "the patentee must show that there is a reasonable probability that 'but for' the infringement it would have made the sales that were made by the infringer." *Rite-Hite*, 56 F.3d at 1545. Thus, while § 284 does not require that a patentee itself make, use, or sell the patented device, *see King Instruments*, 65 F.3d at 949, to obtain an award based on a lost profits theory, "the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales." *Poly-America*, 383 F.3d at 1311. In addition, the lost profits must be reasonably foreseeable: "If a particular injury was or should have been reasonably foreseeable by an infringing competitor in the relevant market, broadly defined, that injury is generally compensable absent a persuasive reason to the contrary." *Rite-Hite*, 56 F.3d at 1546.

In *Poly-America*, the Federal Circuit held that a patentee corporation could not recover damages based on the lost profits of a sister corporation, even if the two corporate entities "share[d] interests as two entities collaborating in the manufacture" of the invention. 383 F.3d at 1311. The court stated, "Poly-America and Poly-Flex may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that

structure – in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee." *Id.* Although Poly-America (the patentee) and Poly-Flex (the licensee) had entered into an agreement whereby Poly-America was purportedly given the right to collect all damages for past infringement accruing to Poly-Flex, the Federal Circuit found that this private arrangement did not permit Poly-America to seek the lost profits of Poly-Flex. *Id.* at 1311-1312. The court reasoned that Poly-Flex, as a non-exclusive licensee, held only a "bare license" to the patent and therefore did not have standing, under *Rite-Hite*, to sue for infringement of the patent to obtain its own lost profits. *Id.* Thus, the agreement between the parties could not "create lost profits for a patentee if there are none." *Id.* at 1311. The court further noted that "[a]warding lost profits to Poly-America on the basis of its private arrangement with Poly-Flex would synthetically create lost profits for Poly-America, when it may not have suffered any, to the detriment of [the infringer]." *Id.* at 1311-1312.

In *Mars*, the Federal Circuit revisited the implications of corporate structure as to the availability of patent damages based on lost profits. 527 F.3d 1359 (Fed. Cir. 2008). In that case, the parent company and patentee, Mars, sought to recover damages for patent infringement based on the lost sales of its wholly owned subsidiary, MEI. *Id.* at 1365. Although the district court had held, based on *Poly-America*, that Mars could not recover MEI's lost profits, Mars argued on appeal that the facts were distinguishable because it was seeking lost profits of a wholly owned subsidiary and the "consolidated financial statements prove[d] that 'all MEI's lost profits were inherently lost profits of Mars.'" *Id.* (quoting Mars brief).

The Federal Circuit, noting that "the correct measure of damages is a highly case-specific and fact-specific analysis," found that Mars could not recover MEI's lost profits based on the evidence presented in the district court. *Id.* at 1366-1367. It pointed to the uncontradicted testimony of Mars's Corporate Tax Director that MEI and Mars had a "traditional royalty-bearing license agreement" and to the fact that "Mars identified no record evidence that it ever received or recognized any form of profit or revenue from MEI apart from these royalty payments." *Id.* at 1367. The court therefore concluded that the evidence did not support Mars's assertion that it "inherently" lost profits when MEI lost profits. *Id.* The court left open the possibility that it

1    would have reached a different result if the evidence had showed that the wholly-owned

2    subsidiary's profits flowed "inexorably" up to the parent.  *Id.*  It also made clear that it was not

3    deciding whether "Mars would have been entitled to recover under any other damages theory for

4    the economic injury that it suffered as a result of MEI's lost sales." *Id.* at 1366.  Finally, it noted

5    that "[w]e have previously recognized that patentees may be entitled to damages above a

6    reasonable royalty on theories entirely distinct from lost profits." *Id.* (citing *Minco, Inc. v.*

7    *Combustion Engineering, Inc.*, 95 F.3d 1109, 1120 (Fed. Cir. 1996)).

### b. Legal Standards Governing Shareholder Standing

9         "A basic tenet of American corporate law is that the corporation and its shareholders are

10   distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).  As a general rule, a

11   shareholder does not have standing to redress an injury to a corporation but rather, "must be

12   injured directly and independently of the corporation" to have standing.  *Shell Petroleum, N.V. v.*

13   *Graves*, 709 F.2d 593, 594 (9th Cir. 1983).  This rule derives from the doctrine of prudential

14   standing rather than constitutional standing based on Article III of the U.S. Constitution.  *Id.*  In

15   *Warth v. Seldin*, the Supreme Court explained that the doctrine of prudential standing is based on

16   the recognition that even where a plaintiff has alleged sufficient facts to establish a "Case" or

17   "Controversy" under Article III, the plaintiff must also, as a matter of "judicial self-governance,"

18   "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or

19   interests of third parties." 422 U.S. 490, 500 (1975).  The purpose of the prudential standing

20   doctrine is to ensure that courts are not "called upon to decide abstract questions of wide public

21   significance even though other governmental institutions may be more competent to address the

22   questions and even though judicial intervention may be unnecessary to protect individual rights."

23   *Id.*

24         The Court in *Warth v. Seldin* explained that the existence of prudential standing "turns on

25   the nature and source of the claim asserted." *Id.*  The critical inquiry "is whether the constitutional

26   or statutory provision on which the claim rests properly can be understood as granting persons in

27   the plaintiff's position a right to judicial relief." *Id.*  The Court further noted that "Congress may

28   grant an express right of action to persons who otherwise would be barred by prudential standing

United States District Court
Northern District of California

rules." *Id.* at 501.

### c. Discussion

Defendants ask the Court to grant summary judgment as to the Volterra Asia damages under the doctrine of shareholder standing and the Federal Circuit's decisions in *Poly-America* and *Mars*. While it is not clear that the shareholder standing cases require this result, the Court finds that the holdings and reasoning of *Poly-America* and *Mars* preclude Volterra from seeking the Volterra Asia damages based on the theory advanced by its expert, Dr. Meyer.

To determine whether Volterra Semiconductor has standing to seek the Volterra Asia damages, the Court must look to the Patent Act itself. *See WiAV Solutions LLC v. Motorola, Inc.,* 631 F.3d 1257, 1264 (Fed. Cir. 2010) ("Because the Patent Act creates the legally protected interests in dispute, the right to assert infringement of those interests comes from the Act itself"). As discussed above, the Supreme Court and the Federal Circuit have construed § 284 of the Patent Act broadly. *See General Motors,* 461 U.S. at 654-65; *Rite-Hite,* 56 F.3d at 1544. Nonetheless, damages are available only for "direct" injury. *King Instruments,* 65 F.3d at 949. Further, under *Mars* and *Poly-America,* a separate corporate entity's loss of profits due to price erosion does not constitute a direct injury to the parent because a patent holder may not "enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure." *Poly-America,* 383 F.3d at 1311. Yet that is just what Volterra seeks to do in relying on Dr. Meyer's expert opinions in this case. Dr. Meyer's opinion is that the direct injury to Volterra Semiconductor is, dollar-for-dollar, the decrease in the amount of cash held by its "assets" as a result of price erosion on the subsidiaries' sales. This "injury" is indistinguishable from a claim for the lost profits of a subsidiary.

Further, the Court is not persuaded by Volterra's assertion that *Mars* does not apply here because it is seeking damages on a theory "entirely distinct from lost profits."[5] The Federal

---

[5] The Court need not address whether the Volterra Asia damages are available on the basis that the losses of Volterra Semiconductor's subsidiaries would have flowed "inexorably up to the parent." *Mars,* 527 F.3d at 1367. Volterra does not seek damages on this theory and has not attempted to make any factual showing that this potential exception in *Mars* applies.

31

1   Circuit in *Mars* cited *Minco* as an example of what might constitute such a "distinct" theory,

2   describing *Minco* as "recognizing that the patentee might have been entitled to damages as a result

3   of overpaying for the infringer's business, if it had proven that the infringing products were an

4   important factor in the sale." 527 F.3d at 1366.  In *Minco*, the asserted patent covered a rotary

5   furnace for fusing minerals. 95 F.3d at 1112.  The defendant was a competitor of the patentee and

6   used a kiln that infringed the plaintiff's patent. 95 F.3d at 1114-1115.  The patentee  sought lost

7   profits damages on a variety of theories, including a theory that when the infringer sold its

8   business to a third party, it received a higher selling price because of the kilns; under this theory,

9   the patentee asserted that the third party would have purchased its business rather than the

10   defendant's business but for the infringement.  *Id.*  However, the trial court found, as a factual

11   matter, that the defendant's use of the kilns was not an important factor in the sale of the

12   infringer's business and therefore, that the patentee was not entitled to these damages. *Id.* at 1120.

13   The Federal Circuit affirmed the district court's holding.  *Id.* ("While in theory Minco might have

14   been entitled to some recovery from CE's sale of its business because it included the infringing

15   kilns, the district court specifically determined that Minco did not show that the infringing kilns

16   were an important factor in the sale").

17        Unlike *Minco*, the loss here is a disguised effort to recover the lost profits of the

18   subsidiary.  Volterra seeks to prove that its subsidiary lost profits through price erosion, and, as a

19   result, the parent lost the exact same amount of money (adjusting only for taxes and royalties) –

20   now called loss of value of the subsidiary.  Although Volterra's expert says that she is just valuing

21   the assets of the subsidiaries, the fact that the asset value is not only tied to lost profits but is

22   exactly equal to lost profits requires the conclusion that Plaintiff's theory is not entirely distinct

23   from a lost profits theory.  To hold otherwise would eliminate the rule announce in *Mars* because a

24   parent corporation could always recover the lost profits of its wholly owned subsidiary simply by

25   characterizing them as the lost value of its asset.  Indeed, the parent corporation in *Mars*

26   presumably could have obtained an award of its subsidiary's lost profits by simply renaming the

27   loss.

28        The Federal Circuit's reliance on *Minco* in the *Mars* decision also indicates that profits

United States District Court
Northern District of California

1    obtained by a separate entity are available only where there is a *factual* basis for such an award,

2    even where the patentee's damages theory is completely independent of a lost profits theory.

3    While Dr. Meyer has offered hypotheticals about the potential impact of Defendants'

4    infringement, however, such as the possibility that Volterra would have received a lower price if it

5    had attempted to sell one of its subsidiaries, she has provided no factual basis to support these

6    hypotheticals. Rather, she opines that it is irrelevant to her theory whether the scenarios she offers

7    ever occurred or even, whether they were likely to have occurred.[6]   As discussed above, were the

8    Court to find that such hypotheticals are sufficient to establish an independent basis for a parent to

9    recover the lost profits of its subsidiaries it would be creating an exception that would essentially

10   swallow the rule announced in *Poly-America* and *Mars*. Every parent of a wholly owned

11   subsidiary, including the parent in *Mars*, could obtain the lost profits of the subsidiary simply by

12   claiming it fully controlled  the subsidiary and that dividends *could* have passed the lost profits

13   upstream had the parent decided dividends should be declared by the subsidiary or that a

14   hypothetical buyer *might* have paid less for a subsidiary had the parent chosen to sell it.

15         Further, such a holding would also fly in the face of the well-established rule that damages

16   may not be awarded on the basis of harm that is entirely speculative. Not only did Dr. Meyer fail

17   to address whether the hypothetical scenarios were likely to have occurred; there is evidence in the

18   record that it would have been *unlikely* for any of these scenarios to have occurred. *See* Wille

19   Motion Decl., Ex. T (Plaintiff's Response to Defendants' Request for Admissions, Nos. 29, 60)

20   ("Volterra admits that Volterra International has not declared a dividend during the time period

21   from January 1, 2008 through the present"; Volterra admits that it  has "never attempted to

22   market, advertise, or otherwise sell its shares of Volterra International"); *id.*, Ex. F (Burns Dep.) at

23   48:16-25, 72:23-73:1, 185: 18-22 (testimony of Volterra International director that he did not

24   recall Volterra International ever paying a dividend to Volterra Semiconductor and that he was not

---

[6] At oral argument, Volterra informed the Court that in recent weeks there has been a tender offer to Volterra Semiconductor by a third party to buy Volterra Semiconductor and its subsidiaries. As a matter of case management and fairness, and in light of the delay of almost a year that resulted from Volterra's previous request to amend its expert reports (which the Court granted), the Court will not permit Volterra to amend its expert reports yet again based on these recent events.

United States District Court
Northern District of California

1   aware of Volterra Semiconductor ever attempting to sell its shares of Volterra International); *id*,

2   Ex. S (Volterra Semiconductor 2012 Form 10-K filed with the Securities and Exchange

3   Commission, p. 33, 52) (stating that "[a]s of December 31, 2012, the cash and short-term

4   investments held by our foreign subsidiaries was approximately $72.1 million," that "[i]f these

5   funds were repatriated to the U.S., under current tax law we could be required to accrue and pay

6   U.S. taxes on a portion of these funds," and that "[o]ur current plan is to permanently reinvest

7   these funds outside the U.S."). As discussed above, nothing in *Mars* suggests that the Federal

8   Circuit intended to relax the requirements for establishing causation of patent damages and indeed,

9   its reliance on *Minco* suggests the opposite.

10         The Court concludes that Volterra's theory as to the Volterra Asia damages, as reflected in

11   the expert opinions offered by Dr. Meyer, is not "entirely distinct from lost profits" and is barred

12   by *Poly-America* and *Mars*. The Court further finds that Volterra has not demonstrated a material

13   issue of fact on this question because the expert opinions of Dr. Meyer are the only evidence it

14   cited in response to Defendants' request for summary judgment to show that Volterra

15   Semiconductor was *directly* harmed by price erosion on the Volterra Asia sales.[7]

16         **2.    Whether Volterra Semiconductor is Precluded from Recovering Damages
             Based on Volterra Asia Sales because the Infringing Acts or Sales Occurred**

17         **Outside of the United States**

18         **a.   Infringing Acts Outside of the United States**

19         Defendants asks the Court to hold, as a matter of law, that Volterra cannot obtain price

20   erosion damages on the sales by Volterra Asia because there is no evidence that acts of

21   infringement in the United States that constituted "direct competition" caused the alleged price

22   erosion. The Court concludes Defendants' position is based on an incorrect reading of the

23   applicable case law.

24         There is no dispute that "infringement," under § 271 of the Patent Act, must occur within

25   _____

26   [7] At oral argument, Volterra argued, for the first time, that the Court should deny summary
     judgment on this issue because *other* evidence in the record shows that Volterra Semiconductor

27   was directly injured as a result of price erosion on Volterra Asia sales. Volterra's argument is
     untimely, however, given that Defendants expressly requested entry of summary judgment on this

28   ground and Volterra did not make this argument in its opposition brief or point to any evidence
     other than Dr. Meyer's opinions to demonstrate the existence of a material dispute of fact.

34

United States District Court
Northern District of California

the United States. *See* Volterra Opposition at 13. Further, Defendants have stipulated that they have committed acts of infringement in the United States. *See* Docket Nos. 895, 1176. Thus, the question on this issue is simply one of causation. As discussed above, to recover lost profits, "the patentee must show that there is a reasonable probability that 'but for' the infringement it would have made the sales that were made by the infringer." *Rite-Hite*, 56 F.3d at 1545. Volterra's theory of causation is *not* that Defendants' sale of infringing products that directly competed with Volterra's drove down the price, though that might be a viable price erosion theory if the facts supported it. Rather, Volterra's theory is that Defendants forced Volterra to lower its prices through their efforts, in the United States, to obtain design wins with IBM and HP for their infringing products. These efforts, according to Volterra, included testing of the infringing products at Defendants' facilities in the United States and meeting with representatives of IBM and HP at numerous locations in the United States to demonstrate the advantages of their voltage regulator solutions, both in terms of performance and cost.

Further, Volterra has pointed to evidence in support of its opposition to Defendants' Motion demonstrating that there is at least a question of fact as to whether Volterra's prices, including the prices charged by Volterra Asia, were lowered in response to these infringing activities in the United States. *See* Numann Opp. Decl., ¶¶ 5-6, Morando Opp. Decl., ¶ 73; *see also Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1579-80 (Fed. Cir. 1990) (holding that even where the infringer had not yet begun to actually sell the infringing product, "losses incurred upon announcement by [the infringer] of the infringing activity may be included [in lost profits damages], when the losses are found to be reasonably related to the infringing activity"). The Court's conclusion finds further support in the fact that Defendants were the only potential supplier, other than Volterra, of the invention. *See Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("Where, as here, the patent owner and the infringer were the only suppliers of the product, causation may be inferred").

Defendants mischaracterize the law in asserting, based on *Wechsler* and *Vulcan*, that damages based on price erosion are not available unless the patentee can show "direct competition." In *Vulcan*, both the patentee and the infringer had submitted competing bids to

supply General Motors with the invention and the infringer, who offered a lower price, was selected as the supplier. 278 F.3d at 1376-1377. The district court awarded the patentee lost profits but calculated the amount based on the lower price offered by the infringer, reasoning that the patentee was not entitled to an award based on its own higher price bid because the patentee was unaware that the competitor's bid was for an infringing product. *Id.* at 1377. On appeal, the patentee asserted it should have been awarded lost profits damages that accounted for the price erosion even though it had not been aware that the competing bid was for an infringing product. *Id.* The Federal Circuit agreed, with the caveat that the patentee was required to "establish the amount of price reduction, and that the price was reduced in response to the competing bid." *Id.* Nothing in the Federal Circuit's decision purported to establish a broad rule that causation of lost profits can only be established by showing "direct competition." Rather, the Federal Circuit's holding in *Vulcan* was based on the specific theory of damages and the factual record of that case.

Similarly, the *Wechsler* decision also does not establish a requirement that a patentee must prove lost profits resulted from "direct competition." There, the patentee did not begin selling its product until four months after the infringer stopped selling the infringing product. 486 F.3d at 1293-1294. Nonetheless, the court recognized that the patentee might be entitled to lost profits damages if it could show that the earlier sales by the infringer had preempted subsequent sales or eroded the prices for the invention. *Id.* at 1294. The patentee could not do so, presenting "little more than conclusory evidence on these theories." *Id.* Accordingly, the court found that "nothing in the record links the price difference to [the infringer's] earlier presence in the market." *Id.* Again, the Federal Circuit's holding is merely an application of the general rules of causation in lost profits cases to the specific factual record of the case.

The Court finds that Volterra has offered sufficient evidence to demonstrate a fact question as to whether Defendants' infringing acts in the United States caused price erosion on the Volterra Asia sales.

**b. Lost Profits Based on Sales Outside of the United States**

Relying upon the Federal Circuit's decision in *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.* ("*Power Integrations*"), 711 F.3d 1348 (Fed. Cir. 2013),

Defendants contend Volterra is precluded from recovering the Volterra Asia damages because they are based on "worldwide sales." Although a close call, the Court concludes Defendants' reading of *Power Integrations* is overly broad and does not apply to the facts here.

In *Power Integrations*, the Federal Circuit addressed whether the patentee could receive an award of lost profits based on foreign sales of the infringing product by the defendant. 711 F.3d at 1370. Although the Federal Circuit's decision refers generally to "lost foreign sales," the opening brief filed by Power Integrations makes clear that it was seeking lost profits based on both lost sales and price erosion resulting from the defendant's foreign sales of the infringing product at prices significantly lower than those of the patentee to third parties who had been customers of the patentee. *See* 2011 WL 2827447, at * 40-41 (Plaintiff's Opening Brief). In the trial court, the jury had awarded over $33 million in damages but the court had vacated the award, concluding that it was not supported by law because $30 million of the expert's proposed damages "was not 'rooted in Fairchild's activity in the United States.'" 711 F.3d at 1372. On appeal, Power Integrations asked the Federal Circuit to reinstate the jury's award, invoking "established law that once a patentee demonstrates an underlying act of domestic infringement, the patentee is entitled to receive full compensation for 'any damages' suffered as a result of the infringement." *Id.* (citing *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654–55 (1983)). It further asserted that it should be awarded lost profits under *Rite-Hite* based on foreign sales because it was reasonably foreseeable to the infringer that those foreign sales would harm the patentee. *Id.*

The Federal Circuit rejected Power Integrations' arguments, reasoning that it is "axiomatic that U.S. Patent law does not operate extraterritorially to prohibit infringement abroad." *Id.* at 1371 (citations omitted). The court stated:

> Our patent laws allow specifically "damages adequate to compensate for the infringement." 35 U.S.C. § 284 (emphasis added). They do not thereby provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all. . . .
>
> Power Integrations' "foreseeability" theory of worldwide damages sets the presumption against extraterritoriality in interesting juxtaposition with the principle of full compensation. Nevertheless, Power Integrations' argument is not novel, and in the end, it is not

1   persuasive. Regardless of how the argument is framed under the
2   facts of this case, the underlying question here remains whether
    Power Integrations is entitled to compensatory damages for injury
    caused by infringing activity that occurred outside the territory of
3   the United States. The answer is no.

4   *Id.*

5   The court went on to reject Power Integrations' assertion that "it may recover damages for

6   Fairchild's worldwide sales of the patented invention because those foreign sales were the direct,

7   foreseeable result of Fairchild's domestic infringement." *Id.* The Federal Circuit noted that Power

8   Integrations had pointed to no case law "that supports an award of damages for sales

9   consummated in foreign markets, regardless of any connection to infringing activity in the United

10  States." *Id.* "To the contrary, the entirely extraterritorial production, use, or sale of an invention

11  patented in the United States is an independent, intervening act that, under almost all

12  circumstances, cuts off the chain of causation initiated by an act of domestic infringement." *Id.*

13  (citing *Morrison v. Nat'l Australia Bank Ltd.*, ——U.S. ——, 130 S.Ct. 2869, 2884, 177 L.Ed.2d

14  535 (2010)). Finally, the Federal Circuit agreed with the district court that the estimate of the

15  patentee's damages expert was flawed, noting that "he did not quantify an amount of damages

16  based on any offer for sale by Fairchild in the United States." *Id.* (citing *F. Hoffman-La Roche*

17  *Ltd. v. Empagran S.A.*, 542 U.S. 155, 166 (2004)).

18  While the language of *Power Integrations* is broad, the court made clear that its holding

19  was based on the specific facts of that case. *Id.* at 1372 ("Regardless how the argument is framed

20  *under the facts of this case . . .*"). Of particular significance was the fact that the lost sales

21  damages that Power Integrations was seeking were based on actual foreign sales made by the

22  infringer, Fairchild. *Id.* Because Power Integrations did not establish that the foreign sales were

23  the direct result of infringing activity in the United States – and its expert did not "quantify an

24  amount of damages based on any offer for sale by Fairchild in the United States" – the court

25  found that an award of damages based on these foreign sales by Fairchild would amount to an

26  award of damages for infringement outside of the United States, which would run afoul of the

27  established rule that  the Patent Law does not extend to extraterritorial conduct. *Id.*

28  Here, Volterra's price erosion theory is based entirely upon conduct by the Defendant that

United States District Court
Northern District of California

United States District Court
Northern District of California

it contends forced it to lower its prices on its *own* products sold outside of the United States. It is undisputed that Volterra is not seeking lost profits based on any sales made by *Defendants* outside of the United States (although, according to Volterra, there may have been some). *See* Opposition at 17 n. 21 (citing docket no. 1924). Consequently, an award of damages based on the Volterra Asia sales would not constitute an award of damages based on infringing activity outside of the United States. Further, all of the damages sought on the basis of price erosion as to Volterra Asia sales are on sales of the invention that were made on the IBM and HP projects that were the subject of Defendants' infringement in the United States. As Volterra notes, not only were Defendants' efforts to sell the infringing products to HP and IBM conducted in the United States, but its own decision to lower prices on those projects in response (at least according to Volterra's theory) also occurred in the United States. Thus, the Court concludes that under the facts of this case, the damages Volterra seeks on the Volterra Asia lost profits are the result of infringing activity in the United States, not outside of the United States, and that the holding of *Power Integrations* does not apply.

### 3. Whether Volterra Semiconductor is Precluded from Recovering Damages Based on its own Sales Because it has Provided no Evidence of its actual Costs

Defendants challenge Volterra Semiconductor's claim for damages based on its own sales on the basis that Volterra has offered no evidence of its actual costs, that is, the amount it paid Volterra Asia for the relevant products, which was variable. *See* Motion at 15 (citing Wille Motion Decl., Ex. O (Andrews Dep.) at 62:11-78:6, 113:21-119:5). According to Defendants, lost profits are the difference between the profits a patentee *could* have made but for the infringement and the profits it *actually* made; because actual and "but for" profits are determined by subtracting actual costs from the selling price, Defendants assert, Volterra cannot prove either actual or but-for profits and therefore cannot establish its lost profits. Defendants' argument is frivolous.

The lost profits due to price erosion can be measured by comparing a patentee's actual profits with the profits that could have been obtained but for the infringement. *See Rite-Hite*, 56 F.3d at 1545; *Pentech Intern., Inc. v. Hayduchok*, 931 F.Supp. 1167, 1172-1173 (S.D.N.Y., 1996). While this amount can be calculated by subtracting actual profits from but-for profits – which

39

United States District Court
Northern District of California

1   would require knowledge of both the cost to Volterra of the product at issue and the selling price,

2   (in the actual and the hypothetical but-for scenarios), it can also be calculated by subtracting the

3   actual *price* from the but-for price, assuming that the underlying cost of the product to Volterra

4   Semiconductor is the same in the actual scenario as it is in the but-for scenario.  As a matter of

5   basic math, if the cost to Volterra is the same in both scenarios, even though variable over time,

6   the actual cost simply drops out of the calculation, giving rise to the same result either way.

7   Moreover, Defendants point to no evidence that the payments by Volterra Semiconductor to

8   Volterra Asia in the but-for-scenario would have been any different from the actual payments that

9   were made. Therefore, Defendants' argument has no merit.

### 4.   Whether Mr. Wagner's Opinions on Price Erosion Are Admissible

11        Defendants challenge Mr. Wagner's opinions relating to the price erosion that allegedly

12   resulted from Defendants' infringement on the grounds that he: 1) failed to consider other market

13   factors that account for Volterra's price reductions; 2) inflated the amount of price erosion

14   damages by "cherry-picking" data;  and 3) failed to conduct the required elasticity analysis.  The

15   Court concludes that all of Defendants' challenges go to the weight of Mr. Wagner's opinions and

16   not their admissibility.

17        First, Mr. Wagner's opinions are based on his reconstruction of a hypothetical market that

18   would have existed but for the infringement.   He has addressed the prices and sales that would

19   have been made in this hypothetical market, focusing on specific IBM and HP server projects, and

20   calculated the additional revenue that would have been obtained. See Wille Motion Decl., Ex. B

21   (Wagner Report), ¶¶ 281–92, 307–99, Schedules 4.1–7.8 and 9.1–10.4.  Further, he states that in

22   reconstructing this hypothetical market, he has considered "all the factors that could reasonably be

23   expected to have influenced the pricing for Volterra's products, including general and economic

24   and market factors and the nature of competition from discrete manufacturers.  *Id.* ¶ 110;  *see also*

25   Wagner Decl., Ex. 2 (Wagner Reply Report), ¶¶ 94–98, 28–35, and 75–76.   While Mr. Wagner

26   reached different conclusions than Defendants' expert, that is not a basis for exclusion under Rule

27   702. *See Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) (Noting that

28   "[w]hen. . . the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to

United States District Court
Northern District of California

1   evaluate the correctness of facts underlying one expert's testimony" and pointing to the Advisory

2   Committee note to Rule 702 stating that "emphasis in the amendment on 'sufficient facts or data'

3   is not intended to authorize a trial court to exclude an expert's testimony on the ground that the

4   court believes one version of the facts and not the other").

5          Second, while Defendants object to Mr. Wagner's selection of certain data in connection

6   with his opinions regarding price attrition in his hypothetical market, the essence of their argument

7   is that they disagree with Mr. Wagner's underlying reading of the facts.   This is properly the

8   subject of cross-examination rather than exclusion.

9          Third, Mr. Wagner has conducted an analysis of the elasticity of demand, as required under

10  *Crystal Semiconductor*. *See* Wille Motion Decl., Ex. B (Wagner Report),  ¶¶ 328–33.  Again,

11  Defendants' challenge goes to the weight of Mr. Wagner's opinions, not their admissibility.

12         The Court rejects Defendants' challenges to the expert opinions offered by Mr. Wagner.

### 5.    Whether Dr. Meyer's Opinions on Direct Harm Suffered by Volterra Semiconductor are Admissible

15         Defendants challenge the opinions offered by Dr. Meyer under *Daubert* on the grounds

16  that: 1)  her report is based on the "wholesale adoption" of Mr. Wagner's opinions; 2)  her legal

17  conclusion that Volterra Semiconductor was directly harmed by price erosion on the Volterra Asia

18  sales is not justified and she is not qualified as an expert to offer such a legal opinion; and 3) her

19  valuation of the alleged economic harm suffered by Volterra Semiconductor is not based on

20  widely accepted economic principles.

21         The Court rejects Defendants' first challenge. It is not improper for Dr. Meyer to assume

22  that the findings of Mr. Wagner are true for the purposes of her analysis.  Dr. Meyer was retained

23  to address a separate question that does not depend on the *amount* of the price erosion and was not

24  required to duplicate Dr. Wagner's analysis. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 2008

25  WL 73689, at * 11 (N.D. Cal., Jan. 5, 2008) (overruling an objection to an expert's report based

26  on the expert's failure to independently analyze an issue in the case where the expert had relied on

27  the opinions of another expert, and holding that the expert could properly rely on the opinion of

28  another expert under Rule 703 of the Federal Rules of Evidence).

United States District Court
Northern District of California

The Court agrees with Defendants' second challenge. As discussed above, Dr. Meyer's opinions are based on a legal theory that is inconsistent with the Federal Circuit's decisions in *Poly-America* and *Mars*.

Finally, the Court agrees with Defendants that Dr. Meyer has not demonstrated that her approach to valuation is based on accepted economic principles. Although Volterra argues that her approach to valuation is simple and accepted because "cash is cash," Dr. Meyer has failed to cite to scientific principles that establish that it is appropriate to value the parent's harm on a dollar-for-dollar basis, that is, to conclude that each dollar lost to the off-shore subsidiaries translates to a full dollar of harm to the parent.[8]  To illustrate the shortcomings in this approach, Defendants point to evidence that there likely would have been adverse tax consequences to repatriating the cash held by the subsidiaries.  See Defendants' Summary Judgment/*Daubert* Motion at 25 n. 97 (citing Wille Motion Decl., Ex. Q (Reams Dep.) at 33:12-35:3).  Dr. Meyer, however, appears to have simply assumed that the amount of the lost cash held by the subsidiaries is the same as the direct harm suffered by Volterra Semiconductor.  The Court finds that her approach does not meet the requirement under *Daubert* that an expert's opinions must be based on an accepted methodology.

### 6.    Conclusion

The Court GRANTS Defendants Summary Judgment/*Daubert* Motion as to the Volterra Asia damages because: 1) the opinions expressed by Dr. Meyer are based on a theory of damages that is barred under applicable Federal Circuit case law; and 2) Dr. Meyer's expert opinions do not satisfy the requirements of Rule 702 and *Daubert*.  The Court DENIES Defendants' Summary Judgment/*Daubert* Motion as to the Volterra Semiconductor damages.  The Court also overrules Defendants' objections to Mr. Wagner's opinions under Rule 702 and *Daubert*.

---

[8] The fact that Dr. Meyer took into account the amounts that Volterra's subsidiaries would have paid in taxes and royalties to determine the amount by which the cash value of the subsidiaries was reduced as a result of the infringement does not change the Court's analysis.  The shortcoming in Dr. Meyer's methodology is not the manner in which she calculated the reduction in the cash value of the subsidiaries but rather, her failure to show that she applied an acceptable methodology in concluding that the magnitude of that reduction was the same as the consequent reduction in value of Volterra Semiconductor.

42

United States District Court
Northern District of California

## C. Plaintiff's *Daubert* Motion

Plaintiff's challenges to Dr. Lynde's opinions fall into two broad categories: 1) challenges relating to opinions that contradict the testimony of Volterra's witnesses, mainly on the question of why Volterra lowered its prices on certain products; and 2) challenges relating to opinions that are based on Dr. Lynde's understanding that a plaintiff must demonstrate price erosion occurred as a result of "direct competition." As to the latter category, the Court has already concluded that there is no such requirement, as discussed above, and therefore, Plaintiff's *Daubert* Motion is GRANTED to the extent that Dr. Lynde may not testify as to such a requirement or offer opinions that are likely to suggest to the jury that the law imposes such a requirement. As to the objections in the former category of challenges, the Court finds that the majority go to the weight of Dr. Lynde's opinions and not their admissibility but sustains certain objections, as set forth below.

First, the Court rejects Volterra's assertion that Dr. Lynde's opinions are inadmissible because he did not reconstruct the market to show hypothetically the profits the patentee would have made but for the infringement, as is required under *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001). Dr. Lynde, like Mr. Wagner, considered a wide variety of factors, including macroeconomic factors, in arriving at his opinions about Volterra's pricing and the profits that would have been made absent infringement. The fact that Dr. Lynde reached different conclusions than Mr. Wagner is not a basis for exclusion but rather, should be the subject of cross-examination.

Second, the Court is not persuaded that Dr. Lynde has impermissibly opined about the "motivations" of Volterra in offering opinions about what caused Volterra to take certain actions. To determine whether price erosion damages are available, an expert is required to address the factors that led the patentee to act as it did. *See Ericsson, Inc. v. Harris Corp.*, 2001 WL 3613193, at * 7 (E.D. Tex., Mar. 13, 2001) (finding that expert who opined as to price erosion damages did not satisfy requirements of *Daubert* based, in part, on the fact that the expert had not "in his analysis, sufficiently taken into consideration all of the many other factors that could cause a manufacturer of a product to lower prices"). While Volterra is correct that an expert cannot opine about the subjective intent of a corporation or individual, *see, e.g., Therasense, Inc. v. Becton,*

43

United States District Court
Northern District of California

1    *Dickinson & Co.*, 2008 WL 2037732, at *5 (N.D. Cal. May 12, 2008), that rule should not be read

2    so broadly as to prohibit an expert from opining as to causation. Therefore, the Court concludes

3    that Dr. Lynde's opinions about causation should not be excluded under Rule 702 and *Daubert*.[9]

4         The Court also rejects Volterra's challenge based on Dr. Lynde's "subjective interpretation"

5    of Volterra documents and deposition testimony in support of his opinions. Experts generally base

6    their opinions, in part, on review of the relevant documents and testimony in a case and courts

7    generally find that this is an appropriate basis for expert opinion. *See, e.g., Playtex Prods., Inc. v.*

8    *Proctor & Gamble Co.*, 126 Fed. App'x 32, 35 (2d Cir. 2005) (finding Dr. Lynde's expert opinion

9    on lost profits to be admissible where he had relied on "party declarations and deposition

10   testimony, as well as documents from both parties"). Further, while Volterra suggests Dr. Lynde

11   did not perform an extensive review and that he reviewed only documents selected by counsel, it

12   does not make a persuasive showing on this point in light of Dr. Lynde's deposition testimony

13   describing the documents to which he had access and how he conducted his review. *See* Morando

14   Motion Decl., Ex. 2 (Lynde Dep.) at 10-11, 276-277. Thus, Dr. Lynde may rely on Volterra's

15   documents, including the Product Vision Statements.

16        The Court also is not persuaded that Dr. Lynde should not be permitted to testify that the

17   global recession may have affected Volterra's pricing. As discussed above, to determine whether

18   a patentee is entitled to damages based on price erosion, macroeconomic factors must be

19   considered. Given that Dr. Lynde offers his opinion as a criticism of Mr. Wagner's opinions, Dr.

20   Lynde is not required to quantify the impact the recession may have had on Volterra's pricing.

21   Again, to the extent the experts disagree as to whether the global recession affected Volterra's

22   pricing, this question can be addressed through cross-examination at trial.

23        Turning to Volterra's objection that Dr. Lynde's expert report contains impermissible

24   opinions about the credibility of Volterra's witness, the Court finds this objection has some

25

26   ─────────────────────
     [9] Defendants are cautioned, however, that Dr. Lynde must be mindful when offering testimony at
27   trial of the line between causation and subjective intent, which is not always easy to draw.
     *Therasense* illustrates this point. There, the court found that an expert could not opine that a
28   particular device was "designed to infringe" the patent but could testify that the device was
     "specifically adapted for use" in an infringing manner. *Id.*

                                            44

weight. *See, e.g.*, Morando Motion Decl., Ex. 1 (Lynde Report), ¶¶ 237 ("Given this, it is not credible to believe his more recent inconsistent statement that Volterra set its pricing in response to [the competitive threat from the infringing products]"), ¶ 249 ("Given all this, Mr. Teuscher's current testimony lacks documentary corroboration . . . ."), ¶ 315 ("Teuscher's declaration suggests a different course of events than I have observed in my review of the contemporaneously-created record of Volterra emails, memos, and presentations"). It is well-established that an expert may not invade the province of the jury by testifying about the credibility of witnesses. *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1373 (N.D. Cal. 1995) ("[c]redibility determinations and weighing of the evidence are solely jury functions"), *aff'd sub nom Eisenstadt v. Allen*, 113 F.3d 1240 (9th Cir. 1997). Therefore, Volterra's objection on this ground is sustained. [10]

Finally, while Dr. Lynde may testify about what is contained in relevant contemporaneous documents, or even as to the absence of contemporaneous documents on a particular subject matter, he will not be permitted to testify as to what type of documents one would *expect* to find under the circumstances. Dr. Lynde's reports do not reflect any expertise in this area.

## IV.   CONCLUSION

Defendants' Summary Judgment/*Daubert* Motion is GRANTED in part and DENIED in part. Plaintiff's *Daubert* Motion is GRANTED in part and DENIED in part. A Case

---

[10] The Court notes, however, that "an expert is not foreclosed from offering an opinion based on a set of facts assumed to be credible—provided the opinion is based on the expert's 'knowledge, skill, experience, training, or education.'" *Ellis v. Navarro*, 2012 WL 3580284, at *6 (N.D.Cal., Aug. 17, 2012) (citing Fed.R.Evid. 702; *United States v. Romo*, 413 F.3d 1044, 1049 (9th Cir.2005)). Further, it certainly is *not* the law that any opinion by Dr. Lynde that contradicts the testimony of Volterra's witness is impermissible because it may lead the *jury* to conclude the witness is not credible. Thus, the Court sustains Volterra's objection only to the extent that Dr. Lynde will not be permitted on direct examination to express opinions that directly state or strongly imply that Volterra's witnesses are not credible. On cross-examination, however, he may explain why he reached conclusions that are inconsistent with the testimony of Volterra's witnesses if Volterra opens the door to such testimony.

Management Conference shall be held on Friday, September 27, 2013 at 1:30 p.m.  The parties are requested to submit a joint case management statement by September 26, 2013.

      **IT IS SO ORDERED**.

Dated:  September 24, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

46